Peter C. Harvey, Esq.
Geoffrey Potter, Esq.
Aron Fischer, Esq.
Joseph R. Richie, Esq.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Tel: (212) 336-2000

*Attorneys for Plaintiffs*
*LifeScan, Inc. and*
*Johnson & Johnson Health Care Systems, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LIFESCAN, INC. and JOHNSON & JOHNSON HEALTH CARE SYSTEMS, INC.,<br>                              Plaintiffs,<br><br>            v.<br><br>JEFFREY C. SMITH, GEOFFREY S. SWINDLE, STEVEN L. HADLOCK & SAHILY PAOLINE,<br>                              Defendants. | Civil Action No. _____<br><br>**COMPLAINT**<br>**JURY DEMAND** |

Plaintiffs LifeScan, Inc. and Johnson & Johnson Health Care Systems, Inc., for

their Complaint against Defendants Jeffrey C. Smith, Geoffrey S. Swindle, Steven L. Hadlock,

and Sahily Paoline, hereby allege as follows:

## NATURE OF THE ACTION

1.       LifeScan, Inc. ("LifeScan"), a manufacturer of medical equipment for

patients with diabetes, including blood-glucose test strips, and its affiliate Johnson & Johnson

Health Care Systems, Inc. ("JJHCS"), seek compensation for damages caused by Defendants'

fraud, racketeering, and other wrongful acts.

2.       Defendants operated a brazen scheme to defraud Plaintiffs and other

manufacturers of blood-glucose test strips.  Defendants conspired between and among

themselves, and among others not yet known to Plaintiffs, to obtain blood-glucose test strips manufactured by LifeScan and other manufacturers for sale at a lower insurance price under a specific health insurance plan and sell those strips at a significantly higher price on an unauthorized health insurance plan. This diversion resulted in Defendants causing LifeScan and JJSHC to pay millions in improper rebates and deprived Plaintiffs of the proceeds from the true sales price. This scheme also netted Defendants millions of dollars in unjustified payments. Essentially, Defendants diverted the test strips (from the Durable Medical Equipment insurance plan (DME Plans) to beneficiaries of retail insurance plans that cover test strips under a pharmacy benefit ("Pharmacy Plans").

3. Through this diversion, Defendants illegally arbitraged the substantial difference in wholesale list price and insurance reimbursement rates between test strips intended for DME Plans and Pharmacy Plans.

4. Test strips paid for by Pharmacy Plans ("Retail Strips") have a substantially higher list price and are reimbursed by insurance at a correspondingly higher rate than test strips paid for by DME Plans ("DME Strips"). However, Pharmacy Plans that pay the higher reimbursement rates receive rebates from LifeScan, whereas DME Plans do not. As a result of these rebates paid to Pharmacy Plans, LifeScan's net revenues from Retail Strips and DME Strips—and the net costs to the consumers—are comparable, notwithstanding the substantial difference in list price and insurance reimbursement rates.

5. Defendants, acting through illicit businesses they owned and controlled, obtained the lower-priced DME Strips (sometimes using illegal methods), sold them to beneficiaries of Pharmacy Plans, and submitted fraudulent insurance claims to the Pharmacy Plans to obtain the higher reimbursement rate for Retail Strips. Importantly, Defendants' profits did not result from offering lower prices to consumers, the vast majority of whom pay a fixed

out-of-pocket amount set by their insurance plans.  Rather, the profits resulted from causing

LifeScan to pay substantial rebates to Pharmacy Plans as a result of Defendants' fraud.

6.    In order to make their illicit profits, Defendants and their business partners

conspired to defraud LifeScan through this illegitimate diversion scheme.

7.    Pharmacy Plans will reimburse pharmacies for the sale of Retail Strips,

but not for DME Strips.  To obtain the higher reimbursement rate for Retail Strips, the

Defendants' network of pharmacies had to fraudulently claim to Pharmacy Plans that they were

selling Retail Strips when they were in fact selling DME Strips.

8.    Defendants' fraudulent scheme caused LifeScan to wrongfully pay

millions of dollars in rebates and deprived LifeScan of more than $40 million in legitimate sales

of Retail Strips.

## PARTIES

9.    Plaintiff LifeScan, Inc. is a corporation organized under the laws of the

State of California, with its principal place of business at 965 Chesterbrook Boulevard, Wayne,

Pennsylvania 19087.  LifeScan is a wholly owned operating subsidiary of Johnson & Johnson.

LifeScan is engaged in the business of manufacturing and marketing blood-glucose test strips.[1]

10.    Plaintiff Johnson & Johnson Health Care Systems, Inc. ("JJHCS") is a

corporation organized under the laws of the State of New Jersey, with its principal place of

business at 425 Hoes Lane, Piscataway, New Jersey 08854.  JJHCS is a wholly-owned operating

subsidiary of Johnson & Johnson.  JJHCS processes and pays claims and rebates submitted by

insurance companies in connection with insurance reimbursements paid on products

manufactured by Johnson & Johnson subsidiaries, including LifeScan.

---

[1] LifeScan's blood-glucose test strips are in fact manufactured by a separate corporate affiliate, LifeScan
Scotland Ltd.  LifeScan is referred to herein as a "manufacturer" in order to distinguish it from secondary
distributors such as Defendants.

