Liza M. Walsh
Stephen V. Falanga
Christopher M. Hemrick
William T. Walsh, Jr.
WALSH PIZZI O'REILLY FALANGA LLP
One Riverfront Plaza
1037 Raymond Blvd., Suite 600
Newark, NJ 07102
(973) 757-1100

*Attorneys for Defendant,*
*ZB, N.A. (d/b/a Zions First National*
*Bank)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LIFESCAN, INC. and JOHNSON & JOHNSON HEALTH CARE SYSTEMS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> JEFFREY C. SMITH; GEOFFREY S. SWINDLE; STEVEN L. HADOCK; SAHILY PAOLINE; DAVID GRANT; JUSTIN LEAVITT; BLAINE SMITH; ALISON WISTNER; ADAM KOOPERSMITH; & ZB, N.A.; <br><br> Defendants. | Civil Action No. 2:17-cv-5552 (CCC/CLW) <br><br> **CERTIFICATION OF LIZA M. WALSH IN SUPPORT OF DEFENDANT ZB N.A.'S MOTION TO TRANSFER VENUE OR, ALTERNATIVELY, TO DISMISS OR STAY THIS ACTION** <br><br> *Filed Electronically* |

I, LIZA M. WALSH, of full age, hereby certify and state:

1.  I am an attorney at law of the State of New Jersey and a member of the

law firm of Walsh Pizzi O'Reilly Falanga LLP, counsel for defendant, ZB, N.A.

(d/b/a Zions First National Bank)("Zions"), in the above-captioned action.  I am fully informed of the facts contained herein and am authorized to make the within Certification on behalf of Zions.

2.      I make this Certification in support of Zions' Motion for an Order transferring venue of this action to the United States District Court for the District of Utah pursuant to 28 U.S.C. § 1404(a) or, in the alternative, to dismiss or stay Plaintiffs' Amended Complaint as to Zions pursuant to Rules 12(b)(1), 12(b)(6) and (9)(b) of the Federal Rules of Civil Procedure (the "Motion").

3.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of the relevant portions of the Credit Agreement between Zions and non-party Alliance referenced in Plaintiffs' Amended Complaint and Zions' Brief in support of its Motion.

4.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of the Proof of Claim filed by Plaintiff LifeScan, Inc. on September 5, 2017 asserting an unsecured priority claim in an amount "[n]ot less than $49,339,603[.00]" against non-party Alliance Medical Holdings, LLC in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, Case No. 17-32188.

I hereby certify under penalty of perjury that the foregoing is true and correct.


Dated: March 5, 2018                    *s/ Liza M. Walsh*
                                         Liza M. Walsh

# EXHIBIT A

CREDIT AGREEMENT

Among

ALLIANCE MEDICAL HOLDINGS, LLC
as Borrower

THE SUBSIDIARIES OF ALLIANCE MEDICAL HOLDINGS, LLC
as Guarantors

THE OTHER LOAN PARTIES FROM TIME TO TIME PARTY HERETO

and

ZIONS FIRST NATIONAL BANK
as Lender

Effective Date: June 24, 2014

6902317.6

TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| 1. | | Definitions | 1 |
| | 1.1 | Definitions | 1 |
| | 1.2 | Terms Generally | 17 |
| | 1.3 | Changes in Accounting Standards | 17 |
| 2. | | The Loan | 17 |
| | 2.1 | Term Loan | 17 |
| | 2.2 | Revolving Loan | 19 |
| | 2.3 | Interest on Loan | 22 |
| | 2.4 | Payment Dates and Times; Application of Payments | 24 |
| | 2.5 | Prepayments | 24 |
| | 2.6 | Recovery of Additional Costs | 26 |
| | 2.7 | Loan Fee | 26 |
| | 2.8 | Account Debit | 26 |
| | 2.9 | Payment of Prior Loans | 26 |
| | 2.10 | Late Fee | 27 |
| | 2.11 | Taxes | 27 |
| 3. | | Security for Loan | 29 |
| | 3.1 | Collateral | 29 |
| 4. | | Conditions to Loan Disbursements | 30 |
| | 4.1 | Conditions to Initial Loan Disbursements | 30 |
| | 4.2 | Conditions to Subsequent Loan Disbursements | 32 |
| | 4.3 | No Default or Material Adverse Effect | 32 |
| 5. | | Representations and Warranties of Loan Parties | 33 |
| | 5.1 | Organization and Qualification | 33 |
| | 5.2 | Authorization | 33 |
| | 5.3 | No Governmental Approval Necessary | 33 |
| | 5.4 | Accuracy of Financial Statements | 34 |
| | 5.5 | No Pending or Threatened Litigation | 34 |
| | 5.6 | Full and Accurate Disclosure | 34 |
| | 5.7 | Compliance with ERISA | 34 |
| | 5.8 | Compliance with USA Patriot Act | 35 |
| | 5.9 | Compliance with All Other Applicable Law | 35 |

