IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LIFESCAN, INC., et al.<br><br>Plaintiffs,<br><br>v.<br><br>JEFFREY C. SMITH, et al.,<br><br>Defendants. | Civ. Action No. 2:17-cv-05552-CCC-CLW<br><br>Hon. Claire C. Cecchi<br><br>*Filed Electronically* |

LISA SMILEY, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am the Senior Manager, Global Brand Protection for the Supply Chain operations of Johnson & Johnson. I submit this declaration on personal knowledge in support of Plaintiffs' Opposition to ZB N.A.'s Motion to Transfer Venue, Stay or Dismiss this Action and Plaintiffs' Opposition to the Individual Defendants' Motions to Dismiss.

2. I have been employed as Senior Manager, Global Brand Protection since 2015. As part of my responsibilities, I have monitored the counterfeiting, diversion and other illicit trade of LifeScan Inc.'s ("LifeScan") product line of OneTouch® diabetic test strips and devices and recommended appropriate action to safeguard patients and the integrity of our brands.

10364819v.1

3. "Diversion" refers to a product being sold outside of its authorized chain of distribution. LifeScan sells its blood glucose test strips in different packages sold through different distribution channels with different payment structures to accommodate different insurance plans. One of these distribution channels is the retail channel, where products ("Retail Strips") are sold by retail pharmacies through a pharmacy benefit. Another distribution channel is the DME channel, where products ("DME Strips") are sold by mail order through a durable medical equipment benefit.

4. Because of the significant differences in how Retail Strips and DME Strips are sold and paid for, it is crucial for LifeScan's business that the test strips be sold only within their intended channels. When, for example, DME Strips are diverted into the retail channel, the pricing arrangements between LifeScan, Johnson and Johnson Healthcare Systems, Inc. ("JJHCS"), pharmacy benefit managers ("PBMs"), insurance companies, and patients are disturbed, causing losses to LifeScan and JJHCS.

5. As part of my responsibilities, I analyzed the diversion of test strips by pharmacies affiliated with Alliance Medical Holdings LLC ("Alliance"), which had been diverting DME Strips into the retail channel.

6. To obtain numbers on how many strips were diverted, we relied on two figures that were available to JJHCS and LifeScan: (1) the number of

insurance claims made by the Alliance-affiliated pharmacies based on alleged sales of Retail Strips; and (2) the number of Retail Strips actually purchased by the Alliance-affiliated pharmacies from LifeScan and LifeScan's Authorized Distributors. The difference between the number of Retail Strip-based insurance claims made by the Alliance pharmacies, on the one hand, and the number of Retail Strips actually purchased by the Alliance pharmacies, on the other, represents the number of diverted test strips that were falsely adjudicated as Retail Strips to insurance companies.

7. These numbers are, of course, restricted to those pharmacies known to be affiliated with Alliance. There may have been other pharmacies affiliated with Alliance that are unknown at this time.

8. Prior to 2014, the majority of Alliance's false adjudications of OneTouch® test strips were made through three Utah-based Alliance-affiliated pharmacies, Medsource Rx Pharmacy, LLC ("Medsource"), Everest Pharmacy, LLC ("Everest") and Aspire Rx, LLC ("Aspire"). From 2010-2013, these pharmacies (the "Utah-based Pharmacies") collectively adjudicated over 17 million diverted test strips as Retail Strips.

9. On June 14, 2014, I understand that Alliance and Zions Bank executed a Credit Agreement refinancing Alliance's $36 million credit facility, and that Alliance used this credit to expand its operations.

10. 2014 was a year of significant change in the operations of the Alliance-affiliated pharmacies, as pharmacies outside of Utah began falsely adjudicating massive quantities of OneTouch® test strips:

- Peterson Rx, LLC ("Peterson") in New Jersey falsely adjudicated 2,283,550 test strips compared to 4,025 the year before;

- David Pharmacy, LLC ("David") in Ohio falsely adjudicated 1,915,550 test strips compared to 75 the year before;

- Cure Rx, LLC ("Cure") in Pennsylvania falsely adjudicated 2,339,850 test strips compared to 68,900 the year before;

- Stonybrook Pharmacy, LLC ("Stonybrook") in Nebraska falsely adjudicated 6,339,000 test strips compared to 1,090,350 the year before;

- Brighton Pharmacy, LLC in Arizona falsely adjudicated 1,898,550 test strips compared to 1,824,100 the year before; and

- Hawkins Pharmacy, LLC in Mississippi falsely adjudicated 1,780,602 test strips compared to 27,350 the year before.

