## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LIFESCAN, INC., et al. | Civ. Action No. 2:17-cv-05552-CCC-CLW |
| Plaintiffs, | Hon. Claire C. Cecchi |
| v. | |
| JEFFREY C. SMITH, et al., | *Filed Electronically* |
| Defendants. | |

RYAN MOTT, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.    I am an attorney at Patterson Belknap Webb & Tyler LLP.

2.    I submit this declaration in support of Plaintiffs' Opposition to the Individually-Named Defendants' Motions to Dismiss or Transfer and Plaintiffs' Opposition to ZB, N.A.'s Motions to Dismiss, Transfer or Stay.

3.    In particular, I submit this declaration to provide the Court with evidence that has been produced in discovery to date that is relevant to certain Defendants' motions to dismiss for lack of personal jurisdiction or motions to transfer venue.

4.    Evidence relevant to each defendant is discussed under that defendant's heading below.  For the Court's convenience, where an exhibit or

10359210v.1

deposition excerpt is relevant to two or more defendants, that exhibit/excerpt is reproduced under the heading for each defendant to whom it is relevant. Thus, certain exhibits are cited more than once in this declaration.

5.      On January 23, 2018, Plaintiffs served document requests on Defendants. To date, no Defendant has produced documents in response to the requests.

6.      On February 7, 2018, Plaintiffs issued a subpoena to non-party Alliance. Plaintiffs received from Alliance a hard drive from non-party Alliance containing nearly 1.4 million e-mails. Our firm has begun to review these documents but has not yet completed its review.

7.      Alliance informed us that they withheld certain e-mails on claims of privilege. For example, our review of the e-mails indicates that Alliance produced no e-mails to or from Defendant David Grant (except those that were forwarded to other e-mail accounts). On information and belief, all e-mails to or from David Grant have been withheld, without any individual review as to whether they are actually privileged.

8.      Exhibit 1 is a transcript of the April 12, 2018 deposition of Masum Amin, formerly a pharmacist at Peterson Pharmacy in New Jersey.

9.      Exhibit 2 is a transcript of the April 25, 2018 the deposition of Dow Jones, formerly an owner of Peterson Pharmacy.

### A.    Evidence Related to Jeffrey Smith

10.    Exhibit 3 is an August 15, 2013 e-mail chain with the subject "Re: Oklahoma and New Jersey Pharmacies" and involving Jeffrey Smith, Sahily Paoline, and Alliance employees Morgan Mower and Candace Czerny.  Mower writes to Jeffrey Smith, "New Jersey Pharmacy said they are . . . sending over due diligence items tonight."  Jeffrey Smith responds, "Candace, Please review these tomorrow so that we can book airlines for Si [Sahily Paoline] to . . . New Jersey[.] Si, Please arrange to get to these two locations, pending sign off from Candace."

11.    Exhibit 4 is an August 25, 2013 e-mail from Sahily Paoline to, *inter alia*, Jeffrey Smith and Justin Leavitt with the subject "Peterson Pharmacy New Jersey."  Attached to the e-mail is a document titled "Peterson NJ due diligence.docx" and twenty-one pictures of the Peterson Pharmacy in New Jersey. In the body of the e-mail, Paoline writes, "This is a WIN."

12.    Exhibit 5 is an August 27, 2013 e-mail from Jeffrey Smith to Candace Czerny with the subject "Re: POA will work in New Jersey, still working on CA and OK."  Copied on the e-mail are, *inter alia*, Justin Leavitt and Sahily Paoline.  In response to an e-mail from Czerny that has been deleted from Jeffrey Smith's reply, Smith writes, "terrific.  Let's rock NJ - the planets have aligned for Si[.]  sweet[.]"

13.    When Dow Jones was asked during his April 25, 2018

deposition, "Who approached you with the idea of buying Peterson Pharmacy" in

New Jersey, he answered, "My associate Jeff Smith."  (*See* ¶ 9, Ex. 2, *supra*: Jones

Dep. at 32:13-15.)

14.    When Dow Jones was asked during his April 25, 2018 why

Alliance wanted to open pharmacies like the Peterson Pharmacy in New Jersey, he

answered that "it was about . . . servicing customers within the specific state."

Jones clarified that Peterson also later served customers outside of New Jersey.

(*See* ¶ 9, Ex. 2, *supra*: Jones Dep. at 42:15-43:3.)  Jones later testified, "it was

explained to me that they needed pharmacies in regions so they could ship into that

area or that state to be compliant" with regulations.  (*Id.* at 207:25-208:13.)

15.    During his April 25, 2018 deposition, Dow Jones testified that

"after Jeff [Smith] and I spoke and I expressed an interest in owning a pharmacy,

he said, 'Great, there's several to choose from.  We'll get back to you with a list of

some pharmacies that you might be interested in buying.'"  (*See* ¶ 9, Ex. 2, *supra*:

Jones Dep. at 48:17-24.)

16.    Exhibit 6 is a September 30, 2013 to October 2, 2013 e-mail

chain with the subject "RE: Peterson Pharmacy POA."  In that chain, Dow Jones

writes to Morgan Mower, "Si has visited the pharmacy and . . . Surveyed

competitive environment[,] Hours of other nearby pharmacies[,] Inventory levels[,]

-4-

Floorplan layout compliance – including record storage, etc.[,] Shipping and delivery options[.]"  Copied on that e-mail are, *inter alia*, Justin Leavitt, Sahily Paoline, and Jeffrey Smith.

17.    Exhibit 7 is an October 2, 2013 e-mail from Sahily Paoline to Dow Jones; copied are, *inter alia*, Jeffrey Smith and Justin Leavitt.  The subject of the e-mail is "Peterson update."  Sahily Paoline writes bullet-pointed notes on subjects including "Inventory," "Personnel/Hiring," "Hours of Operation," "Competition," "Floor plan," and "Shipping/Delivery Options."  Under the "Personnel/Hiring" heading, Paoline writes, "I have interviewed 2 promising candidates and have another interview scheduled today."

18.    Exhibit 8 is a June 10, 2016 e-mail from "DocuSign System . . . on behalf of Nicole Olmstead" to Blaine Smith.  Attached to the e-mail is a document titled "Prepurchase Management Agreement – Peterson v.2.doc.pdf."

19.    Exhibit 9 is the document attached to the June 10, 2016 e-mail depicted in Exhibit 8.  The document is titled "Prepurchase Management Agreement."  Page 1 of the Agreement shows that it is dated May 31, 2016; the agreement concerns "the pharmacy . . . located at 125 North Broadway, South Amboy, New Jersey"; PetersonRx, LLC is the "Owner" of the pharmacy and Skyline Health Services, LLC is the "Buyer"; and by "entering into this Agreement, it is the intention of the parties to place the parties in the same

economic position . . . as if . . . the ownership of the Pharmacy assets had already been transferred to Buyer." Page 15 shows that Dow Jones signed the Agreement on behalf of PetersonRx, LLC and Jeffrey Smith signed on behalf of Skyline Health Services, LLC.