11.     On information and belief, Defendant Jeffrey C. Smith is a Utah resident, having an address at 987 East Old English Road, Draper, Utah 84020.  Smith was Chief Executive Officer of Alliance Medical Holdings, LLC ("Alliance") until the middle of 2017. Smith is also an officer of Medsource Rx, Brighton Pharmacy, Western Diabetic, and Stonybrook Pharmacy.  Smith was previously Manager of Overstockdrugstore.com.

12.     On information and belief, Defendant Geoffrey S. Swindle is a Utah resident, having an address at 1389 East Harvard Avenue, Salt Lake City, Utah 84105.  Swindle founded Alliance and serve as its Chief Strategy Officer of Alliance until October 2015.

13.     On information and belief, Defendant Steven L. Hadlock is a Utah resident.  Hadlock is Director of Pharmacy Operations of Alliance.

14.     On information and belief, Defendant Sahily Paoline is a Utah resident. Paoline is Senior Vice President of Pharmacy Operations of Alliance and was Pharmacist in Charge of Medsource Rx.

15.     Non-party Alliance Health Networks, LLC ("Alliance") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 9883 South 500 West, Sandy, Utah 84070.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 18 U.S.C. § 1964, and general principles of ancillary and pendent jurisdiction.

17.     The Court has personal jurisdiction over the Defendants because they regularly transact or have transacted business in the District of New Jersey by, for example, selling LifeScan and other manufacturers' products into the state of New Jersey and receiving insurance reimbursements from insurance companies located in the state of New Jersey.

18.     In addition, the Court has personal jurisdiction over the Defendants

because the payments Defendants fraudulently and knowingly caused JJHCS to pay were made from the District of New Jersey.

19.     In addition, the Court has personal jurisdiction over all Defendants under 18 U.S.C. § 1965.

20.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to the claim occurred in this district, and one or more of the Defendants is subject to personal jurisdiction in this district.

## FACTS COMMON TO ALL CLAIMS

### LifeScan's Blood Glucose Test Strip Products & Insurance Reimbursement

21.     LifeScan is one of the leading manufacturers of blood glucose test strips. Millions of people with diabetes depend on LifeScan's test strips to monitor their blood sugar. Diabetes patients use LifeScan's test strips by placing a drop of blood on a strip and inserting the strip into a meter, which provides a blood glucose reading.

22.     Health insurance may cover test strips in two different ways.  Pharmacy Plans cover them under a "pharmacy benefit," the same benefit that covers prescription drugs. Patients with Pharmacy Plans may purchase test strips at retail pharmacies with their insurance coverage.  DME Plans cover test strips under a "durable medical equipment benefit," the same benefit that covers medical equipment such as wheelchairs.  Patients with DME Plans must purchase test strips from durable medical equipment distributors – at a lower cost – in order to pay with insurance.

23.     LifeScan sells its blood glucose test strips in different packages sold through different distribution channels targeted to patients with these different types of insurance coverage.  There are two types of LifeScan blood glucose test strips relevant here:  Retail Strips, intended for retail sale, and DME Strips, intended for sale by providers of durable medical

equipment.  LifeScan's Retail Strips are packaged in a blue box and intended for sale at retail pharmacies.  The Retail Strips may be sold to anyone, including people who do not have insurance and pay cash.  However, the vast majority of purchasers of LifeScan's Retail Strips pay through Pharmacy Plans, which reimburse the pharmacies.

24.    Since 2009, LifeScan has sold its Retail Strips to wholesalers for between about $46 and $60 50-strip box.  The wholesalers sell the Retail Strips to retail pharmacies. When a Pharmacy Plan beneficiary purchases LifeScan Retail Strips, the patient's insurance plan reimburses the pharmacy approximately $65 per box.  Under contracts with the insurers, LifeScan (via its affiliate JJHCS) pays rebates of between about $30 and $50 for every 50-strip box of Retail Strips that is reimbursed by a Pharmacy Plan, so LifeScan's net revenue per box of Retail Strips is substantially less than the $46 to 60 wholesale price.  It is well known throughout the diabetes product industry that test-strip manufacturers pay these rebates to Pharmacy Plans.

25.    By contrast, LifeScan sells its DME Strips exclusively to mail-order distributors, which are contractually obligated to sell *only* to DME beneficiaries.  LifeScan's DME Strips are packaged in a white box ("White Box DME Strips"), and LifeScan sells them to mail-order distributors for $24 or less per 50-strip box.  The packaging of White Box DME Strips clearly states "MAIL ORDER ONLY—NOT FOR STORE SALE."  Commercial DME plans reimburse the mail-order distributors, on average, approximately $32 per 50-strip box. LifeScan does not pay rebates to DME plans.  Since 2013, certain commercial plans, matching the Medicare reimbursement rate, have reimbursed at only about $10 per 50-strip box.

26.    Before 2016, LifeScan also sold DME Strips packaged in gray boxes to authorized DME wholesalers for $24 or less per 50-strip box ("Gray Box DME Strips").  The DME wholesalers sold these Gray Box DME Strips to authorized mail-order distributors, who were required to have contracts with LifeScan in order to purchase Gray Box DME Strips from

the DME wholesalers.  These contracts required the distributors to distribute the Gray Box DME Strips only to DME Beneficiaries.  The packaging clearly stated "For DME Beneficiaries only."