i

TABLE OF CONTENTS

| | | |
|---|---|---|
| 5.10 | Environmental Representations and Warranties | 35 |
| 5.11 | Operation of Business | 36 |
| 5.12 | Payment of Taxes | 36 |
| 5.13 | Solvency | 36 |
| 5.14 | Assets of Loan Parties | 36 |
| 5.15 | Employee Matters | 37 |
| 5.16 | Healthcare Representations and Warranties | 38 |
| 5.17 | Brokerage | 38 |
| 6. | Covenants | 38 |
| 6.1 | Use of Proceeds | 38 |
| 6.2 | Continued Compliance with ERISA | 38 |
| 6.3 | Compliance with USA Patriot Act | 39 |
| 6.4 | Continued Compliance with Applicable Law | 39 |
| 6.5 | Prior Consent for Amendment or Change | 39 |
| 6.6 | Payment of Taxes and Obligations | 39 |
| 6.7 | Financial Statements and Reports | 39 |
| 6.8 | Inventory and Accounts Receivable | 41 |
| 6.9 | Insurance | 41 |
| 6.10 | Inspection; Collateral Exams | 42 |
| 6.11 | Operation of Business | 42 |
| 6.12 | Maintenance of Records and Properties | 42 |
| 6.13 | Notice of Claims | 42 |
| 6.14 | Environmental Covenants | 43 |
| 6.15 | Financial Covenants | 44 |
| 6.16 | Negative Pledge | 44 |
| 6.17 | Restriction on Debt | 44 |
| 6.18 | Mergers, Consolidations, and Purchase and Sale of Assets | 45 |
| 6.19 | Dividends, Loans; Investments | 45 |
| 6.20 | Change of Control | 46 |
| 6.21 | Name or Organizational Change | 46 |
| 6.22 | Maintenance of Existence | 46 |
| 6.23 | Further Assurances | 47 |

6902317

TABLE OF CONTENTS

| | | |
|---|---|---|
| 6.24 | Bank Accounts and Treasury Management | 47 |
| 6.25 | Collateral Access Agreements; Notice of Termination of Leases | 47 |
| 6.26 | Transactions with Affiliates | 47 |
| 6.27 | Subsidiaries | 47 |
| 6.28 | Updated Schedules of Assets; Certificates of Title | 48 |
| 6.29 | Subordination of Intercompany Debt | 48 |
| 6.30 | Subordinated Debt | 48 |
| 6.31 | Press Release; Public Offering Materials | 49 |
| 6.32 | Creation of Trusts; Transfers to Trusts | 49 |
| 6.33 | Material Contracts | 50 |
| 6.34 | Annual Recapture of Excess Cash | 50 |
| 6.35 | Post-Closing Obligations | 50 |
| 7. | Default | 51 |
| 7.1 | Events of Default | 51 |
| 7.2 | No Waiver of Event of Default | 53 |
| 8. | Remedies | 53 |
| 8.1 | Remedies upon Event of Default | 53 |
| 8.2 | Rights and Remedies Cumulative | 54 |
| 8.3 | No Waiver of Rights | 54 |
| 9. | Guarantee | 54 |
| 9.1 | Guarantee | 54 |
| 9.2 | Guarantee Unconditional | 54 |
| 9.3 | Obligations Independent | 54 |
| 9.4 | Waiver by Guarantor | 54 |
| 9.5 | Consent to Lender's Acts | 56 |
| 9.6 | Subordination by Guarantor | 57 |
| 9.7 | Representations of Guarantor | 57 |
| 9.8 | Term of Guarantee | 58 |
| 9.9 | Enforceability of Guarantee | 58 |
| 9.10 | Guarantee of Hedging Transactions | 58 |
| 10. | General Provisions | 58 |
| 10.1 | Governing Agreement | 58 |