11. In addition, in 2014, seven new pharmacies that had never before falsely adjudicated OneTouch® test strips began doing so. Depending on the pharmacy, the scale ranged from the thousands to millions of OneTouch® test strips. These new pharmacies included:

- Oak Creek Pharmacy LLC, located in Nebraska, with 1,966,600 false adjudications;

- Riverfront Pharmacy, LLC, located in Iowa, with 955,025 false adjudications;

- Norwood Pharmacy, LLC, located in Missouri, with 1,446,200 false adjudications;

- Twin Lakes Pharmacy, LLC, located in Texas, with 125,250 false adjudications;

- El Dorado Pharmacy, LLC, located in Texas, with 228,100 false adjudications;

- Cordele Pharmacy, LLC, located in North Carolina, with 15,500 false adjudications; and

- Rock City Pharmacy, LLC, located in Michigan, with 3,050 false adjudications.

12.  As a result, in 2014, the number of false adjudications of OneTouch® test strips in the known Alliance network more than doubled (from 9,720,501 in 2013 to over 20 million in 2014).

13.  In 2014, the Utah-based Pharmacies, which until this point had been the primary locus of false adjudications in the Alliance network, wound down operations by 79%, falsely adjudicating 1,429,250 test strips. While in 2013, the Utah-based Pharmacies were responsible for 69% of the total false adjudications of the known Alliance-affiliated pharmacies, in 2014, the Utah-Based Pharmacies were responsible for only 6%.

14. In 2014, of the known Alliance-affiliated pharmacies, the Peterson pharmacy in New Jersey was a primary source of false adjudications of OneTouch® test strips. It was responsible for the false adjudication of 2,283,550 test strips, more than all of the Utah-Based Pharmacies combined. In 2014, only two Alliance-affiliated pharmacies surpassed Peterson in terms of the number of false adjudications: Stonybrook in Nebraska, with 6,339,000 false adjudications; and Cure in nearby Wyomissing, Pennsylvania, with 2,339,850 false adjudications.

15. In 2015, the Utah-based Pharmacies stopped falsely adjudicating test strips almost entirely. Everest falsely adjudicated only 200 strips, while Medsource and Aspire falsely adjudicated none. The primary source of false adjudications had, by this point, been entirely outsourced to Alliance-affiliated pharmacies located outside of Utah. Collectively, the Alliance-affiliated pharmacies falsely adjudicated 13,773,636 strips. This year, the Peterson pharmacy in New Jersey was responsible for the false adjudication of 1,739,760 test strips, behind only the Stonybrook pharmacy in Nebraska (with 1,828,600 false adjudications) and the David pharmacy in Ohio (with 1,792,800 false adjudications).

16. In 2016, the false adjudications of the Alliance-affiliated pharmacies continued to take place entirely outside of Utah. The Peterson pharmacy in New Jersey was responsible for falsely-adjudicating 665,900 test

strips this year. In total, the Alliance-affiliated pharmacies falsely-adjudicated 7,697,002 test strips in 2016.

17. While we are still receiving claims for 2017, it is clear that by 2017 the false adjudications of the known Alliance-affiliated pharmacies had decreased substantially, dropping by 92% to approximately 600,000 nationwide. Current numbers show that the Peterson pharmacy in New Jersey falsely adjudicated 2,250 test strips for this year.

18. It is clear from the data that starting in 2014, when the Credit Agreement was signed with Zions Bank, Alliance transformed its initiative to falsely adjudicate test strips from a primarily Utah-based initiative to one of national proportions.

19. It is also clear that starting in 2014, Peterson pharmacy in New Jersey became a key pharmacy of the Alliance network. For each of 2014, 2015, and 2016, it falsely adjudicated more test strips than all of the Utah-based Pharmacies combined for those years. It also falsely adjudicated more test strips over these years than any other Alliance-affiliated pharmacy with the exception of Stonybrook pharmacy in Nebraska.

20. Unlike Stonybrook pharmacy in Nebraska, however, Peterson pharmacy continued its operations into 2016, during which time it was still falsely-

adjudicating hundreds of thousands of test strips. That year, Stonybrook pharmacy falsely adjudicated only 100 test strips, compared to 1,828,600 the year before.

21. Based on the data, therefore, it is clear that the Peterson pharmacy in New Jersey had a primary role in the false adjudication of test strips by the Alliance network of pharmacies, being responsible for falsely adjudicating a total of 4,691,460 test strips between 2014 and 2017.

22. It is also clear that, following the signing of the Credit Agreement in 2014, Alliance abandoned the Utah-based Pharmacies as the vehicles for falsely adjudicating test strips, and instead, outsourced the false adjudications to pharmacies across the country.

23. It is also clear that the Peterson pharmacy in New Jersey was a key locus of operations of the Alliance network across the life of Alliance's operations. Starting when Alliance abandoned Utah as the primary location of false adjudications in 2014, Peterson pharmacy continued to falsely adjudicate test strips until the winding down of Alliance's operations in 2016-2017.

24. Cure pharmacy in Wyomissing, PA also had a significant role in the false adjudication of test strips, being responsible for falsely adjudicating 3,831,000 test strips from 2014-2017. Cure pharmacy, as well, operated continuously through 2016. During that year, it falsely adjudicated 273,150 test strips.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 2, 2018

                                                                 */s/ Lisa Smiley*
                                                                  Lisa Smiley