20.    Exhibit 10 is a June 20, 2016 e-mail from "DocuSign System . . . on behalf of Nicole Olmstead" to Blaine Smith. The subject of the e-mail is "Purchase Agreements – Peterson." Attached to the e-mail is a file containing documents titled "Assert Purchase Agreement," "Bill of Sale, Assignment and Assumption Agreement," "Compliance Certificate," and "Indemnification Agreement." In the body of the e-mail, Alliance employee Nicole Olmstead writes, "Dear Dow, The attached agreements reflect the terms that have been agreed upon. . . . Upon Board approval, Jeff Smith will fully execute the agreements . . . ."

21.    Exhibit 11 is the file attached to the June 20, 2016 e-mail depicted in Exhibit 10. The file contains documents titled "Assert Purchase Agreement," "Bill of Sale, Assignment and Assumption Agreement," "Compliance Certificate," and "Indemnification Agreement." Page 1 of the Assert Purchase Agreement shows that PetersonRx, LLC is the "Seller" and New Jersey Rx, LLC is the "Buyer." Page 15 of the Asset Purchase Agreement shows that communications from the Buyer should be addressed to David Grant, who is listed

-6-

as the "General Counsel" of New Jersey Rx Holdings, LLC.  Page 16 of the Asset

Purchase Agreement shows that Jeffrey Smith was to sign the agreement on behalf

of New Jersey Rx, LLC.  Page 3 of the Bill of Sale shows that Jeffrey Smith was to

sign that agreement on behalf of New Jersey Rx, LLC.  Page 2 of the

Indemnification Agreement shows that Jeffrey Smith was to sign that agreement on

behalf of Alliance Medical Holdings, LLC.

     22.    Exhibit 12 is an August 2, 2016 e-mail from "DocuSign System

. . . on behalf of Nicole Olmstead" to Blaine Smith.  Attached to the e-mail are

documents entitled "Profits Interest Unit Grant New Jersey Rx – Kaycee

Metekingi.docx.pdf" and "Operating Agreement New Jersey Rx, LLC.docx.pdf."

     23.    Exhibit 13 is one of the documents attached to the August 2,

2016 e-mail depicted in Exhibit 12.  The document is titled "Profits Interest Unit

Grant New Jersey Rx – Kaycee Metekingi.docx.pdf."  Page 10 of the document

shows that Jeffrey Smith signed the Profits Interest Unit Grant on behalf of New

Jersey Rx, LLC.

     24.    Exhibit 14 is one of the documents attached to the August 2,

2016 e-mail depicted in Exhibit 12.  Page 1 of the document shows that it is titled

"Operating Agreement of New Jersey Rx, LLC."  Page 35 of the document shows

that Jeffrey Smith signed the Agreement on behalf of New Jersey Rx Holdings,

LLC.

-7-

25.     Exhibit 15 is a Certificate of Formation from the New Jersey Department of Treasury showing that Newton Rx, LLC was incorporated in New Jersey on July 18, 2016 by Newton Rx Holdings, LLC, with Jeffrey Smith signing as the authorized representative.  I downloaded this document from the website of the State of New Jersey Division of Revenue and Enterprise Services Business Records Service on April 6, 2018.

26.     During his April 25, 2018 deposition, Dow Jones testified that he discussed Alliance's purchase of the Peterson Pharmacy in New Jersey with Jeffrey Smith.  According to Jones, Jeffrey Smith "said that they'd like to own the pharmacy.  That . . . they're expanding and wanted to own the pharmacies." (*See* ¶ 9, Ex. 2, *supra*: Jones Dep. at 70:16-23; *see also id.* at 71:15-22; *id.* at 86:25-87:4.)  Later in his deposition, Jones testified, "We had a meeting where I discussed the concerns, and really it turned into a meeting about we're going to buy your pharmacies."  Jones testified that Jeff Smith and David Grant were in that meeting.  (*Id.* at 192:22-195:22.)

27.     Dow Jones testified during his April 25, 2018 deposition that after he sold the Peterson Pharmacy to Alliance and developed concerns about Alliance-affiliated pharmacies' billing practices, he "had a conversation" with Jeffrey Smith about those practices.  According to Jones, Jeffrey Smith told Jones

10359210v.1

that "they were looking into it." (*See* ¶ 9, Ex. 2, *supra*: Jones Dep. at 81:25-82:14; *see also id.* at 190:3-20.)

**B.    Evidence Related to Sahily Paoline**

28.    Exhibit 16 is Defendant Sahily Paoline's Responses to Plaintiffs' First Set of Interrogatories, received by Plaintiffs on April 9, 2018 via e-mail. Plaintiffs' interrogatory number 1 asked Paoline, "Identify all occasions in which you were physically present in the State of New Jersey for any purpose, including the dates and duration of all trips to the State of New Jersey." In response, Paoline made several objections and stated that "she was in New Jersey eight times. Seven of those trips were for personal or family purposes. One trip in November 2013 was for two-days to conduct an inventory of a pharmacy."

29.    Exhibit 3 is an August 15, 2013 e-mail chain with the subject "Re: Oklahoma and New Jersey Pharmacies" and involving Jeffrey Smith, Sahily Paoline, and Alliance employees Morgan Mower and Candace Czerny. Mower writes to Jeffrey Smith, "New Jersey Pharmacy said they are . . . sending over due diligence items tonight." Jeffrey Smith responds, "Candace, Please review these tomorrow so that we can book airlines for Si [Sahily Paoline] to . . . New Jersey[.] Si, Please arrange to get to these two locations, pending sign off from Candace."

30.    Exhibit 17 is an August 20, 2013 e-mail chain with the subject "RE: Peterson Letter of Intent." In an e-mail to James Beatty, the broker for the

-9-

Peterson Pharmacy in New Jersey, Sahily Paoline writes, "I will be conducting the site visit on Friday."

31.     Exhibit 4 is an August 25, 2013 e-mail from Sahily Paoline to, *inter alia*, Jeffrey Smith and Justin Leavitt with the subject "Peterson Pharmacy New Jersey." Attached to the e-mail is a document titled "Peterson NJ due diligence.docx" and twenty-one pictures of the Peterson Pharmacy in New Jersey. In the body of the e-mail, Paoline writes, "This is a WIN."

32.     Exhibit 5 is an August 27, 2013 e-mail from Jeffrey Smith to Candace Czerny with the subject "Re: POA will work in New Jersey, still working on CA and OK." Copied on the e-mail are, *inter alia*, Justin Leavitt and Sahily Paoline. In response to an e-mail from Czerny that has been deleted from Jeffrey Smith's reply, Smith writes, "terrific. Let's rock NJ - the planets have aligned for Si[.] sweet[.]"

33.     Exhibit 6 is a September 30, 2013 to October 2, 2013 e-mail chain with the subject "RE: Peterson Pharmacy POA." In that chain, Dow Jones writes to Morgan Mower, "Si has visited the pharmacy and . . . Surveyed competitive environment[,] Hours of other nearby pharmacies[,] Inventory levels[,] Floorplan layout compliance – including record storage, etc.[,] Shipping and delivery options[.]" Copied on that e-mail are, *inter alia*, Justin Leavitt, Sahily Paoline, and Jeffrey Smith.