27.     LifeScan's DME mail-order distributors (whether they purchased the DME Strips directly from LifeScan or a DME wholesaler) are contractually prohibited from selling DME Strips to Pharmacy Beneficiaries (or cash payers).  Because these contractual provisions prevent DME Strips from being reimbursed by insurers that receive rebates from LifeScan, LifeScan is able to sell DME Strips for a much lower price than Retail Strips.  These lower prices are offered in return for and in reliance on the DME mail-order distributors' compliance with the terms of their contracts with LifeScan.

28.     Each of LifeScan's test strip products has a different National Drug Code ("NDC") printed on its package.  An NDC is a unique numerical identifier assigned by the U.S. Food and Drug Administration, which regulates these devices.

29.     The NDC for LifeScan's products are:  (1) for a 50-strip box of White Box DME Strips – 53885-0963-50; (2) for a 50-strip box of the Gray Box DME Strips – 53885-0000-75; and (3) for a 50-strip box of the Retail Strips – 53885-0244-50.

30.     Figure 1 depicts LifeScan's White Box DME Strips, Gray Box DME Strips, and Retail Strips:

<u>Figure 1</u>



| White Box Mail-Order Product | Gray Box Wholesale Product | Blue Box Retail Product |
|---|---|---|
| **Required Recipients:** DME Beneficiaries Only | DME Beneficiaries Only | Pharmacy Beneficiaries and Cash Payers |

31.     When patients with insurance purchase LifeScan blood glucose test strips, sellers of the test strips are paid by the patients' insurers instead of by the patients themselves. To obtain payment, the seller must submit a reimbursement claim to the insurer.  When the patient is a DME Plan beneficiary, the seller is required to seek the appropriate DME reimbursement (around $32 per box for non-Medicare plans).  When the patient is a Pharmacy Plan beneficiary, the seller is required to seek the appropriate Pharmacy Plan reimbursement (around $65 per box).

32.     When the patient is a Pharmacy Plan beneficiary, the test strip seller must submit the product's NDC to the patient's insurance plan as part of the reimbursement claim. This is necessary because Pharmacy Plans only cover specific pharmaceuticals and medical devices, listed by NDC, that are on the plan's formulary.  Products not listed on the Pharmacy Plan's formulary are not entitled to any reimbursement.[2]

---

[2] No NDC is submitted in reimbursement claims for DME product.  This is because DME plans are "brand-agnostic," meaning that they provide the same reimbursement rate regardless of the brand the customer buys. Instead of an NDC, the reimbursement claim includes a Healthcare Common Procedure Coding System code (an

33.     Because of the significant differences in how Retail Strips and DME Strips are sold and paid for, it is crucial for LifeScan's business that the test strips be sold only within their intended channels.  Diversion of DME Strips into the retail channel not only deprives LifeScan of retail sales, it also causes an out-of-pocket loss on each box of DME Strips that is paid for through a Pharmacy Plan, because the rebates LifeScan pays Pharmacy Plans (about $30–50 per box) are higher than the price LifeScan receives for DME Strips ($24 or less per box).

34.     Because of this potential for harm, LifeScan and the insurance companies that pay for its blood glucose test strips have implemented systems that make it impossible for distributors to lawfully divert blood glucose test strips outside their intended channels.  The only way to do so is to violate a contractual obligation and/or commit fraud.

35.     Because reimbursement by a Pharmacy Plan requires that the seller submit a reimbursement claim with a valid retail NDC, it would be fraudulent for a test strip seller to obtain the $65 retail reimbursement rate by claiming reimbursement for Retail Strips (by submitting the retail NDC), when DME Strips are in fact being sold.

36.     Unfortunately, Defendants and their business entities have engaged in these acts of fraud.

**Defendants' Fraudulent Scheme**

37.     Defendants are or were officers and/or directors of Alliance Health Networks, LLC ("Alliance").  Alliance owns and controls a large network of companies it uses to defraud LifeScan and other test strip manufacturers.  These companies include the following approximately 126 entities:  Alta Distributors, LLC ("Alta Distributors"), Alliance Medical

---

HCPCS or "Hix-Pix" code) that designates the type of equipment sold (*i.e.*, DME product), but (unlike an NDC) not the brand.  Of course, no legitimate company would submit Retail Strips for reimbursement by a DME Plan, because the wholesale price of Retail Strips is higher than the reimbursement rate offered by commercial DME Plans.