TABLE OF CONTENTS

| | | |
|---|---|---|
| 10.2 | Loan Parties' Obligations Cumulative | 58 |
| 10.3 | Payment of Expenses and Attorneys' Fees | 59 |
| 10.4 | Right to Perform for Borrower | 59 |
| 10.5 | Assignability | 59 |
| 10.6 | Third Party Beneficiaries | 59 |
| 10.7 | No Partnership or Joint Venture | 60 |
| 10.8 | Governing Law | 60 |
| 10.9 | Savings Clause | 60 |
| 10.10 | Severability of Invalid Provisions | 60 |
| 10.11 | Interpretation of Agreement | 60 |
| 10.12 | Survival and Binding Effect of Representations, Warranties, and Covenants | 61 |
| 10.13 | Indemnification | 61 |
| 10.14 | Environmental Indemnification | 61 |
| 10.15 | Interest on Expenses and Indemnification, Collateral, Order of Application | 62 |
| 10.16 | Limitation of Consequential Damages | 62 |
| 10.17 | Waiver and Release of Claims | 62 |
| 10.18 | Revival Clause | 62 |
| 10.19 | Jury Trial Waiver, Arbitration, and Class Action Waiver | 63 |
| 10.20 | Consent to Utah Jurisdiction and Exclusive Jurisdiction of Utah Courts | 65 |
| 10.21 | Joint and Several Liability | 65 |
| 10.22 | Notices | 65 |
| 10.23 | Duplicate Originals; Counterpart Execution | 66 |
| 10.24 | Disclosure of Financial and Other Information | 66 |
| 10.25 | Integrated Agreement and Subsequent Amendment | 66 |

EXHIBITS

Exhibit A – Form of Compliance Certificate

10.7    No Partnership or Joint Venture

This Agreement is not intended to create and shall not be interpreted to create any partnership or joint ventures between or among Lender and the Loan Parties.

10.8    Governing Law

The Loan Documents shall be governed by and construed in accordance with the laws of the State of Utah, excluding conflict of law provisions that would result in the application of any law other than the laws of the State of Utah, and except to the extent that any such document expressly provides otherwise.

10.9    Savings Clause

In any action or proceeding involving any state corporate law or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor, or the validity and enforceability of any security interest, lien or other encumbrance, would otherwise be held or determined to be avoidable, invalid or unenforceable but for the application of this Section, then, notwithstanding any other provision of the Loan Documents to the contrary, without any further action by the Loan Parties or Lender, the amount of such obligations shall be automatically limited and reduced to the highest amount that would not cause such obligations to be voidable, invalid or unenforceable, and any such security interest, lien or encumbrance shall be limited to the maximum extent not subject to being voidable, invalid or enforceable, and the Loan Documents shall be deemed automatically amended accordingly.

This Section is intended solely to preserve the rights of Lender to the maximum extent not subject to avoidance, invalidity or unenforceability, and no Loan Party or other Person shall have any right or claim under this Section.

10.10   Severability of Invalid Provisions

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or thereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.11   Interpretation of Agreement

The article and section headings in this Agreement are inserted for convenience only and shall not be considered part of this Agreement nor be used in its interpretation.

All references in this Agreement to the singular shall be deemed to include the plural when the context so requires, and vice versa. References in the collective or conjunctive shall also include the disjunctive unless the context otherwise clearly requires a different interpretation.

6902317.6                                          60

into this Agreement by, among other things, the mutual waivers, agreements, and certifications in this section.

10.20   Consent to Utah Jurisdiction and Exclusive Jurisdiction of Utah Courts

The Loan Parties and Lender each acknowledge that by execution and delivery of the Loan Documents the parties hereto have transacted business in the State of Utah and the parties hereto voluntarily submit to, consent to, and waive any defense to the jurisdiction of courts located in the State of Utah as to all matters relating to or arising from the Loan Documents and/or the transactions contemplated thereby. EXCEPT AS EXPRESSLY AGREED IN WRITING BY LENDER AND EXCEPT AS PROVIDED IN THE ARBITRATION PROVISIONS ABOVE, THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF UTAH SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OF ANY AND ALL CLAIMS, DISPUTES, AND CONTROVERSIES, ARISING UNDER OR RELATING TO THE LOAN DOCUMENTS AND/OR THE TRANSACTIONS CONTEMPLATED THEREBY. NO LAWSUIT, PROCEEDING, OR ANY OTHER ACTION RELATING TO OR ARISING UNDER THE LOAN DOCUMENTS AND/OR THE TRANSACTIONS CONTEMPLATED THEREBY MAY BE COMMENCED OR PROSECUTED IN ANY OTHER FORUM EXCEPT AS EXPRESSLY AGREED IN WRITING BY LENDER.