-10-

34.     Exhibit 7 is an October 2, 2013 e-mail from Sahily Paoline to Dow Jones; copied are, *inter alia*, Jeffrey Smith and Justin Leavitt.  The subject of the e-mail is "Peterson update."  Sahily Paoline writes bullet-pointed notes on subjects including "Inventory," "Personnel/Hiring," "Hours of Operation," "Competition," "Floor plan," and "Shipping/Delivery Options."  Under the "Personnel/Hiring" heading, Paoline writes, "I have interviewed 2 promising candidates and have another interview scheduled today."

35.     When Dow Jones was asked during his April 25, 2018 deposition whether "Paoline . . . had made huge efforts to make the Peterson purchase happen," Jones answered, "Yes."  (*See* ¶ 9, Ex. 2, *supra*: Jones Dep. at 124:18-21.)

36.     During her April 12, 2018 deposition, Amin testified that Sahily Paoline "met me on the first day of work."  When asked whether Paoline "was actually in the pharmacy in New Jersey," Amin answered, "Yes."  (*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 18:12-22.)

37.     Exhibit 18 is a January 2, 2014 e-mail chain between Morgan Mower and Sahily Paoline with the subject "Re: Peterson counter top."  Mower writes:

> I spoke with Alex and he has ordered the countertop and will have it done pronto.  I guess there was a mess with Steve H. wanting to move a bunch of things around and try to come up with a bunch of ideas on how to structure the pharmacy different. . . .  Alex was a little

-11-

frustrated at Steve, because Steve does not know how these pharmacies are completely setup and is trying to step in to change everything. . . .  Steve says it does not matter where we put the table according to the board of pharmacy . . . .

38.    Exhibit 19 is a January 30, 2014 e-mail chain with the subject "Re: Peterson Pharmacy inventory," in which Sahily Paoline writes, "Just visited with Masum [Amin] and Dow [Jones] yesterday . . . ."

39.    During her April 12, 2018 deposition, Amin was asked who, besides her, was "involved in managing Peterson."  Amin answered that she had "remote managers.  When I first started, I was hired by Si [Sahily Paoline].  I met her on my first day.  And then I was introduced to Steve [Hadlock], who was my remote manager.  So any questions, any issues on setting up, whatever it was, it was relayed to him."  When asked if she reported to both Paoline and Hadlock as "remote managers," Amin answered, "Yes, yes."  (*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 13:23-14:16.)

40.    During his April 25, 2018 deposition, Dow Jones testified that when he became concerned with Alliance-affiliated pharmacies' billing practices, he "made a phone call to the regional managers . . . that managed the pharmacies."  When asked, "Who were the regional managers," Jones answered, "they worked for Si [Sahily Paoline] who ran the pharmacy side of things. . . .  She ran that side.  She had her people.  And so it was those people that I'd interface with when there was pharmacy questions."  (*See* ¶ 9, Ex. 2, *supra*: Jones Dep. at 85:3-86:2.)  Jones

-12-

later testified that he communicated with Paoline about Peterson Pharmacy "from time to time" about "pharmacy questions, operations, staff.  Probably mostly about staff. . . .  It was her and . . . her team, if I recall, that kind of vetted and hired and worked with the pharmacy staff."  (*See id.* at 94:25-95:16.)

41.     When asked during her April 12, 2018 deposition who she interviewed with for her job as the head pharmacist at the Peterson Pharmacy in New Jersey, Amin answered, "With Sahily Paoline."  When asked, "is she the one that hired you?" Amin answered, "Yes."  (*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 18:2-8.)

42.     During her April 12, 2018 deposition, Amin testified that she had conference calls with Sahily Paoline "maybe every other month.  It would be just a follow-up to see how the pharmacy is doing.  Or if there was something that needed to be notified across more than one pharmacy, there would be a conference call."  (*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 25:13-26:19.)

43.     Exhibit 20, marked as Plaintiffs' Exhibit 6 during Robert Bucco's April 6, 2018 deposition, is a March 31 to April 10, 2014 e-mail chain with the subject "Product" and involving Masum Amin, Dow Jones, Sahily Paoline, Steven Hadlock, and other Alliance employees.  On April 8, 2014, with Steven Hadlock copied, Amin wrote to Sahily Paoline:

> I wanted to reach out to express my concern on the One touch Ultra DME products. . . .

-13-

> I have told my shippers that I do not want any DME products on my
> picking [station], as I will not send them out.  I am concerned and
> need much more detailed information on the use of DME products.

Paoline responds, "we are currently unable to source any other One Touch product.

I wish there was another option, but none exists currently."  Amin wrote to Paoline

again on April 8, 2014, asking, "Si, Where do pharmacists stand on a liability

standpoint?  Every box that goes out has my name on it.  How do other dispensing

pharmacist[s] feel about this?"  Paoline responded:

> I understand and appreciate your concern . . . .  The patient is provided
> exactly the same product made by the same manufacturer . . . .
> Manufacturers currently try to control supply of product and earmark
> these products for specific delivery channels. . . .
>
> Steve [Hadlock] and I have had similar conversations with other
> pharmacists and after reviewing the background and explaining the
> company plan to remedy the situation, they have been on board.  I
> hope this helps you feel more comfortable with the situation.  If you
> still feel uneasy perhaps you, Amy [McMurtry] and I can set up a
> meeting to discuss further and discuss next steps. . . .

Two days later, on April 10, 2014, Amin replies, "Let's set up a call."

44.     Exhibit 21, marked as Plaintiffs' Exhibit 14 during Masum

Amin's April 12, 2018 deposition, is an April 10, 2014 e-mail from Alliance

employee Jose Vargas to Sahily Paoline with the subject line "Peterson."  Vargas

writes, "So I spoke with Justin about the situation with Peterson and the One

Touch not being shipped out because they are DME."

-14-

45.     Exhibit 22 is a July 1, 2014 e-mail from Alliance employee Amy McMurtry to, *inter alia*, Steven Hadlock, Sahily Paoline, and Masum Amin. The subject is "Pharmacy Audits." McMurtry writes, "When you receive a request for an audit please forward this to Steve Hadlock and he will work with you in collecting the necessary data for submission. He is now taking care of audits for all locations."

46.     Exhibit 23, marked as Plaintiffs' Exhibit 17 during Masum Amin's April 12, 2018 deposition, is a June 17, 2014 e-mail chain with the subject "Invoice Request- PETERSON PHARMACY" and involving, *inter alia*, Steven Hadlock and Sahily Paoline. Helena Lopez, an Investigator for the PBM Catamaran, e-mailed Peterson Pharmacy with an "invoice request notification." Lopez states, "your pharmacy will have to contact your wholesaler for NDCs on the attached request. Your wholesalers will need to send the invoices directly to me for review." Lopez's e-mail is forwarded to Hadlock, who writes to five Alliance employees, including Sahily Paoline, asking them to gather information or answer questions. Hadlock states, "I would like all the information to be to me by tomorrow for review."