Administration, Inc., Alliance Medical Holdings, LLC, and a large network of affiliated companies, including the following: AHN Holding Co., LLC; Alameda Rx Holdings, LLC; Aspire Rx, LLC; Belle Pharmacy, LLC; Benson Pharmacy, Inc.; Berkshire Pharmacy, LLC; Best Rx Holdings, LLC; Best Rx, LLC; Better Care Rx Holdings, LLC; Bridgestone Pharmacy Holdings, LLC; Bridgestone Pharmacy, LLC; Brighton Pharmacy, LLC; Brookhill Pharmacy, LLC; BrooksideRx Holdings, LLC; BrooksideRx, LLC; Bubba's Rx Holdings, LLC; Burbank Pharmacy, LLC; Canyon Medical, LLC; Canyons Pharmacy, LLC; Central Medical, LLC; Charleston Rx Holdings, LLC; Charleston Rx, LLC; Cheshire Pharmacy, LLC; Cheshire Rx Holdings, LLC; Chronic Care Health Foundation, LLC; Cloud Management, LLC; Conoly Pharmacy Holdings, LLC; Conoly Pharmacy, LLC; Cordele Pharmacy, LLC; Cottonwood Pharmacy, LLC; Crestwell Pharmacy Holdings, LLC; CSL Capital Holdings, LLC; Cure Rx, LLC; David Pharmacy, LLC; Delaney Pharmacy, LLC; Eat Great Café, LLC; El Dorado Pharmacy, LLC; El Dorado Rx Holdings, LLC; Everest Pharmacy, LLC; Galena Pharmacy Holdings, LLC; Galena Pharmacy, LLC; Garnett Pharmacy, LLC; Genessee Pharmacy, LLC; Geneva Pharmacy, LLC; Geneva Rx Holdings, LLC; Genshai Holdings, LLC; Glendale Square Rx, Inc.; Good Wave, LLC; Goodman Pharmacy, LLC; Hawkins Pharmacy Holdings, LLC; Hawkins Pharmacy, LLC; Hawthorne Pharmacy, LLC; Hawthorne Rx Holdings, LLC; Hazelwood Pharmacy, LLC; Health Rx Holdings, LLC; Health Saver Holdings, LLC; Health Saver Rx, LLC; Improve Rx Holdings, LLC; Improve Rx, LLC; Ingram Diabetic, LLC; Ingram Medical Administration, Inc.; Innovative Rx, LLC; Insight Rx Holdings, LLC; JTK Medical, LLC; Kendall Pharmacy, Inc.; Living Again Holding Co, LLC; Lockeford Rx Holdings, LLC; Lockeford Rx, Inc.; Lone Peak Rx, LLC; Med Mart Holdings, LLC; Medina Pharmacy, LLC; Medsource Rx Pharmacy, LLC; Namaste Capital Holdings, LLC; New Jersey Rx Holdings, LLC; New Jersey Rx, LLC; New Life Pharmacy, LLC; Newton Rx Holdings, LLC; Newton Rx,

LLC; Norwood Pharmacy, LLC; Oak Creek Pharmacy Holdings, LLC; Oak Creek Rx, LLC; Ohana Pharmacy Holdings, LLC; Ohana Rx, LLC; Ollin Pharmaceutical, LLC; On Track Rx Holdings, LLC; On Track Rx, LLC; Osceola Clinic Pharmacy, LLC; Osceola Rx Holdings, LLC; Peach Medical Holdings, LLC; Peterson Rx, LLC; Pharmacare Holdings, LLC; Philadelphia Pharmacy Holdings, LLC; Pineview Rx Holdings, LLC; Pinnacle Pharmacy Solutions, LLC; Pro Rx Holdings, LLC; Raven Pharmacy Holdings, LLC; Raven Pharmacy, LLC; Richardson Pharmacy, LLC; Riverbend Prescription Services, LLC; Riverfront Pharmacy, LLC; Riverfront Rx, LLC; Rock City Pharmacy, LLC; Rx Pro Holding Co, LLC; Rx Pro Holding Co., LLC; Rx Solutions Holdings, LLC; Skyline Health Services, LLC; Smart Rx Holdings, LLC; Staley Pharmacy, LLC; Steel Medical, LLC; Stonybrook Pharmacy, LLC; Twin Lakes Pharmacy, LLC; Uinta Rx Holdings, LLC; Uinta Rx, LLC; Uplift Rx Holdings, LLC; Uplift Rx, LLC; Vitality Holdings, LLC; Warner Diabetic, LLC; Waverly Pharmacy, LLC; Western Diabetic Supply Corp.; White Capital Management, LLC; Woodward Drugs, LLC; and Woodward Rx Holdings, LLC (together and with other, currently unidentified affiliates, the "Alliance Pharmacies").

38.     Operating through Alliance and the Alliance Pharmacies, Defendants first used various methods, some unlawful, to obtain DME Strips.  Instead of selling the DME Strips to DME Beneficiaries, the Alliance Pharmacies sold the test strips to Retail Beneficiaries.  In order to obtain reimbursements for DME Strips, the Alliance Pharmacies submitted *hundreds of thousands* of false insurance reimbursement claims to multiple Pharmacy Plans.

39.     Specifically, at the direction of Defendants, Alliance and the Alliance Pharmacies obtained over a million boxes of LifeScan DME Strips and sold them to Pharmacy Beneficiaries.  The Alliance Pharmacies submitted false reimbursement claims on these boxes in order to profit from the high retail-product insurance reimbursement rate.  And, when one of the

Alliance Pharmacies was audited and discovered to be submitting fraudulent requests for reimbursement, the Defendants caused those patients to be serviced by a different, as-yet-undiscovered Alliance Pharmacy.  This fraud caused LifeScan to lose over $38 million in profits, and also caused JJHCS to pay out millions of dollars in rebates that it should not have paid.

**LifeScan Obtains Direct Knowledge of Defendant's Fraudulent Scheme**

40.     In April 2014, Confidential Witness 1 ("CW1"), a pharmacist at Cure Rx, informed LifeScan that Cure Rx was distributing LifeScan's DME Strips to Pharmacy Beneficiaries.  CW1 explained that Cure Rx received the LifeScan DME Strips from Alta Distributors.

41.     CW1 told LifeScan that Alliance was the parent company to Alta Distributors.  CW1 had contacted Alliance to ask why Alta Distributors was sending LifeScan DME Strips to Cure Rx even though Cure Rx's customers were Pharmacy Beneficiaries who were not entitled to receive such product.  CW1 also asked whether Alliance or Alta Distributors had contracts with LifeScan that permitted them to purchase and sell LifeScan DME Strips.