10.21   Joint and Several Liability

Each Loan Party shall be jointly and severally liable for all obligations and liabilities arising under the Loan Documents.

10.22   Notices

All notices or demands by any party to this Agreement shall, except as otherwise provided herein or in any Hedging Transaction Documents, be in writing and may be sent by certified mail, return receipt requested. Notices so mailed shall be deemed received three days after deposited in a United States post office box, certified mail, return receipt requested, properly addressed to the party hereto at the mailing addresses stated herein or to such other addresses as any party hereto may from time to time specify in writing. Any notice so addressed and otherwise delivered shall be deemed to be given when actually received by the addressee. Notices concerning any Hedging Transaction Documents shall be provided as set forth therein.

Mailing addresses:

Lender:

> Zions First National Bank
> Corporate Banking Group
> One South Main Street, Suite 200
> Salt Lake City, Utah 84133
> Attention: Donald L. Rands

# EXHIBIT B



| Fill in this information to identify the case: |
|---|
| Debtor 1 | Alliance Medical Holdings, LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: Southern District of Texas | |
| Case number | 17-32188 |

## Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:   Identify the Claim

| 1. Who is the current creditor? | LifeScan, Inc. |
|---|---|
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes.  From whom? |
| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Patterson Belknap Webb & Tyler LLP (c/o Brian P. Guiney)<br>Name<br>1133 Avenue of the Americas<br>Number     Street<br>New York          NY          10036<br>City                 State          ZIP Code<br><br>Contact phone (212) 336-2305<br><br>Contact email bguiney@pbwt.com<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one): | **Where should payments to the creditor be sent? (if different)**<br><br>Name<br><br>Number     Street<br><br>City                 State          ZIP Code<br><br>Contact phone<br><br>Contact email |
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____.          Filed on _____<br>                                                                                              MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ |

**Part 2:**   **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

| | |
|---|---|
| 7. How much is the claim? | $ <u>Not less than $49,339,603</u> . **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>See attached description of claim. |

| | |
|---|---|
| 9. Is all or part of the claim secured? | ☑ No<br>☐ Yes.  The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**           $_____<br>**Amount of the claim that is secured:**    $_____<br><br>**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**    $_____<br><br>**Annual Interest Rate** (when case was filed) _____%<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| 10. Is this claim based on a lease? | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition.    $_____ |

| | |
|---|---|
| 11. Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $ _____ |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:    Sign Below

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b). | *Check the appropriate box:* |
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571. | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct. |

Executed on date  08/30/2017
                   MM / DD / YYYY

_____
    Signature

**Print the name of the person who is completing and signing this claim:**

| | |
|---|---|
| Name | Brian P. Guiney |
| | First name         Middle name         Last name |
| Title | Counsel |
| Company | Patterson Belknap Webb & Tyler LLP |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 1133 Avenue of the Americas |
| | Number      Street |
| | New York                NY     10036 |
| | City                    State    ZIP Code |
| Contact phone | (212) 336-2305        Email  bguiney@pbwt.com |

<u>**Addendum to Proof of Claim of LifeScan, Inc. ("LifeScan")**</u>

**<u>Background</u>**

      1.     LifeScan is one of the leading manufacturers of blood glucose test strips. Millions of people with diabetes depend on LifeScan's test strips to monitor their blood sugar. Diabetes patients use LifeScan's test strips by placing a drop of blood on a strip and inserting the strip into a meter, which provides a blood glucose reading.

      2.     Health insurance may cover test strips in two different ways. "Pharmacy Plans" cover them under a "pharmacy benefit," the same benefit that covers prescription drugs. Patients with Pharmacy Plans ("Pharmacy Beneficiaries") may purchase test strips at retail pharmacies with their insurance coverage. "DME Plans" cover test strips under a "durable medical equipment" benefit, the same benefit that covers medical equipment such as wheelchairs. Patients with DME Plans ("DME Beneficiaries") must purchase test strips from durable medical equipment distributors in order to pay with insurance.

      3.     LifeScan sells its blood glucose test strips in different packages sold through different distribution channels targeted to patients with these different types of insurance coverage. There are two types of LifeScan blood glucose test strips relevant here: test strips intended for retail sale ("Retail Strips") and test strips intended for sale by providers of durable medical equipment ("DME Strips"). LifeScan's Retail Strips are packaged in a blue box and intended for sale at retail pharmacies. The Retail Strips may be sold to anyone, including people who do not have insurance and pay cash. However, the vast majority of purchasers of LifeScan's Retail Strips pay through Pharmacy Plans, which reimburse the pharmacies.