47.     Exhibit 24 is a July 11 to July 12, 2014 e-mail chain between Dow Jones and Sahily Paoline with the subject "Re: Service Agreements." On July 11, 2014, Paoline writes to Jones, "Just a reminder that we need the remaining

-15-

service agreements signed by the end of this month. . . .  Let me know when you'd

be available and I can coordinate with David Grant."  Dow responds the next day,

"There were a few changes that had to be made on all the contracts.  I believe they

are complete, but will review with David and make sure."

48.     Exhibit 25, marked as Plaintiffs' Exhibit 7 during Robert

Bucco's April 6, 2018 deposition, is a September 22, 2014 e-mail chain with the

subject "Pharmacy audits," involving, *inter alia*, David Grant, Sahily Paoline,

Steven Hadlock, and Masum Amin.  Paoline writes to Alliance employees that

"any ONSITE and PURCHASE audits" should be submitted to herself and David

Grant.  Paoline's e-mail later is forwarded to, *inter alia*, Masum Amin.

49.     Exhibit 26 is a December 19, 2014 e-mail chain with the

subject "Fwd: Peterson Pharmacy Inspection Report" involving, *inter alia*, David

Grant and Sahily Paoline.  William Stilling e-mails David Grant with the subject

line "Timing for Licenses and New Jersey," summarizing how best to obtain an

inspection from the New Jersey Board of Pharmacy.

50.     Exhibit 27 is an April 6, 2016 to June 13, 2016 e-mail chain

involving, *inter alia*, Masum Amin, Sahily Paoline, and Alliance employees

Lindsey Oltmans, Amanda Haynie, and Amy McMurtry.  The subject of the e-mail

is "Re: Express Investigation – Peterson."  On June 13, 2016, Amin writes to

Haynie and Oltmans, "As you can see the NDC numbers we . . . received and what

-16-

is on the Invoice do not match. The product received does not match the ACCU50

and ULT50 billing NDC #s. How are we to proceed to correct this?" Later that

day, Oltmans e-mails McMurtry:

> Amy, it appears Masum is back and has lots of questions. Mostly
> regarding NDC and product as you can see below. Do you suggest
> Amanda has the NDC and different channels discussion? Or do you
> think we should set up a call with legal? I'm not sure how well the
> NDC discussion will go over with Masum.

McMurtry forwards this e-mail to Paoline, writing:

> Masum is back from maternity leave and . . . she has some
> questions/concerns over the NDC's on shipments and invoices not
> aligning. We have previously had the secondary market and
> DME/Medicare beneficiaries discussion with Masum, but we have not
> discussed the NDC issue or anything surrounding adjudications.
> Knowing Masum, I feel like she may respond better to legal having
> this discussion with her . . . . Thoughts?

Later that day, Paoline responds to McMurtry, "Totally agree, we should enlist

Legal from the get go."

       51.    During her April 12, 2018 deposition, Amin was asked whether

she "ever communicate[d] with Sahily Paoline about the fact that DME test strips

were being adjudicated as retail test strips." Amin answered that "there was a

conference call . . . in 2016 . . . that was set up to go over that." (*See* ¶ 8, Ex. 1,

*supra*: Amin Dep. at 58:14-59:18.) When asked who was on that conference call,

Amin answered, "Si [Sahily Paoline] was on it, I believe Amy [McMurtry], David

Grant was on it." (*See id.* at 59:19 24.)

52.     During her April 12, 2018 deposition, Amin was questioned regarding an e-mail she wrote to Dow Jones stating, "I do not feel comfortable dispensing DME packaged products while we are billing for retail test strips." When asked, "And Sahily Paoline was one of the people trying to convince you to do this?" Amin answered, "They were, yes, they were encouraging me to see it in a different way." (*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 76:21-77:25.)

53.     During her April 12, 2018 deposition, Amin testified that in 2016, after she expressed concern regarding shipment of DME products, she was told:

> this was what you had to do. And then . . . I was verbally told that "Maybe this is not the right fit for you as a position." I was told by Trisha Riggs that I wasn't doing my job, that I would have to be -- that they would even consider putting me on some kind of leave . . . . And then it just went downhill from there. It came from me saying, "I don't want to do it."

(*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 67:6-68:15.)

54.     During his April 25, 2018 deposition, Dow Jones recalled a conversation with Sahily Paoline and Amy McMurtry about his concerns with shipping DME test strips from Peterson Pharmacy in which "they said, 'Oh, they're exactly the same products. It's not a problem. It's just different labeling on the boxes." (*See* ¶ 9, Ex. 2, *supra*: Jones Dep. at 154:14-155:18.) When asked whether "Paoline and McMurtry encouraged Masum Amin to continue" dispensing DME packaged products while billing for retail test strips, Jones answered, "That's

-18-

correct." (*Id.* at 157:20-158:10.) Jones later testified, "I think I was . . . on the page that they were encouraging them to ship DME product." (*Id.* at 160:14-16.)

55.    Exhibit 28 is a screenshot from the New Jersey Division of Consumer Affairs website showing that Sahily Paoline is licensed as a pharmacist in New Jersey. Her license was issued on July 27, 2000, and her license status at the time of this screenshot was "Active." I downloaded this document from the website of the New Jersey Division of Consumer Affairs on April 5, 2018.

56.    Exhibit 29, marked as Plaintiffs' Exhibit 16 during Masum Amin's April 12, 2018 deposition, is an April 22 to April 23, 2014 e-mail chain between Amin and Dow Jones; Amin forwarded the chain to her personal e-mail account on February 23, 2017. On April 23, 2014, Amin wrote to Jones, "I know we have a short term band aid on the DME shipping with Si's [Sahily Paoline's] initials."

57.    During her April 12, 2018 deposition, Amin testified that when she refused to sign her name to boxes of DME strips on a particular day, Alliance "redid them with not my initials basically." When asked, "And they did it with Sahily Paoline's initials, is that right," Amin answered, "To my understanding, yes." She answered "Yes" when asked whether Paoline was "also a pharmacist" and "also licensed in New Jersey." Amin was asked again: "And so DME test strips went out from Peterson Pharmacy with Sahily Paoline's initials on them; is

-19-

that right?"  Amin answered, "That day, yeah."  (*See* ¶ 8, Ex. 1, *supra*: Amin Dep.
at 60:14-61:20.)  During her testimony on Plaintiffs' Exhibit 16 (*see* ¶ 56, Ex. 29,
*supra*), Amin stated that Paoline was "willing to put her initials on" DME strips
(*see* Amin Dep. at 84:6-22).

58.    During his Deposition on April 25, 2018, Dow Jones recalled
that after Amin spoke with Paoline about her concerns with shipping DME test
strips, "Si was going to sign off on sending DME product at that time."  (*See* ¶ 9,
Ex. 2, *supra*: Jones Dep. at 153:21-154:9.)  Jones later was asked, "because
Masum Amin was refusing to dispense DME products, Peterson was shipping
them with Paoline's approval instead; right," and Jones answered, "That was what
I understand was the short-term fix until they could get retail product."  (*Id.* at
176:8-12.)