42.     CW1 spoke to Defendant Hadlock, Director of Pharmacy Operations at Alliance.  According to CW1, Hadlock was "fully aware of the insurance fraud issues" involved in distributing DME Strips to Pharmacy Beneficiaries.  Hadlock told CW1 that neither Alta Distributors nor Alliance had a contract with LifeScan to purchase DME Strips.  CW1 also contacted Defendant Paoline, then Vice President of Operations at Alliance, but Paoline did not respond to CW1's questions.

43.     CW1 informed LifeScan that Alliance was sending LifeScan DME Strips to at least ten additional pharmacies around the country, including Defendants Peterson Rx and Medsource Rx.  According to CW1, these pharmacies were all distributing the LifeScan DME Strips to Pharmacy Beneficiaries.

44.     Prior to CW1's call to LifeScan, LifeScan was not aware that Alliance or the Alliance Pharmacies were selling DME Strips to Pharmacy Beneficiaries.

### Defendants Attempt to Conceal Their Fraudulent Scheme

45.     In July 2014, LifeScan retained an independent auditor to audit Western Diabetic, which CW1 had stated was another source for the LifeScan DME Strips that Cure Rx sold to Pharmacy Beneficiaries.  Western Diabetic had a contract with LifeScan which permitted it to purchase Gray Box DME Strips from authorized wholesalers and to distribute them to DME Beneficiaries.[3]  This contract provided LifeScan with audit rights.

46.     Soon after the audit's initiation, Mandy Larson, Pharmacy Technician Manager at Alliance and a direct report to Defendant Paoline, informed a representative of the independent auditor that Western Diabetic had just been "shut down."  The auditor was unable to complete the audit of Western Diabetic.

47.     As a result of CW1's report to LifeScan and Western Diabetic's suspicious "shut down," LifeScan initiated an investigation of Alliance and the Alliance Pharmacies.  This investigation revealed the existence of a highly-coordinated criminal enterprise between Alliance, Alta Distributors, and the Alliance Pharmacies (including other, as-yet-unidentified pharmacies).

### Defendants' Methods of Conducting Their Scheme

48.     In June 2015, a second confidential witness, a former employee of Alliance, confirmed that Alliance sells DME Strips to Pharmacy Beneficiaries, thereby profiting from the high reimbursements insurance companies pay for Retail Strips.

49.     As the first step in this criminal scheme, Alliance obtains large amounts of blood-glucose test strips, including test strips manufactured by the three leading blood-glucose

---

[3] Western Diabetic is the only known Alliance affiliate that had a contract with LifeScan.

test strip manufacturers: LifeScan, Abbott Diabetes Care ("Abbott"), and Roche Diabetes Care ("Roche"). The majority of the test strips Alliance obtains are DME Strips.

50.     Alliance obtains blood-glucose test strips from a number of sources. One source is distributors that have contracted with manufacturers to purchase DME Strips. These distributors violate their contracts with the manufacturers (which require sales to DME Beneficiaries only) by selling to Alliance instead.

51.     Western Diabetic was one such distributor. Until Western Diabetic "shut down" suddenly, it had a contract with LifeScan to purchase Gray Box DME Strips from authorized wholesalers. As CW1 stated, Western Diabetic was one of the sources for the DME Strips that Alliance Pharmacies sold to Pharmacy Beneficiaries, thereby fraudulently obtaining insurance reimbursements from Pharmacy Plans.

52.     Alliance also obtains DME Strips from third-party "diverters" that purchase DME Strips from distributors (just as Alliance does) and sells them on the gray market. These third-party diverters sell DME Strips to Alliance with the knowledge and intent that Alliance will sell them to Pharmacy Beneficiaries and fraudulently obtain the higher reimbursements from Pharmacy Plans. Indeed, in setting the price they sell the DME Strips for, the third-party diverters take into account the ability of their customers to profit from such insurance fraud.

53.     Alliance also obtains test strips through "buy-backs" from patients. Defendants direct the Alliance Pharmacies to sell patients the maximum number of boxes of test strips that the patients' insurance plans will cover (e.g., eight boxes per month). Most patients do not need this many test strips, but there is often no cost to them because they have used up their insurance deductibles. Alliance buys back the unused boxes from patients, permitting Alliance and/or the Alliance Pharmacies to sell the same boxes twice, receiving multiple insurance

reimbursements for the same box.

54.     On information and belief, Alliance also uses additional methods to obtain DME Strips.

55.     Once it obtains blood-glucose test strips, Alliance ships them to Alta Distributors, which in turn ships them to various distribution locations, including the Alliance Pharmacies, which ship the test strips to patients or sell them to walk-in customers.[4]

56.     Defendants made and conspired to make over one million fraudulent false statements since 2009:  the insurance reimbursement claims in which the Alliance Pharmacies falsely claimed they were selling Retail Strips, when they were, in fact, selling DME Strips. These insurance reimbursement claims, which were transmitted over interstate wires, falsely included the NDCs for Retail Strips.

**Defendants' Ill-Gotten Financial Reward for Their Fraudulent Scheme**

57.     Defendants' goal in causing these false reimbursement claims was to obtain the approximately $65 reimbursement insurers pay for Retail Strips instead of the approximately $32 reimbursement (and sometimes as low as $10 reimbursement) that commercial insurers pay for DME Strips.

58.     The insurance companies that paid these reimbursements did not know, and had no reason to know, that the reimbursement claims were fraudulent.