      4.     Since 2009, LifeScan has sold its Retail Strips to wholesalers for between about $46 and $60 for a 50-strip box. The wholesalers sell the Retail Strips to retail pharmacies. When a Pharmacy Beneficiary purchases LifeScan Retail Strips, the patient's insurance plan

reimburses the pharmacy approximately $65 per box. Under contracts with the insurers,

LifeScan (via its affiliate JJHCS) pays rebates of between about $30 and $50 for every 50-strip

box of Retail Strips that is reimbursed by a Pharmacy Plan, so LifeScan's net revenue per box of

Retail Strips is substantially less than the $46 to $60 wholesale price. It is well known

throughout the diabetes product industry that test-strip manufacturers pay these rebates to

Pharmacy Plans.

5.      By contrast, LifeScan sells its DME Strips exclusively to mail-order

distributors, which are contractually obligated to sell only to DME Beneficiaries. LifeScan's

DME Strips are packaged in a white box ("White Box DME Strips"), and LifeScan sells them to

mail-order distributors for $24 or less per 50-strip box. The packaging of White Box DME

Strips clearly states "MAIL ORDER ONLY—NOT FOR STORE SALE." LifeScan does not

pay rebates to DME plans.

6.      Before 2016, LifeScan also sold DME Strips packaged in gray boxes to

authorized DME wholesalers for $24 or less per 50-strip box ("Gray Box DME Strips"). The

DME wholesalers sold these Gray Box DME Strips to authorized mail-order distributors, who

were required to have contracts with LifeScan in order to purchase Gray Box DME Strips from

the DME wholesalers. These contracts required the distributors to distribute the Gray Box DME

Strips only to DME Beneficiaries. The packaging clearly stated "For DME Beneficiaries only."

7.      LifeScan's DME mail-order distributors (whether they purchased the

DME Strips directly from LifeScan or a DME wholesaler) are contractually prohibited from

selling DME Strips to Pharmacy Beneficiaries. Because these contractual provisions prevent

DME Strips from being reimbursed by insurers that receive rebates from LifeScan, LifeScan is

able to sell DME Strips for a much lower price than Retail Strips. These lower prices are offered

in return for and in reliance on the DME mail-order distributors' compliance with the terms of

-2-

their contracts with LifeScan.

        8.      Each of LifeScan's test strip products has a different National Drug Code number ("NDC") printed on its package.  An NDC is a unique numerical identifier assigned by the U.S. Food and Drug Administration, which regulates these devices.  The NDC for a 50-strip box of White Box DME Strips is 53885-0963-50; the NDC for a 50-strip box of the Gray Box DME Strips is 53885-0000-75; and the NDC for a 50-strip box of the Retail Strips is 53885-0244-50.

        9.      Figure 1 depicts LifeScan's White Box DME Strips, Gray Box DME Strips, and Retail Strips:

## Figure 1



| | White Box Mail-Order Product | Gray Box Wholesale Product | Blue Box Retail Product |
|---|---|---|---|
| Required Recipients: | DME Beneficiaries Only | DME Beneficiaries Only | Pharmacy Beneficiaries and Cash Payers |

        10.     When patients with insurance purchase LifeScan blood glucose test strips, sellers are paid by the patients' insurers instead of by the patients themselves.  To obtain payment, the seller must submit a reimbursement claim to the insurer.  When the patient is a DME Beneficiary, the seller is required to seek the appropriate DME reimbursement.  When the patient is a Pharmacy Beneficiary, the seller is required to seek the appropriate Pharmacy Plan

-3-

reimbursement (around $65 per box).

11.     When the patient is a Pharmacy Beneficiary, the test strip seller must submit the product's NDC to the patient's insurance plan as part of the reimbursement claim. This is necessary because Pharmacy Plans only cover specific pharmaceuticals and medical devices, listed by NDC, that are on the plan's formulary. Products not listed on the Pharmacy Plan's formulary are not entitled to any reimbursement.

12.     Because of the significant differences in how Retail Strips and DME Strips are sold and paid for, it is crucial for LifeScan's business that the test strips be sold only within their intended channels. Diversion of DME Strips into the retail channel not only deprives LifeScan of retail sales, it also causes an out-of-pocket loss on each box of DME Strips that is paid for through a Pharmacy Plan, because the rebates LifeScan pays Pharmacy Plans (about $30–50 per box) are higher than the price LifeScan receives for DME Strips ($24 or less per box).