## C.    Evidence Related to David Grant

59.    When Dow Jones was asked during his April 25, 2018
deposition, "did you communicate . . . with David Grant regarding your purchase
of Peterson Pharmacy," Jones answered, "Yes."  Specifically, Jones recalled
discussing "liabilities, you know, obligations that I would have as an owner" as
well as "What does the contract look like?"  When asked whether David Grant
"was . . . one of your primary points of communication at Alliance during the

process of buying the pharmacy," Jones answered, "I believe so." (*See* ¶ 9, Ex. 2, *supra*: Jones Dep. at 96:14-97:7.)

60.     Exhibit 24 is a July 11 to July 12, 2014 e-mail chain between Dow Jones and Sahily Paoline with the subject "Re: Service Agreements." On July 11, 2014, Paoline writes to Jones, "Just a reminder that we need the remaining service agreements signed by the end of this month. . . . Let me know when you'd be available and I can coordinate with David Grant." Dow responds the next day, "There were a few changes that had to be made on all the contracts. I believe they are complete, but will review with David and make sure."

61.     Exhibit 26 is a December 19, 2014 e-mail chain with the subject "Fwd: Peterson Pharmacy Inspection Report" involving, *inter alia*, David Grant and Sahily Paoline. William Stilling e-mails David Grant with the subject line "Timing for Licenses and New Jersey," summarizing how best to obtain an inspection from the New Jersey Board of Pharmacy.

62.     Exhibit 25, marked as Plaintiffs' Exhibit 7 during Robert Bucco's April 6, 2018 deposition, is a September 22, 2014 e-mail chain with the subject "Pharmacy audits," involving, *inter alia*, David Grant, Sahily Paoline, Steven Hadlock, and Masum Amin. Paoline writes to Alliance employees that "any ONSITE and PURCHASE audits" should be submitted to herself and David Grant. Paoline's e-mail later is forwarded to, *inter alia*, Masum Amin.

63.     During her April 12, 2018 deposition, Amin testified that she communicated with David Grant "over E-mail and some phone conversations as well." "[T]owards the end" of Amin's time working at the Peterson Pharmacy, she communicated with Grant "pretty frequently, like, just a couple of times over the phone to clear up things and then just some E-mails." (*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 27:7-25.)

64.     During her April 12, 2018 deposition, Amin was asked whether she "ever communicate[d] with Sahily Paoline about the fact that DME test strips were being adjudicated as retail test strips." Amin answered that "there was a conference call . . . in 2016 . . . that was set up to go over that." (*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 58:14-59:18.) When asked who was on that conference call, Amin answered, "Si [Sahily Paoline] was on it, I believe Amy [McMurtry], David Grant was on it." (*See id.* at 59:19-24.)

65.     During her April 12, 2018 deposition, Amin explained that Alliance officials told her

> that the term 'alternatively packaged products' was used a lot. . . . I was referenced FDA websites and told that the FDA doesn't recognize billing through NDC numbers. It's just the drug identifier. And that if manufacturers choose to have alternatively packaged products, that doesn't change the integrity of the product, which means you can use it. That was basically the message I took away, and that was told on more than one occasion.

When asked "who was it that was telling you that," Amin answered, "It came from – it was a step . . . David [Grant] was the last step basically, when we had that conference call." (*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 65:22-66:15.)

66.     During her April 12, 2018 deposition, Amin testified that when she expressed concerns about sending patients DME strips but billing PBMs for retail strips, David Grant was one of the people at Alliance who

> explain[ed] to [her] that it's not a health care issue. Like, as a pharmacist, you're not giving the patient the wrong stuff. This is a contractual issue or a contractual thing, not a health care thing, so . . . you're not doing wrong because you're still giving the patient OneTouch, you're still giving them the right stuff, it's just not in the form – it's an alternatively packaged form. And that's to channel different avenues, markets is the way he had explained it.

(*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 66:12-67:2.)

67.     During her April 12, 2018 deposition, Amin testified that in 2016:

> I was basically requesting from David Grant, "I want something in writing that tells me that this is what is expected of me, and that from your legal point of view, I, as a pharmacist, am not doing anything incorrectly."

> And I was told that to get anything like that, a nondisclosure would have to be signed and whatever document was given to me would have to be something that can only be shared if asked to a judge directly, not to just anybody, and that was, that was the end of that.

When asked, "Did you ever get anything in writing," Amin answered, "No." (*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 103:20-104:16.)

-23-

68.     Exhibit 30, marked as Plaintiffs' Exhibit 22 during Masum

Amin's April 12, 2018 deposition, is a June 16, 2016 e-mail from Amin to David

Grant with the subject "Call Follow up Regarding Product selection and

dispensing."  Amin wrote:

> I wanted to recap what we discussed in hopes to make sure I understand everything correctly.
>
> -FDA intention of the use of NDC # is to identify product- that's all
>
> -Manufacturers have taken the slightly altered NDC # as a means to channel product in different distributions, resulting in increased rebates and profits etc
>
> -a secondary market is used to purchase discounted DTS [diabetic test strips] so business plan can be sustainable
>
> -Alta distributors do not recognize different manufacture NDC#s, so they send product all under one retail item #/NDC#
>
> - As a company, Alliance Health, does not differentiate between the retail packaging and manufacturers alternative packaging.  Ex: "mail order only" or "Institutional use only"
>
> -Since the company does not differentiate in the manufacture, the billing concerns are contractual concerns and not a regulatory matter
>
> - according to FWA and medicare-d billing, based on the FDA intention of the use of an NDC, billing of medicare with the retail NDC, and dispensing any of the manufactures packaging is acceptable
>
> . . .
>
> As dispensing pharmacists we are billing PBMs, including medicare-d, for a retail NDC# which is linked to a specific reimbursement rate, while we may be sending out a differently packaged product. Regardless of the integrity of the product and the use of FDA's definition of an NDC#, the reimbursement rates are established by

-24-

PBMs and they are linking that rate to the different NDC # numbers on the manufacturers packaging.

David to be clear, as per company belief of no product differentiation, the pharmacist is to knowing bill retail NDC# and send out alternatively packaged product?

Thank you for the detailed information on the call and the legal clarifications provided. . . .

I appreciate your counsel,

Masum Amin

69.     During her April 12, 2018 deposition, Amin summarized the billing practice discussed in her June 16, 2016 e-mail to David Grant depicted in Exhibit 30 during the following colloquy:

[Counsel]: Now when Peterson Pharmacy dispensed DME test strips, what product did it bill the patient's insurance for?

[Amin]: We billed the short code, which was -- it was like OTU 50 or something.  It was something like that.  So it was the same short code from the beginning to end, so it never got updated.

Q: And when you entered that short code, which product's NDC was populated?

A: That's your retail NDC number.