59.     As Defendants knew and intended, the insurance companies that paid these reimbursements submitted rebate claims to JHCS.  Indeed, it is widely known throughout the blood-glucose test strip industry that manufacturers like LifeScan, Abbott, and Roche pay rebates to Pharmacy Plans.  Participants in the industry understand that these rebates explain why Pharmacy Plans are willing to pay higher reimbursement rates than DME Plans.  As is also

---

[4] Test buys conducted on behalf of LifeScan show that, when patients attempt to purchase mail-order test strips from one of the Alliance Pharmacies, the product is often shipped by another Alliance Pharmacy.

widely known throughout the industry, manufacturers' rebate payments to Pharmacy Plans are required and ministerial (i.e., not discretionary).

60.     As experienced and sophisticated participants in the industry, Defendants knew that the false reimbursement claims submitted by the Alliance Pharmacies would be transmitted to Plaintiffs via rebate claims, and would be relied on by Plaintiffs to their detriment.

61.     While Defendants' fraudulent reimbursement claims were made to the insurers, the insurers were made whole by receiving rebates from Plaintiffs for the fraudulent claims.  Had the Defendants not committed fraud and the Alliance Pharmacies had purchased and sold Retail Strips as they should have, the insurers would have paid the amount in reimbursements as they actually did, and would have received the same amount in rebates from Plaintiffs.  It is LifeScan and JJHCS, not the insurers, that were injured by Defendants' fraud. The insurers are therefore unlikely to take action to discover or remedy Defendants' fraud.

62.     All of the Defendants were involved and directed the fraudulent scheme described above.  Defendants Smith, Swindle, Hadlock, and Paoline are or have been executives or principals of Alliance, Alta Distributors, Overstockdrugestore.com, and/or one or more of the Alliance Pharmacies.  They were personally involved in running these businesses, approved of the fraud that accounted for a large portion of these businesses' profits, and personally profited from it.

63.     Moreover, CW1 contacted Defendants Hadlock and Paoline and informed them that she was aware of the fraudulent scheme.  Hadlock and Paoline took no action.

### Defendants' Used Their "Lead Generation" Business to Feed Their Fraud

64.     Defendants supported their fraudulent scheme with another arm of Alliance's business, its "lead generation" arm.  Alliance maintains several websites and online social networks that provide information to diabetes patients.  Alliance's primary social network

for diabetes patients is called "Diabetic Connect."

65.     By asking users to sign up for various services and discounts, these websites obtain valuable personal information from users, including names, addresses, and medical issues.  Alliance sells these "leads" to various customers in the healthcare industry, including manufacturers like LifeScan.

66.     Between 2012 and 2015, LifeScan paid Alliance over $3.4 million for such leads.  Alliance generated these leads by offering users of its websites, including Diabetic Connect, online coupons called "meter cards" for purchasing LifeScan blood-glucose testing meters.[5]  Alliance received a payment from LifeScan if a customer who had not been a LifeScan customer for at least a year signed up for a meter card through an Alliance website and used a prescription to purchase LifeScan test strips at a pharmacy.

67.     Alliance encourages the users of its websites and social networks to use the Alliance Pharmacies to obtain medical products, including blood-glucose test strips.  On information and belief, some or all of the patients for whom LifeScan paid Alliance for using meter cards purchased LifeScan products from one of the Alliance Pharmacies Defendants and purchased DME product Alliance fraudulently diverted.  In other words, Alliance charged LifeScan $3.4 million in fees for generating business that actually defrauded LifeScan.

68.     In addition to its online "lead generation," Alliance has nearly 8,000 employees who phone patients and earn commissions for convincing them to switch their test strips prescriptions to Alliance.

### Alliance Bankruptcy Filing and Defendant Smith's Firing

69.     On April 4, 2017, unable to access cash held in its own bank accounts due to an asset freeze, under increasing governmental and commercial scrutiny for its brazen fraud,

---

[5] LifeScan blood-glucose test strips can only be used with LifeScan's meters.

and following a raid by the Federal Bureau of Investigation, Alliance and a number of its affiliates and subsidiaries, including many of the Alliance Pharmacies filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas ("Bankruptcy Court").

70.     Within weeks after the commencement of the bankruptcy case, Defendant Smith was fired by the board and replaced by an interim CEO.  Just a few weeks after that, the Bankruptcy Court entered an order replacing Alliance's management altogether and appointing a Chapter 11 Trustee to manage all aspects of the business.

**Admissions of the Fraudulent Scheme**

71.     When two executives of Alliance were deposed on July 19, 2017, in connection with Alliance's bankruptcy case, they testified that the Alliance Pharmacies no longer sold LifeScan's strips, but *freely admitted* the fraud that Alliance had perpetrated prior to the bankruptcy case with respect to the Retail Strips – i.e., they acknowledged that Alliance made insurance claims for retail boxes but delivered not-for-retail boxes to their patients.  They further testified that Defendant Smith, as CEO and founder of the business, was aware of and directed the fraud described above.  According to one witness, this fraud was essentially the "foundational practice" that the Defendants used to build the business.

**Plaintiffs' Damages Due to Defendants' Fraud**

72.     Between 2009 and 2015, the currently-known Alliance Pharmacies submitted reimbursement claims for at least 57,395,765 Retail Strips – i.e., 1,147,915 50-count boxes.  During this same period, the currently-known Alliance Pharmacies and their affiliates purchased a mere 392,475 Retail Strips – i.e., 7,850 50-count boxes.