13.     Because of this potential for harm, LifeScan and the insurance companies that pay for its blood glucose test strips have implemented systems that make it impossible for distributors to lawfully divert blood glucose test strips outside their intended channels. The only way to do so is to violate a contractual obligation and/or commit fraud.

**The Debtors' Fraud**

14.     Because reimbursement by a Pharmacy Plan requires that the seller submit a reimbursement claim with a valid retail NDC, it would be fraudulent for a test strip seller to obtain the $65 retail reimbursement rate by claiming reimbursement for Retail Strips (by submitting the retail NDC), when DME Strips are in fact being sold. But LifeScan believes that this is precisely what the Debtors did. In fact, when two executives of Alliance were deposed on July 19, 2017, in connection with this case, they freely admitted the fraud described below.

-4-

According to one witness, it was essentially the "foundational practice" upon which the Debtors built their business.

15.     Alliance owns and controls a large network of companies it uses to defraud LifeScan and other test strip manufacturers. These companies include certain of the Debtors in these proceedings as well as many other entities that are not Debtors (collectively, and with other, currently unidentified affiliates, the "Alliance Pharmacies").

16.     On information and belief, the Alliance Pharmacies, under the direction of the Debtors, used various methods, some unlawful, to obtain DME Strips. For example, instead of selling the DME Strips to DME Beneficiaries, the Alliance Pharmacies sold the test strips to Pharmacy Beneficiaries. In order to obtain reimbursements for DME Strips – to which they were not entitled, because rebates are only paid on Retail Strips – the Alliance Pharmacies submitted *hundreds of thousands* of false insurance reimbursement claims to multiple Pharmacy Plans. And, when one of the Alliance Pharmacies was audited and discovered to be submitting fraudulent requests for reimbursement, the Debtors caused those patients to be serviced by a different, as-yet-undiscovered Alliance Pharmacy.

**Damages**

17.     LifeScan believes that it has been damaged in an amount of nearly $50 million ($49,339,603) on account of fraudulent reimbursement claims across the Alliance Pharmacies. LifeScan believes that each of the parent Debtors – Alliance Medical Holdings, LLC, Alliance Health Networks, LLC and Alliance Medical Administration, Inc. – as well as Alta Distributors, LLC are jointly and severally liable for this entire amount. Moreover, certain of the Debtors are among the Alliance Pharmacies that defrauded LifeScan, including Riverfront Pharmacy, LLC, Case No. 17-32232 (not less than $1,680,814), Oak Creek Pharmacy, LLC, Case No. 17-32201 (not less than $3,321,633), and Stonybrook Pharmacy, LLC, Case No. 17-

-5-

32213 (not less than $7,345,945).

      18.    LifeScan is asserting a separate proof of claim against each of the foregoing Debtors in the corresponding amounts. But, because of the nature of the fraud and other factors, LifeScan cannot be certain that its damages are not even higher, nor can it rule out the possibility that it has claims against other Debtors not identified in this paragraph. Accordingly, LifeScan expressly reserves the right to modify, amend, supplement, or withdraw this Proof of Claim and to assert any additional Proof of Claim against any other Debtor. [1]

**Reservation of Rights**

      19.    This Proof of Claim is a protective Proof of Claim and is filed to protect LifeScan from potential forfeiture of any rights or remedies against any of the Debtors. The filing of this Proof of Claim shall not constitute (a) a waiver or release of any rights or remedies of LifeScan against any of the Debtors or any other person or property; (b) consent by LifeScan to the jurisdiction of this Court with respect to the subject matter of the claims set forth herein or the waiver of any objection thereto; or (c) an election of remedies, choice of law or submission to jurisdiction.

---

[1] On June 2, 2017, LifeScan served a discovery request on the Debtors under Bankruptcy Rule 2004 demanding documents pertaining to, among other things, the fraud alleged in this proof of claim. However, at the request of the Debtors, LifeScan agreed to bifurcated discovery and has held certain of its requests in abeyance, including those pertaining to its prepetition damages. Deposition testimony from knowledgeable witnesses may reveal more details about the Debtors' business practices, and a thorough review of the Debtors' books and records may aid in the parties' reconciliation of the precise amount of LifeScan's damages.

9932337v.3