Q: And so when you delivered DME test strips to a patient, their insurance would be billed for retail test strips?

A: Correct.

(*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 55:4-18.)

Amin noted that she had "concerns" with this practice and that "[t]he concerns were expressed numerous times." (*Id.* at 57:3-10.)

70.     During her April 12, 2018 deposition, Amin testified that the

June 16, 2016 e-mail to David Grant depicted in Exhibit 30 was "my recap from a

conference call we had.  I just -- we discussed so many things that I had sent a

recap just to make sure that the points I took away from the call were the actual

points they were trying to make."  (*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 109:2-7.)

Amin testified that Grant led the conference call, during which

> He basically had reviewed, like, secondary markets; he talked about
> how the FDA defined NDC numbers; what the company as Alliance
> Health recognized; and then he touched based on the fraud, waste,
> abuse concern that I had mentioned; and there was a 50- versus 100-
> count NDC issue.  He kind of touched upon everything that was in E-
> mail threads prior to.

(*See id.* at 111:17-112:3.)

71.     When Amin was asked during her April 12, 2018 deposition

whether David Grant "encourage[d] you to send out DME test strips and bill for

retail test strips," Amin answered,

> I took it as encouragement.  He was very adamant on just telling me
> that it's not a pharmacy issue, that I'm not giving somebody the
> wrong product, it's a contractual issue.  It was -- that was, like, the
> only thing that he had on repeat, despite my concerns not being that
> I'm giving somebody the wrong product.

(*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 112:13-21.)

72.     During her April 12, 2018 deposition, Amin testified that David

Grant never responded to the part of her June 16, 2016 e-mail depicted in Exhibit

-26-

30 asking, "David to be clear, as per company belief of no product differentiation, the pharmacist is to knowing bill retail NDC# and send out alternatively packaged product?" (*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 114:23-115:8.)

73.    Exhibit 31, marked as Plaintiffs' Exhibit 24 during Masum Amin's April 12, 2018 deposition, is an April 6 to June 17, 2014 e-mail chain involving, *inter alia*, Masum Amin and Alliance employee Amanda Haynie.  The subject is "Re: Follow up."  On June 16, 2016, Haynie writes to Amin:

> I know you still have a couple of questions out to David for clarification, but I just wanted to check in after having the meeting earlier today and see if you are feeling more comfortable/confident with everything overall?  Are you able to send all patients out or are you still holding any aside?

On June 17, 2016, Amin replied:

> I am still holding accounts.  After the call and spending more time thinking about what was said, I realize that the company belief is not how the billing rules work.  The belief is a belief not what is currently accepted practice.  I read all of David's links and they are all informative and I have a better understanding of the secondary market.  However in the links there was no actual informations of that addresses the billing/dispensing concerns.  I have re read the FWA training that was sent, and I am still confused and not confident on the fact that Peterson Pharmacy Pharmacists are expected to knowingly/intentionally dispense different NDC # products while billing the retail NDC#.

> I understand that this may be a complex contractual issue, not a regulatory one, and David may very well see that this is a legally acceptable.  As dispensing pharmacists, we need to be absolutely clear that we are understanding the company expectation clearly and that it is in David's professional counsel that this is appropriate practice and

the dispensing pharmacists are not doing anything that can be deemed as Fraud, Waste, or Abuse.

74.     During her April 12, 2018 deposition, Amin agreed that on or about June 22, 2016, she placed a call to the "hotline that the US Department of Health and Human Services -- for reporting fraud, waste, and abuse." Amin testified that during that call, "I just told them . . . all the steps I had taken and what was being expected of me and how I didn't feel comfortable, that I was at a point where I didn't know what else to do besides tell them." When asked, "And the issue that you reported was billing insurance for one NDC when you were delivering a different product to the customer," Amin answered, "yes, like, we're billing one NDC, dispensing another NDC." Amin further agreed that during her call to the hotline, she told them that she "spoke to the remote manager about her concern," and that by remote manager, she meant "all the way up the chain to David [Grant]." (*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 125:14-127:9.)

75.     When Dow Jones was asked during his April 25, 2018 deposition whether he "investigate[d] whether Peterson Pharmacy had ever engaged in this billing practice of dispensing a product with one national drug code and billing for another," Jones testified, "Those were some of the conversations we had with legal counsel." Jones clarified that "legal counsel" meant David Grant. According to Jones, Grant told Jones "that . . . there was some allegations that's what was happening, and they'd look into it and let me know what was going on."

-28-

Jones recalled that Grant never "specifically outline[d] to me . . . if the practice was or wasn't happening." (*See* ¶ 9, Ex. 2, *supra*: Jones Dep. at 80:4-19; *see also id.* at 97:11-98:8.)

76.     During his April 25, 2018 deposition, Dow Jones answered "Yes" when asked whether he "communicate[d] with Mr. Grant regarding Alliance's purchase of Peterson." When asked, "And then was he [David Grant] your point of contact with Alliance as you negotiated the terms of that purchase," Jones responded, "He was." (*See* ¶ 9, Ex. 2, *supra*: Jones Dep. at 98:9-19). Later, when asked, "who was it that first told you that they [Alliance] wanted to buy the [Peterson] pharmacy," Jones responded, "I believe it was David Grant who initiated that." (*Id.* at 192:6-9.) Jones testified that it was David Grant who presented him with the Prepurchase Agreement depicted in Exhibit 9. (*See id.* at 199:8-18.)

77.     Exhibit 11 is the file attached to the June 20, 2016 e-mail depicted in Exhibit 10. The file contains documents titled "Assert Purchase Agreement," "Bill of Sale, Assignment and Assumption Agreement," "Compliance Certificate," and "Indemnification Agreement." Page 1 of the Assert Purchase Agreement shows that PetersonRx, LLC is the "Seller" and New Jersey Rx, LLC is the "Buyer." Page 15 of the Asset Purchase Agreement shows that communications from the Buyer should be addressed to David Grant, who is listed

-29-

as the "General Counsel" of New Jersey Rx Holdings, LLC.  Page 16 of the Asset

Purchase Agreement shows that Jeffrey Smith was to sign the agreement on behalf

of New Jersey Rx, LLC.  Page 3 of the Bill of Sale shows that Jeffrey Smith was to

sign that agreement on behalf of New Jersey Rx, LLC.  Page 2 of the

Indemnification Agreement shows that Jeffrey Smith was to sign that agreement on

behalf of Alliance Medical Holdings, LLC.

**D.     Evidence Related to Steven Hadlock**

78.     Exhibit 32 is a December 19, 2013 e-mail chain between Steven

Hadlock and Masum Amin with the subject "RE: Peterson Pharmacy."  Hadlock

writes to Amin:

> I would like to welcome you to our organization.  I will be your direct
> link to concerns you may have as a pharmacist.  Please feel free to call
> me or e-mail me for any of your concerns.
>
> . . .
>
> I have attached to this e-mail several documents that we use and are
> required by most inspectors or auditors.  Please put them in an
> electronic file in the Pharmacists computer for reference.  You will
> also need to print them out and have ready to use in the pharmacy
> itself.
>
> I will be calling you to train you on the documents and how they
> relate to our process.