73.     With the exception of the reimbursement claims for 7,850 boxes of Retail Strips the Alliance Pharmacies actually purchased, the Alliance Pharmacies' reimbursement

claims for Retail Strips were fraudulent. 1,140,065 of the 1,147,915 boxes for which the Alliance Pharmacies submitted retail reimbursement claims were in fact boxes of DME Strips.

74.     The Pharmacy Beneficiaries who purchased these 1,147,915 boxes of LifeScan DME Strips *would* have purchased Retail Strips, but for Defendants' fraud. Indeed, they likely had little idea the test strips they purchased were not intended for sale to customers such as themselves. Accordingly, but for Defendants' fraud, LifeScan would have sold 1,147,915 additional boxes of Retail Strips.

75.     LifeScan is entitled to damages in the amount of the difference between the price for which it sold the DME Strips ($24 or less per box) and the price at which it would have sold the Retail Strips the Pharmacy Beneficiary should have received (between $46 and $60). This amounts to no less than $40 million.

76.     This figure is in fact a conservative estimate, because it does not include the fraud that occurred in 2016, and the fact that some of the test strips Defendants diverted were likely to have been a premium LifeScan test strip called Verio. LifeScan sells the Verio test strips intended for DME Beneficiaries for less than $24, and it sells the Verio test strips intended for Pharmacy Beneficiaries for more than it sells its other types of test strips. LifeScan's damages from the diversion of a box of Verio test strips were therefore higher than its damages from the diversion of a box of other test strips.

77.     In addition, LifeScan was damaged in the amount it paid to Alliance for leads that in fact were Pharmacy Beneficiary patients who Alliance then sold DME Strips. This amount is to be determined at trial, and is as high as $3.4 million.

### Defendants' Additional Illegal Acts

78.     Defendants have engaged in numerous additional illegal acts, including the following:

79.     First, Defendants' businesses obtain blood-glucose test strips by purchasing them from shoplifting rings.  Members of one Miami-area shoplifting ring were criminally prosecuted for racketeering in 2014–2015.  This ring employed teams of shoplifters who stole pharmaceutical products, including blood-glucose test strips, from pharmacies.  The shoplifters sold the stolen product to "fences," who sold them to various buyers.  These fences sold stolen blood-glucose test strips to Alliance Pharmacies Overstockdrugstore.com and Medsource Rx, which knew the test strips had been stolen.

80.     Second, Defendants' businesses obtain patient information by illegal means.  The Attorney General of West Virginia has brought civil cases against three of the Alliance Pharmacies: David Pharmacy, Rock City Pharmacy, and Cure Rx.  The West Virginia Attorney General alleges that these pharmacies used private patient information to send requests, without the patients' knowledge or permission, to patients' doctors asking that those patients' prescriptions be reassigned to David Pharmacy, Rock City Pharmacy, or Cure Rx.  On information and belief, Alliance purchased the patient information on the "dark web" from hackers who obtained it in the 2015 data breach of Anthem Blue Cross.  The transfer of the prescriptions to the Alliance Pharmacies resulted in the patients paying more for products than they otherwise would have.  The West Virginia Attorney General sued the three Alliance Pharmacies above under the state's consumer protection laws.

81.     Third, Defendants' businesses falsify prescriptions.  A diabetes patient acting on LifeScan's behalf attempted to purchase blood-glucose test strips from one of the Alliance Pharmacies by mail.  Some months later, one of the other Alliance Pharmacies (not the one the patient had attempted to purchase from) sent the patient a package that included test strips and several pre-printed prescription labels with the patient's name, a prescription number, and the name of the supposed "doctor" who issued the prescription:  "Dr. Jean Wilson."  Jean

Wilson was not the doctor of the patient who had made the purchase, and was not known to the patient. In fact, research revealed that the Jean Wilson in question is not a doctor at all, but a nurse practitioner. On information and belief, Alliance pays a large number of doctors and other medical professionals to write test strip prescriptions for patients who do not need test strips.

82.     Third, Defendants' businesses regularly ship products to patients that the patients never requested and do not need. For patients that have insurance, Defendants collect additional fraudulent reimbursements. Uninsured patients are billed for these unneeded and unrequested test strips.

83.     Fourth, Defendants commit similar fraud with other products. Most alarmingly, while executing a search warrant, law enforcement officials seized counterfeit prescription pills from Alliance. Moreover, Alliance has shipped within the United States products that are labeled for sale only in Canada, Alliance has sold expired products, Alliance has sold generic blood glucose test strip meters (some of which were not FDA approved) with stickers on them purporting to be from name-brand companies, Alliance has sold cheap walkers with stickers on them purporting to be more expensive models, and billed the patient's insurance for the more expensive models.

## FIRST CLAIM FOR RELIEF

### Fraud
### (Against all Defendants)

84.     Plaintiffs hereby repeat and re-allege the allegations in paragraphs 1 to 83 above as if set forth fully herein.

85.     Defendants knowingly and intentionally made and caused to be made false insurance reimbursement claims to insurance companies. These insurance reimbursement claims falsely stated that Defendants had sold LifeScan's Retail Strips to patients, when in fact they had sold DME Strips. Defendants knowingly and intentionally deprived LifeScan of sales of Retail

Strips, and also caused the insurance companies to submit rebate claims to Plaintiffs based on fraudulent insurance claims.