In response to questions from Amin, Hadlock wrote to Amin and Alliance

employee Amber Parr,

> Amber,

Do you have the pool of resumes from Peterson Pharmacy that we can review as a possible 2nd Per Diem pharmacist? . . .

Masum,

I would like to see you with at least 2 and maybe 3 per diem pharmacists to help at your site. We may also want to look for a per diem technician for current and foreseen future needs.

79.     During her April 12, 2018 deposition, Amin was asked who, besides her, was "involved in managing Peterson." Amin answered that she had "remote managers. When I first started, I was hired by Si [Sahily Paoline]. I met her on my first day. And then I was introduced to Steve [Hadlock], who was my remote manager. So any questions, any issues on setting up, whatever it was, it was relayed to him." When asked if she reported to both Paoline and Hadlock as "remote managers," Amin answered, "Yes, yes." (*See* ¶ 8, Ex. 1, *supra*: Amin Dep. at 13:23-14:16.)

80.     Exhibit 23, marked as Plaintiffs' Exhibit 17 during Masum Amin's April 12, 2018 deposition, is a June 17, 2014 e-mail chain with the subject "Invoice Request- PETERSON PHARMACY" and involving, *inter alia*, Steven Hadlock and Sahily Paoline. Helena Lopez, an Investigator for the PBM Catamaran, e-mailed Peterson Pharmacy with an "invoice request notification." Lopez states, "your pharmacy will have to contact your wholesaler for NDCs on the attached request. Your wholesalers will need to send the invoices directly to me for review." Lopez's e-mail is forwarded to Hadlock, who writes to five

-31-

Alliance employees, including Sahily Paoline, asking them to gather information or answer questions.  Hadlock states, "I would like all the information to be to me by tomorrow for review."

81.    Exhibit 20, marked as Plaintiffs' Exhibit 6 during Robert Bucco's April 6, 2018 deposition, is a March 31 to April 10, 2014 e-mail chain with the subject "Product" and involving Masum Amin, Dow Jones, Sahily Paoline, Steven Hadlock, and other Alliance employees.  On April 8, 2014, with Steven Hadlock copied, Amin wrote to Sahily Paoline:

> I wanted to reach out to express my concern on the One touch Ultra DME products. . . .
>
> I have told my shippers that I do not want any DME products on my picking [station], as I will not send them out.  I am concerned and need much more detailed information on the use of DME products.

Paoline responds, "we are currently unable to source any other One Touch product. I wish there was another option, but none exists currently."  Amin wrote to Paoline again on April 8, 2014, asking, "Si, Where do pharmacists stand on a liability standpoint?  Every box that goes out has my name on it.  How do other dispensing pharmacist[s] feel about this?"  Paoline responds:

> I understand and appreciate your concern . . . .  The patient is provided exactly the same product made by the same manufacturer . . . . Manufacturers currently try to control supply of product and earmark these products for specific delivery channels. . . .
>
> Steve [Hadlock] and I have had similar conversations with other pharmacists and after reviewing the background and explaining the

-32-

company plan to remedy the situation, they have been on board. I
hope this helps you feel more comfortable with the situation. If you
still feel uneasy perhaps you, Amy [McMurtry] and I can set up a
meeting to discuss further and discuss next steps. . . .

Two days later, on April 10, 2014, Amin replies, "Let's set up a call."

82.    Exhibit 22 is a July 1, 2014 e-mail from Alliance employee

Amy McMurtry to, *inter alia*, Steven Hadlock, Sahily Paoline, and Masum Amin.

The subject is "Pharmacy Audits." McMurtry writes, "When you receive a request

for an audit please forward this to Steve Hadlock and he will work with you in

collecting the necessary data for submission. He is now taking care of audits for

all locations."

83.    Exhibit 33 is an August 5, 2014 e-mail from Steven Hadlock to,

*inter alia*, Masum Amin with the subject "Pending Audits." Hadlock writes:

"Pharmacists in Charge, Each of you have at least one audit that is in the pending

list. If you have received any correspondence regarding an audit please get that

information to me ASAP."

84.    Exhibit 25, marked as Plaintiffs' Exhibit 7 during Robert

Bucco's April 6, 2018 deposition, is a September 22, 2014 e-mail chain with the

subject "Pharmacy audits," involving, *inter alia*, David Grant, Sahily Paoline,

Steven Hadlock, and Masum Amin. Paoline writes to Alliance employees that

"any ONSITE and PURCHASE audits" should be submitted to herself and David

Grant. Paoline's e-mail later is forwarded to, *inter alia*, Masum Amin.

-33-

85.    Exhibit 18 is a January 2, 2014 e-mail chain between Morgan Mower and Sahily Paoline with the subject "Re: Peterson counter top."  Mower writes:

> I spoke with Alex and he has ordered the countertop and will have it done pronto.  I guess there was a mess with Steve H. wanting to move a bunch of things around and try to come up with a bunch of ideas on how to structure the pharmacy different. . . .  Alex was a little frustrated at Steve, because Steve does not know how these pharmacies are completely setup and is trying to step in to change everything. . . .  Steve says it does not matter where we put the table according to the board of pharmacy . . . .

**E.    Evidence Related to Justin Leavitt**

86.    Exhibit 4 is an August 25, 2013 e-mail from Sahily Paoline to, *inter alia*, Jeffrey Smith and Justin Leavitt with the subject "Peterson Pharmacy New Jersey."  Attached to the e-mail is a document titled "Peterson NJ due diligence.docx" and twenty-one pictures of the Peterson Pharmacy in New Jersey.  In the body of the e-mail, Paoline writes, "This is a WIN."

87.    Exhibit 5 is an August 27, 2013 e-mail from Jeffrey Smith to Candace Czerny with the subject "Re: POA will work in New Jersey, still working on CA and OK."  Copied on the e-mail are, *inter alia*, Justin Leavitt and Sahily Paoline.  In response to an e-mail from Czerny that has been deleted from Jeffrey Smith's reply, Smith writes, "terrific.  Let's rock NJ - the planets have aligned for Si[.]  sweet[.]"

-34-

88.     Exhibit 34 is an August 27, 2013 e-mail from Justin Leavitt to Alliance employee Morgan Mower with the subject "APA – Peterson _ working copy."  Attached to the e-mail is a document titled "APA – Peterson _ working copy.docx."  Leavitt writes to Mower, "Attached is the APA for Peterson Pharmacy.  This is a draft and working copy and is subject to further review and revisions on our part, but in the interest of time, wanted to provide the general framework for Peterson to review."

89.     Exhibit 6 is a September 30, 2013 to October 2, 2013 e-mail chain with the subject "RE: Peterson Pharmacy POA."  In that chain, Dow Jones writes to Morgan Mower, "Si has visited the pharmacy and . . . Surveyed competitive environment[,] Hours of other nearby pharmacies[,] Inventory levels[,] Floorplan layout compliance – including record storage, etc.[,] Shipping and delivery options[.]"  Copied on that e-mail are, *inter alia*, Justin Leavitt, Sahily Paoline, and Jeffrey Smith.