86.     Defendants made or caused to be made those false representations with the intent of defrauding Plaintiffs.  Specifically, Defendants made or caused to be made those false representations in order to profit from the approximately $65-per-box reimbursements the insurance companies pay for boxes of Retail Strips.  Defendants knew that the insurance companies could only pay such high reimbursements because they submitted claims for, and received, rebates from LifeScan.

87.     Plaintiffs and the insurance companies justifiably relied on Defendants' misrepresentations and were unaware of Defendants' fraud.

88.     As a result of Defendants' conduct, Plaintiffs have been injured in an amount not less than $40 million.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Fraud
### (Against all Defendants)

89.     Plaintiffs hereby repeat and re-allege the allegations in paragraphs 1 to 88 above as if set forth fully herein.

90.     Each Defendant intentionally provided substantial assistance to the others and to Alliance, Alta Distributors, and the Alliance Pharmacies in advancing the fraud against Plaintiffs.

91.     Defendants, as the executives and principals of Alliance, Alta Distributors, and/or the Alliance Pharmacies, were personally involved in and approved of the fraudulent scheme.

92.     Defendants could not have perpetrated their fraud without the substantial and material assistance of each other Defendant.  Each Defendant benefited from the success of

the fraud.

93.     All Defendants had actual knowledge of, and substantially assisted in, the fraudulent scheme to sell DME Strips to Pharmacy Beneficiaries and obtain insurance reimbursements for fraudulent claims.

94.     As a result of Defendants' conduct, Plaintiffs have been injured in an amount not less than $40 million.

### THIRD CLAIM FOR RELIEF

**Unjust Enrichment**
**(Against all Defendants)**

95.     Plaintiffs hereby repeat and re-allege the allegations in paragraphs 1 to 94 above as if set forth fully herein.

96.     Defendants caused the Alliance Pharmacies to misrepresent to insurance companies that the product they were selling Retail Strips when they in fact sold DME Strips. These misrepresentations were passed along by the insurance companies to Plaintiffs, directly causing Plaintiffs to pay the insurers millions of dollars in rebates.

97.     As a result of these false representations, Defendants wrongfully obtained a monetary benefit to which they were not legally entitled.

98.     Each Defendant personally benefitted as a result of the additional profits Defendants made as a result of the diversion scheme.  Defendants have no right to retain these unjust gains.

99.     If Defendants are permitted to keep this monetary benefit, it would be manifestly unjust.

### FOURTH CLAIM FOR RELIEF

**Civil Conspiracy**
**(Against all Defendants)**

100.     Plaintiffs hereby repeat and re-allege the allegations in paragraphs 1 to 99 above as if set forth fully herein.

101.     Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to defraud Plaintiffs.  All Defendants adopted the goal of furthering and facilitating this conspiracy.

102.     Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

103.     Plaintiffs were directly and proximately injured by Defendants' conspiracy and suffered losses of at least $40 million.  As a result of their misconduct, Defendants are jointly and severally liable to Plaintiffs for these losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against all Defendants as follows:

(a)  an order entering judgment in favor of Plaintiffs against Defendants, jointly and severally;

(b)  an order awarding Plaintiffs damages in an amount to be determined, but in no event less than $40 million;

(c)  an order awarding Plaintiffs trebling of damages to a value of not less than $120 million;

(d)  an order awarding Plaintiffs pre-judgment and post-judgment interest;

(e)  an order awarding Plaintiffs punitive damages;

(f)  an order awarding Plaintiffs reasonable attorneys' fees and other costs;

(g)  a preliminary injunction and thereafter a permanent injunction against Defendants, as

well as all of those in active concert or participation with them, with notice thereof, enjoining

and restraining all of them from engaging in the unlawful conduct alleged herein;

(h)  for such additional relief as the Court finds just and appropriate.

DATED:   July 28 , 2017
            New York, New York

By:   */s/ Peter C. Harvey*_____
            Peter C. Harvey, Esq.
            Geoffrey Potter, Esq.
            Aron Fischer, Esq.
            Joseph R. Richie, Esq.

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Tel: (212) 336-2000

*Attorneys for Plaintiffs LifeScan, Inc. and*
*Johnson & Johnson Health Care Systems, Inc.*

### JURY DEMAND

Plaintiffs LifeScan, Inc. and Johnson & Johnson Health Care Systems, Inc. hereby demand a trial by jury on all claims asserted in their complaint.

### <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

In accordance with Local Civil Rule 11.2, I certify that this matter is not related to or the subject of any other action pending in any Court, or of any pending arbitration or administrative proceeding.

DATED:   July 28, 2017
         New York, New York

By:   */s/ Peter C. Harvey*_____
      Peter C. Harvey, Esq.

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Tel: (212) 336-2000

*Attorneys for Plaintiffs LifeScan, Inc. and*
*Johnson & Johnson Health Care Systems, Inc.*

**CERTIFICATION OF NON-ARBITRABILITY AND NON-MEDIATION**

In accordance with Local Rule 201.1(d)(1), I certify that the within matter is not subject to compulsory arbitration or to mediation because this action does not consist only of money damages not in excess of $150,000, exclusive of interest and costs and any claim for punitive damages.

DATED:   July 28, 2017
         New York, New York

By:   */s/ Peter C. Harvey*
        Peter C. Harvey, Esq.

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Tel: (212) 336-2000

*Attorneys for Plaintiffs LifeScan, Inc. and*
*Johnson & Johnson Health Care Systems, Inc.*