90.     Exhibit 7 is an October 2, 2013 e-mail from Sahily Paoline to Dow Jones; copied are, *inter alia*, Jeffrey Smith and Justin Leavitt.  The subject of the e-mail is "Peterson update."  Sahily Paoline writes bullet-pointed notes on subjects including "Inventory," "Personnel/Hiring," "Hours of Operation," "Competition," "Floor plan," and "Shipping/Delivery Options."  Under the

"Personnel/Hiring" heading, Paoline writes, "I have interviewed 2 promising candidates and have another interview scheduled today."

91.    Exhibit 35 is a September 30 to October 4, 2013 e-mail chain involving Justin Leavitt, Dow Jones, Morgan Mower and Peterson Pharmacy broker James Beatty.  The subject is "RE: POA for Peterson."  Attached to the e-mail are documents titled "APA – Peterson _ working copy.docx" and "Schedules.xlsx."  On October 4, 2013, Leavitt writes to Dow Jones:

> Attached is the latest version of the APA.  I would review it to ensure it reflects your discussion with the seller . . . .  We also need to fill out the schedules/exhibits I sent over the other day.  (I have reattached) I will have one of my staff fill it out what we can, and then I'll resend so that you and the seller can complete.
>
> . . .
>
> Our attorneys are abstaining from working on or further reviewing these documents as they insist this is necessary to keep the arm's length nature of the transaction in place. . . .

92.    Exhibit 36 is a September 9, 2013 e-mail from Justin Leavitt to Morgan Mower with the subject "Peterson POAs for their review."  Attached to the e-mail are two documents titled "POA for Controlled Substances-Peterson.DOC" and "POA NPI NCPDP and License-Peterson.DOC."  In the body of the e-mail, Leavitt writes, "These documents are for review only and are not in final form yet.  Please pass along to Peterson."

93.     During his April 25, 2018 deposition, Dow Jones recalled that Justin Leavitt "was . . . part of the negotiating and management contract that we were going to abide by and live by" for the Peterson Pharmacy in New Jersey. According to Jones, he and Leavitt discussed "[t]he compensation, the terms, conditions, my share of the profits, et cetera. He was part of that." When asked, "was he [Leavitt] another primary point of contact for you during the purchase process of Peterson," Jones answered, "He was." (*See* ¶ 9, Ex. 2, *supra*: Jones Dep. at 99:14-100:12.) Later during his deposition, Jones recalled that Leavitt "was involved in the process [of purchasing Peterson] and would keep me in the loop of what was going on." (*Id.* at 117:19-118:5.)

94.     During his April 25, 2018 deposition, Dow Jones testified that Alliance "managed the lockbox and collection of the reimbursements" for Peterson Pharmacy. When asked, "And was it Justin Leavitt who managed that," Jones answered, "My understanding is he managing it, and he and his team managing that." (*See* ¶ 9, Ex. 2, *supra*: Jones Dep. at 100:24-101:11.) Later during his deposition, when asked, "do you recall now that Peterson was required to send P&L statements to Justin Leavitt on the 15th of every month," Jones responded, "Yes." (*Id.* at 132:20-23.)

95.     Exhibit 21, marked as Plaintiffs' Exhibit 14 during Masum Amin's April 12, 2018 deposition, is an April 10, 2014 e-mail from Alliance

-37-

employee Jose Vargas to Sahily Paoline with the subject line "Peterson." Vargas writes, "So I spoke with Justin about the situation with Peterson and the One Touch not being shipped out because they are DME."

**F.   Evidence Related to Blaine Smith**

96.   Exhibit 8 is a June 10, 2016 e-mail from "DocuSign System . . . on behalf of Nicole Olmstead" to Blaine Smith. Attached to the e-mail is a document titled "Prepurchase Management Agreement – Peterson v.2.doc.pdf."

97.   Exhibit 10 is a June 20, 2016 e-mail from "DocuSign System . . . on behalf of Nicole Olmstead" to Blaine Smith. The subject of the e-mail is "Purchase Agreements – Peterson." Attached to the e-mail is a file containing documents titled "Assert Purchase Agreement," "Bill of Sale, Assignment and Assumption Agreement," "Compliance Certificate," and "Indemnification Agreement." In the body of the e-mail, Alliance employee Nicole Olmstead writes, "Dear Dow, The attached agreements reflect the terms that have been agreed upon. . . . Upon Board approval, Jeff Smith will fully execute the agreements . . . ."

98.   Exhibit 12 is an August 2, 2016 e-mail from "DocuSign System . . . on behalf of Nicole Olmstead" to Blaine Smith. Attached to the e-mail are documents entitled "Profits Interest Unit Grant New Jersey Rx – Kaycee Metekingi.docx.pdf" and "Operating Agreement New Jersey Rx, LLC.docx.pdf."

99.     During his April 25, 2018 deposition, Dow Jones testified that

Blaine Smith "was vice president of sales" at Alliance.  (*See* ¶ 9, Ex. 2, *supra*:

Jones Dep. at 49:24-50:7.)  When asked, "during the years that you owned

Peterson, did you communicate with Blaine Smith then," Jones replied, "Yeah,

there was conversation about status, how things were going.  Sales are up, sales are

down."  (*Id.* at 102:15-21.)

100.    During his April 25, 2018 deposition, Dow Jones testified that

Blaine Smith "was part and privy to conversations I was having with Jeff [Smith]

. . . and David Grant at the time" of his sale of Peterson Pharmacy to Alliance.

(*See* ¶ 9, Ex. 2, *supra*: Jones Dep. at 200:8-12.)

**G.     Evidence Related to Alison Wistner and Adam Koopersmith**

101.    Exhibit 10 is a June 20, 2016 e-mail from "DocuSign System

. . . on behalf of Nicole Olmstead" to Blaine Smith.  The subject of the e-mail is

"Purchase Agreements – Peterson."  Attached to the e-mail is a file containing

documents titled "Assert Purchase Agreement," "Bill of Sale, Assignment and

Assumption Agreement," "Compliance Certificate," and "Indemnification

Agreement."   In the body of the e-mail, Alliance employee Nicole Olmstead

writes, "Dear Dow, The attached agreements reflect the terms that have been

agreed upon. . . .  Upon Board approval, Jeff Smith will fully execute the

agreements . . . ."

102.   During his deposition, when asked if the "Alliance board did in fact approve the purchase of Peterson Pharmacy," Dow Jones responded "I believe they did, so -- I don't believe I own it anymore . . . ." (*See* ¶ 9, Ex. 2, *supra*: Jones Dep. at 205:9-12.)

**H.   Evidence Related to Zions Bank**

103.   Exhibit 37 is Defendant ZB, NA's Rule 26(a) Initial Disclosures, received by Plaintiffs on April 4, 2018 via e-mail.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 2, 2018

Ryan Mott

-40-