Thomas R. Curtin
George C. Jones
McELROY, DEUTSCH, MULVANEY
 & CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075
(973) 993-8100

*Attorneys for Plaintiff LifeScan, Inc.*

<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| LIFESCAN, INC.,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>JEFFREY C. SMITH; GEOFFREY S. SWINDLE; STEVEN L. HADLOCK; SAHILY PAOLINE; DAVID GRANT; JUSTIN LEAVITT; BLAINE SMITH; TRAVIS HUGHES; ALISON WISTNER; ADAM KOOPERSMITH; ZB, N.A.; HUGHES & COMPANY; HUGHES & COMPANY INVESTMENT PARTNERS, LLC; KESMAN HUGHES & COMPANY, LLC; HS MEDSOURCE HOLDCO, LLC; MERCATO MANAGEMENT, LLC; MERCATO PARTNERS, LLC; MERCATO PARTNERS GROWTH II GP, LLC; MERCATO PARTNERS GROWTH II, L.P.; MERCATO PARTNERS GROWTH AFFILIATES II, L.P.; MERCATO PARTNERS AI II, L.P.; MERCATO PARTNERS INGRAM, LLC; MERCATO PARTNERS INGRAM CO-INVEST, LLC; JABODON PT COMPANY LLC; PRITZKER GROUP VENTURE CAPITAL LLC; NWV-ALLIANCE LLC; & NWV-ALLIANCE-2 LLC;<br><br>　　　　　　　Defendants. | Civil Action No. 17-5552 (CCC) (CLW)<br><br><br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br><br><br><br>**PUBLIC VERSION: REDACTED** |

1.　　　Plaintiff LifeScan, Inc. ("LifeScan"), for its Complaint against Defendants

Jeffrey C. Smith; Geoffrey S. Swindle; Steven L. Hadlock; Sahily Paoline; David Grant; Justin

Leavitt; Blaine Smith; Travis Hughes; Alison Wistner; Adam Koopersmith; ZB, N.A. ("Zions

Bank"); Hughes & Company; Hughes & Company Investment Partners, LLC; Kesman Hughes

& Company, LLC; HS Medsource Holdco, LLC; Mercato Management, LLC; Mercato Partners, LLC; Mercato Partners Growth II GP, LLC; Mercato Partners Growth II, L.P.; Mercato Partners Growth Affiliates II, L.P.; Mercato Partners AI II, L.P.; Mercato Partners Ingram, LLC; Mercato Partners Ingram Co-Invest, LLC; Jabodon PT Company LLC (d/b/a Pritzker Group Venture Capital and Pritzker Group Venture Capital); Pritzker Group Venture Capital LLC; NWV-Alliance LLC; and NWV-Alliance-2 LLC, hereby allege as follows:

## <u>NATURE OF THE ACTION</u>

2.      This action arises out of a years-long, fraudulent racketeering scheme perpetrated by Defendants that cheated LifeScan out of tens of millions of dollars.

3.      LifeScan is a manufacturer of medical equipment, including blood glucose test strips, for patients with diabetes.

4.      Defendants are former officers and directors of Alliance Medical Holdings, LLC and its predecessors (collectively, "Alliance"), as well as investors and banks that knowingly supported Alliance's fraud.

5.      The purpose of the fraud was to generate millions of dollars of illicit profits for Alliance, and its investors and funders, by taking improper advantage of the fact that LifeScan sells its blood glucose test strips through two insurance regimes for two different prices.

6.      As detailed below, LifeScan manufactures blood glucose test strips packaged for sale to beneficiaries of healthcare plans that cover them under a so-called pharmacy benefit ("Pharmacy Plans"), and it also manufactures test strips packaged for sale to beneficiaries of healthcare plans that cover them under a so-called durable medical equipment benefit ("DME Plans").

7.      Test strips packaged for sale through Pharmacy Plans ("Retail Strips")

have a substantially higher wholesale price than test strips packaged for sale through DME Plans ("DME Strips").  LifeScan, however, pays substantial rebates on Retail Strips paid for by Pharmacy Plans, which it does not pay on the lower-priced DME Strips.  As a consequence, LifeScan's net revenues on sales of Retail Strips and DME Strips are comparable.

8.      Defendants, knowing this price structure and acting through businesses that they controlled and financed, concocted and perpetrated a scheme wherein they bought millions of boxes of DME Strips on the gray market, sold them to beneficiaries of Pharmacy Plans, and fraudulently sought reimbursement from the Pharmacy Plans (through those Plans' agents) by falsely claiming to have sold higher-priced Retail Strips.  The Pharmacy Plans paid out on what they did not know to be fraudulent insurance claims and then claimed and received substantial rebates from LifeScan.

9.      According to sworn testimony of former Alliance executives, the practice of fraudulently claiming to Pharmacy Plans that Retail Strips were sold, when, in fact, DME Strips were sold, was the "foundational practice" of Alliance and an "integral part of [Alliance's] business model."  It was known to and facilitated by Alliance's senior management, its Board of Directors, and its key investors.

10.      Alliance's general counsel described the fraud as a "fact" in a 2015 memorandum to Alliance's Board of Directors.  That memorandum also stated that Alliance's profitability depended on the fraud, which continued for more than a year after the memorandum was circulated.

11.      Through their fraud, Defendants scammed tens of millions of dollars from Pharmacy Plans and, ultimately, from LifeScan, which was not only deprived of sales of more than one million boxes of Retail Strips but also paid tens of millions of dollars in rebates to Pharmacy Plans on illusory sales of Retail Strips.

12.     LifeScan, therefore, brings this action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, and state law to recover for its losses.

## PARTIES

13.     Plaintiff LifeScan, Inc. is a corporation organized under the laws of the State of California, with its principal place of business at 965 Chesterbrook Boulevard, Wayne, Pennsylvania 19087.  During the times relevant to the allegations herein, LifeScan was a wholly-owned operating subsidiary of Johnson & Johnson, a New Jersey corporation headquartered in New Brunswick, New Jersey.  On October 2, 2018, Johnson & Johnson sold its ownership interest in LifeScan to DUV Holding Corporation, which indirectly owns 100% of LifeScan's stock.

14.     On information and belief, Defendant Jeffrey C. Smith is a Utah resident, having an address at 987 East Old English Road, Draper, Utah 84020.  Smith was Chief Executive Officer of Alliance Medical Holdings, LLC ("Alliance") until the middle of 2017.

15.     On information and belief, Defendant Geoffrey S. Swindle is a Utah resident, having an address at 1389 East Harvard Avenue, Salt Lake City, Utah 84105.  Swindle founded one of Alliance's predecessors and served as Alliance's Chief Strategy Officer until October 2015.

16.     On information and belief, Defendant Steven L. Hadlock is a Utah resident.  Hadlock was Director of Pharmacy Operations of Alliance.

17.     On information and belief, Defendant Sahily Paoline is a Utah resident.  Paoline was Senior Vice President of Pharmacy Operations of Alliance and was the Pharmacist in Charge ("PIC") of Medsource Rx, a pharmacy controlled by Alliance.

18.     On information and belief, Defendant David Grant is a Utah resident.  Grant was General Counsel of Alliance.

19.     On information and belief, Defendant Justin Leavitt is a Utah resident. Leavitt is the former Chief Financial Officer of Alliance.

20.     On information and belief, Defendant Blaine Smith is a Utah resident. Smith was the Chief Revenue Officer of Alliance.

21.     Defendants Jeffery Smith, Swindle, Hadlock, Paoline, Grant, Leavitt and Blaine Smith are collectively referenced herein as the "**Officer Defendants**."

22.     On information and belief, Defendant Alison Wistner is a Utah resident. Wistner was a director of Alliance and Managing Director of Mercato Partners, LLC, a major investor in Alliance.  At all relevant times, Wistner acted as the agent of Mercado Partners (as defined below) with respect to the matters alleged herein.

23.     On information and belief, Defendant Adam Koopersmith is an Illinois resident.  Koopersmith is a director of Alliance and Partner at Jabodon PT Company d/b/a Pritzker Group Venture Capital and Pritzker Group Venture Capital, a major investor in Alliance.  At all relevant times, Koopersmith acted as the agent of Pritzker Group (as defined below) with respect to the matters alleged herein.

24.     On information and belief, Defendant Travis Hughes is an Illinois resident.  Hughes is a director of Alliance and principal of the Hughes Entities (as defined below), a major investor in Alliance.  At all relevant times, Hughes acted as the agent of the Hughes Entities with respect to the matters alleged herein.

25.     Defendants Wistner, Koopersmith, and Hughes are collectively referenced herein as the "**Director Defendants**."

26.     Defendant ZB, N.A. is a national banking association with its principal place of business at One South Main Street, Salt Lake City, Utah 84133.  Zions First National Bank is a division of ZB, N.A.

27.     Non-party Alliance Medical Holdings, LLC ("Alliance") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 9883 South 500 West, Sandy, Utah 84070.  On April 9, 2017, Alliance and many of its affiliates filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas.

**The Hughes Entities**

28.     Defendants HS Medsource Holdco, LLC, Kesman Hughes & Company, LLC, Hughes & Company, and Hughes & Company Investment Partners, LLC are collectively referred to herein as the "**Hughes Entities**."  On information and belief, each of the Hughes Entities is a corporation organized under the laws of State of Delaware.  Defendants Hughes & Company and Hughes & Company Investment Partners, LLC each have a principal place of business at 161 North Clark Street, Suite 1310, Chicago, Illinois 60601.  Defendant Kesman Hughes & Company, LLC has a principal place of business at 1200 Longmeadow Lane, Lake Forest, Illinois 60045.  Defendant HS Medsource Holdco, LLC has a principal place of business at 747 North LaSalle Boulevard, Suite 500, Chicago, Illinois, 60654.

**Mercato Partners**

29.     Defendant Mercato Management, LLC is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2750 East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121.

30.     Defendant Mercato Partners, LLC is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2750 East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121.

31.     Defendant Mercato Partners Growth II GP, LLC is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2750

East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121.

32.     Defendant Mercato Partners Growth II, L.P. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2750 East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121.

33.     Defendant Mercato Partners Growth Affiliates II, L.P. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2750 East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121.

34.     Defendant Mercato Partners AI II, L.P. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2750 East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121.

35.     Defendant Mercato Partners Ingram, LLC is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2750 East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121.

36.     Defendant Mercato Partners Ingram Co-Invest, LLC is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2750 East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121.

37.     Defendants Mercato Management, LLC, Mercato Partners, LLC, Mercato Partners Growth II GP, LLC, Mercato Partners Growth II, L.P., Mercato Partners Growth Affiliates II, L.P., Mercato Partners AI II, L.P., Mercato Partners Ingram, LLC, and Mercato Partners Ingram Co-Invest, LLC are collectively referred to herein as "**Mercato Partners**."

### Pritzker Group

38.     Defendant Jabodon PT Company LLC d/b/a Pritzker Group Venture Capital and Pritzker Group Private Capital is a corporation organized under the laws of the State of Delaware, with its principal place of business at 111 South Wacker Drive, Suite 4000,

Chicago, Illinois 60606.

39.     Defendant Pritzker Group Venture Capital LLC is a corporation organized under the laws of the State of Delaware, with its principal place of business at 111 South Wacker Drive, Suite 4000, Chicago, Illinois 60606.

40.     Defendant NWV-Alliance LLC is a corporation organized under the laws of the State of Delaware, with its principal place of business at 111 South Wacker Drive, Suite 4000, Chicago, Illinois 60606.

41.     Defendant NWV-Alliance-2 LLC is a corporation organized under the laws of the State of Delaware, with its principal place of business at 111 South Wacker Drive, Suite 4000, Chicago, Illinois 60606.

42.     Defendants Jabodon PT Company, Pritzker Group Venture Capital LLC, NWV-Alliance LLC, and NWV-Alliance-2 LLC are collectively referred to herein as "**Pritzker Group**."

43.     The Hughes Entities, Mercato Partners, and Pritzker Group are collectively referenced herein as the "**Investor Defendants**."

## <u>JURISDICTION AND VENUE</u>

44.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, insofar as the claims asserted herein arise under the laws of the United States; pursuant to 28 U.S.C. § 1332(a)(1), insofar as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States; and pursuant to 28 U.S.C. § 1367(a) insofar as Plaintiff's state law claims are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy.

45.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims

occurred in this district, and Defendants are subject to personal jurisdiction in this district.

46.     Venue is also proper in this District pursuant to 18 U.S.C. 1965(b) and/or 1965(d).  Further, in addition to the bases for personal jurisdiction alleged below, this Court also has personal jurisdiction over the defendants under 18 U.S.C. 1965(b) and/or 1965(d).

47.     The Court has personal jurisdiction over Defendants Jeffrey C. Smith, Geoffrey S. Swindle, Steven L. Hadlock, Sahily Paoline, David Grant, Justin Leavitt, Blaine Smith, Travis Hughes, Alison Wistner, Adam Koopersmith, the Hughes Entities, Mercato Partners, and Pritzker Group because they committed torts alleged herein in New Jersey.  As discussed below, these Defendants sold, aided and abetted the sale of, and/or conspired to sell LifeScan products in the state of New Jersey as part of an illegal scheme whereby they fraudulently obtained improper insurance reimbursements for the New Jersey sales.  To further this scheme, each of these Defendants collaborated to:

A.     Own or exercise control over businesses operating in New Jersey;

B.     Perpetrate fraudulent activities in, and through businesses operating in, New Jersey;

C.     Employ and manage pharmacists and pharmacy technicians operating in New Jersey;

D.     Apply for and receive pharmacy permits from the New Jersey Board of Pharmacy;

E.     Receive insurance reimbursements from insurance companies located in New Jersey;

F.     Fraudulently and knowingly cause LifeScan or its affiliates to make payments from New Jersey.

48.     While the Defendants' fraud was national in character—having been perpetrated in at least Arizona, Iowa, Michigan, Mississippi, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Texas, and Utah—New Jersey was a major center of the fraud.  Specifically, the New Jersey arm of Defendants' fraudulent enterprise—the

Peterson Pharmacy in South Amboy, New Jersey—played a primary role by submitting false insurance claims for *over four million test strips* between 2014 and 2017, the second most of any Alliance-affiliated pharmacy during those years.

49.   The Peterson Pharmacy in New Jersey was thus a location of a significant portion of the tortious acts giving rise to the claims in this Second Amended Complaint.

50.   The Defendants established, operated, managed, and/or directed the Peterson Pharmacy to carry out these tortious acts, and by doing so, affirmatively and expressly directed this tortious conduct in the State of New Jersey.

51.   Defendants Jeffrey C. Smith, Steven L. Hadlock, Sahily Paoline, David Grant, Justin Leavitt, and Blaine Smith were each personally involved in supervising, managing, and executing Alliance's fraudulent activities in New Jersey.

52.   In 2016, Alliance's directors—including Travis Hughes, Alison Wistner, and Adam Koopersmith (acting as agents for the Hughes Entities, Mercato Partners, and Pritzker Group, respectively)— approved the purchase of the Peterson Pharmacy in New Jersey in an effort to facilitate Alliance's fraud.  At the time they approved the purchase of pharmacies, Travis Hughes, Alison Wistner, and Adam Koopersmith were (i) aware of Alliance's fraudulent billing practices and knew they were approving and enabling the expansion of Alliance's fraudulent activities into New Jersey.

### Zions Bank

53.   On March 5, 2018, Zions Bank responded to the First Amended Complaint in this action by filing a motion to dismiss.  Zions Bank omitted from this motion any defense based on purported lack of personal jurisdiction.  Accordingly, Zions Bank has waived any defense to lack of personal jurisdiction and consented to personal jurisdiction in this Court.

54.   Even absent that waiver and consent, the Court has personal jurisdiction

over Defendant ZB, N.A., also referred to herein as Zions Bank, because, as alleged below, ZB, N.A. knowingly funded, and expressly approved in writing, Defendants' illegal scheme to sell and fraudulently obtain retail reimbursement for LifeScan DME Strips.  ZB, N.A. expressly agreed to fund the execution of this fraudulent scheme through pharmacies located in the state of New Jersey and, in furtherance of the fraudulent scheme, received payments directly from the New Jersey pharmacies.

55.     Zions Bank entered into a Credit Agreement with Alliance effective June 24, 2014.  As alleged in more detail below, the Credit Agreement explicitly acknowledged that it was providing credit to Alliance so that its pharmacy-subsidiaries could engage in the fraudulent practice of claiming reimbursement from insurers for sales of Retail Strips while dispensing DME Strips.

56.     No later than April 2016, Alliance notified Zions Bank that it was submitting insurance reimbursement claims from Peterson Pharmacy in South Amboy, New Jersey.  Peterson Pharmacy is owned and operated by New Jersey Rx, LLC, ("New Jersey Rx") a New Jersey limited liability corporation and subsidiary of Alliance.  Beginning in at least April 2016, Zions Bank began including Peterson Pharmacy's accounts receivable in its analysis of Alliance's financial position.

57.     No later than November 2016, Alliance notified Zions Bank that it was submitting reimbursement claims from Newton Pharmacy in Newton, New Jersey.  Newton Pharmacy is owned and operated by Newton Rx, LLC ("Newton Rx"), a New Jersey limited liability corporation and subsidiary of Alliance.

58.     Zions Bank established bank accounts for New Jersey Rx, Newton Rx, and Alliance's other subsidiaries.  Proceeds from fraudulent reimbursement claims made by Peterson Pharmacy and Newton Pharmacy were deposited into their accounts and used to pay

down Alliance's credit line with Zions Bank.

59.    On November 15, 2016, Alliance's Chief Financial Officer, Scott

Klossner, provided a certificate to Zions Bank showing Alliance's compliance with the Credit

Agreement.  The certificate included a list of guarantors of Alliance's obligations under the

Credit Agreement, which included New Jersey Rx and Newton Rx as guarantors.

60.    On February 22, 2017, Zions Bank entered into a Joinder Agreement with

New Jersey Rx, Newton Rx, and several other Alliance subsidiaries whereby the subsidiaries

purported to become guarantors of Alliance's obligations under the Credit Agreement.  That

same day, Zions Bank entered into a Pledge and Security Agreement with New Jersey Rx,

Newton Rx, and several other Alliance subsidiaries whereby the subsidiaries purported to grant

Zions Bank security interests in property to secure Alliance's debt under the Credit Agreement.

## FACTS COMMON TO ALL CLAIMS

### LifeScan's Blood Glucose Test Strip Products

61.    LifeScan is one of the leading manufacturers of blood glucose test strips.

Millions of people with diabetes depend on LifeScan's test strips to monitor their blood sugar.

Diabetes patients use LifeScan's test strips by placing a drop of blood on a strip and inserting the

strip into a meter, which provides a blood glucose reading.  LifeScan's test strips are designed to

work only with LifeScan's OneTouch family of blood glucose meters.

62.    Health insurance companies adjudicate claims for test strips in two

different ways.  Pharmacy Plans cover them under a "pharmacy benefit," the same benefit that

covers prescription drugs.  Patients with Pharmacy Plans may purchase test strips at retail

pharmacies with their insurance coverage.  DME Plans, on the other hand, cover test strips under

a "durable medical equipment benefit," the same benefit that covers medical equipment such as

wheelchairs.  During the period relevant here, patients with DME Plans generally had to

purchase test strips from mail-order durable medical equipment distributors in order to pay with insurance.

63.     LifeScan sells its blood glucose test strips in different packages sold through different distribution channels targeted to patients with these different types of insurance coverage.  There are two types of LifeScan blood glucose test strips relevant here:  Retail Strips, *i.e.*, test strips intended for retail sale, and DME Strips, *i.e.*, test strips intended for sale to providers that bill a DME Plan.

64.     LifeScan's Retail Strips are packaged in a blue box and intended for sale at retail pharmacies ("Blue Box Retail Strips").  Retail Strips may be sold to anyone, including people who do not have insurance and pay cash.  However, the vast majority of purchasers of LifeScan's Retail Strips are Pharmacy Plan beneficiaries.

65.     Since 2009, LifeScan has sold its Retail Strips to wholesalers for between about $46 and $62 for a 50-strip box.  The wholesalers sell the Retail Strips to retail pharmacies at cost plus their margin.  When a patient who is a Pharmacy Plan beneficiary ("Pharmacy Beneficiary") purchases LifeScan Retail Strips, the patient in many cases makes a so-called "co-pay" to cover a portion of the cost of the LifeScan Retail Strips, and the Pharmacy Plan covers the remainder of the purchase price.  Under contracts with the insurers, LifeScan pays Pharmacy Plans rebates of between about $30 and $50 for every box of Retail Strips they reimburse, so LifeScan's net revenue per box of Retail Strips is substantially less than the $46 to $62 wholesale price.  During the period relevant here, it was well known throughout the diabetes product industry that test strip manufacturers paid these rebates to Pharmacy Plans.

66.     By contrast, LifeScan sells its DME Strips exclusively to customers that

are contractually obligated to sell only to beneficiaries of DME Plans ("DME Beneficiaries").[1] LifeScan's mail order DME Strips are packaged in a white box ("White Box DME Strips"), and LifeScan sells them $24 or less per 50-strip box.

67.     Before 2016, LifeScan also sold DME Strips packaged in gray boxes ("Gray Box DME Strips").  Gray Box DME Strips were sold by LifeScan under contracts that required that they be sold exclusively to DME Beneficiaries.  They were also sold for $24 or less per 50-strip box.

68.     LifeScan does not, and at all relevant times, did not pay rebates to commercial DME Plans.

69.     During the period relevant here, all claims by Pharmacy Plans for rebates on LifeScan's Retail Strips were processed and paid on LifeScan's behalf by LifeScan's then-affiliate Johnson & Johnson HealthCare Systems, Inc., which is a New Jersey corporation with its principal place of business in Piscataway, New Jersey.

70.     Because of the significant differences in how Retail Strips and DME Strips are sold and paid for, it is important for LifeScan's business that its test strips are sold only within their intended channels.  Unauthorized diversion of DME Strips into the retail channel not only deprives LifeScan of profits on sales of its Retail Strips; it also causes LifeScan to suffer an out-of-pocket loss on each box of DME Strips that is sold through a Pharmacy Plan, because the rebates LifeScan pays Pharmacy Plans are higher than the wholesale price LifeScan charges for DME Strips.

71.     Accordingly, LifeScan and the insurance companies that pay for its blood glucose test strips have implemented systems that make it impossible to lawfully or unwittingly

---

[1]   Because DME Strips are shipped by mail order and are not intended for retail sale, they are sometimes referred to as "MO" (mail order), "NRS" (not for retail sale), or "NFR" (not for retail sale) strips.

sell DME Strips outside their intended channels.  The only way to do so is to violate a contractual obligation and/or commit fraud.

72.     Figure 1 depicts LifeScan's White Box DME Strips, Gray Box DME Strips, and Blue Box Retail Strips:

## Figure 1



| Required Recipients: | White Box Mail-Order Product | Gray Box Wholesale Product | Blue Box Retail Product |
|---|---|---|---|
| | DME Beneficiaries Only | DME Beneficiaries Only | Pharmacy Beneficiaries and Cash Payers |

73.     The packaging of White Box DME Strips prominently states "MAIL ORDER ONLY—NOT FOR STORE SALE" in a manner that would be obvious to a dispensing pharmacist in a retail pharmacy.

74.     The packaging of Gray Box DME Strips prominently stated "For DME Beneficiaries only" in a manner that would be obvious to a dispensing pharmacist in a retail pharmacy.

75.     LifeScan's DME mail-order distributors (whether they purchase the DME Strips directly from LifeScan or a DME wholesaler) are contractually prohibited from selling DME Strips to anyone but DME Beneficiaries.  Because LifeScan does not pay rebates for DME Strips, it is able to sell them for a much lower price than Retail Strips.  These lower prices are

offered in return for and in reliance on the DME mail-order distributors' compliance with the terms of their contracts with LifeScan.

76.     Critically for this matter, each of LifeScan's test strip products has a different National Drug Code number ("NDC") printed on its package.  A NDC is a unique numerical identifier recorded by the U.S. Food and Drug Administration, which regulates these devices.  The NDC for a 50-strip box of White Box DME Strips is 53885-0963-50; the NDC for a 50-strip box of the Gray Box DME Strips is 53885-0000-75; and the NDC for a 50-strip box of the Retail Strips is 53885-0244-50.

77.     To receive payment from an insurance company for a sale of Retail Strips to a Pharmacy Beneficiary, a pharmacy must submit the product's NDC to the patient's insurance plan as part of the reimbursement claim.  Each Pharmacy Plan only covers pharmaceuticals and medical devices, listed by NDC, that are on the plan's formulary.  DME Strips are not listed on the Pharmacy Plans' formularies.

78.     Because DME Strips are not on Pharmacy Plans' formularies, a pharmacy that sells DME Strips to a Pharmacy Plan beneficiary cannot submit a valid claim for reimbursement to the Pharmacy Plan.  In order to obtain payment from a Pharmacy Plan for a sale of DME Strips, a pharmacy must fraudulently misrepresent the sale as a sale of Retail Strips by fraudulently including the NDC for Retail Strips in its claim for payment.  Defendants and their business entities did that systematically, on a *massive* scale.

**<u>Defendants' Fraudulent Scheme</u>**

79.     Defendants are or were officers, directors, investors and/or financers of Alliance.  At the times relevant to this Second Amended Complaint, Alliance owned, controlled, or was affiliated with a large network of companies it used to defraud LifeScan and other test strip manufacturers.  These companies include Alliance Health Networks, LLC; Alta

Distributors, LLC ("Alta Distributors"); Ollin Pharmaceutical, LLC ("Ollin"); SP Diabetic LLC,

("SP Diabetic"); Skyline Health Services, LLC ("Skyline"); Alliance Medical Administration,

Inc.; AHN Holding Co., LLC; and a large network of affiliated companies, including the

following: Alameda Rx Holdings, LLC; Aspire Rx, LLC; Belle Pharmacy, LLC; Benson

Pharmacy, Inc.; Berkshire Pharmacy, LLC; Best Rx Holdings, LLC; Best Rx, LLC; Better Care

Rx Holdings, LLC; Bridgestone Pharmacy Holdings, LLC; Bridgestone Pharmacy, LLC;

Brighton Pharmacy, LLC; Brookhill Pharmacy, LLC; BrooksideRx Holdings, LLC;

BrooksideRx, LLC; Bubba's Rx Holdings, LLC; Burbank Pharmacy, LLC; Canyon Medical,

LLC; Canyons Pharmacy, LLC; Central Medical, LLC; Charleston Rx Holdings, LLC;

Charleston Rx, LLC; Cheshire Pharmacy, LLC; Cheshire Rx Holdings, LLC; Chronic Care

Health Foundation, LLC; Cloud Management, LC; Conoly Pharmacy Holdings, LLC; Conoly

Pharmacy, LLC; Cordele Pharmacy, LLC; Cottonwood Pharmacy, LLC; Crestwell Pharmacy

Holdings, LLC; CSL Capital Holdings, LLC; Cure Rx, LLC; David Pharmacy, LLC; Delaney

Pharmacy, LLC; Eat Great Café, LLC; El Dorado Pharmacy, LLC; El Dorado Rx Holdings,

LLC; Everest Pharmacy, LLC; Galena Pharmacy Holdings, LLC; Galena Pharmacy, LLC;

Garnett Pharmacy, LLC; Genessee Pharmacy, LLC; Geneva Pharmacy, LLC; Geneva Rx

Holdings, LLC; Genshai Holdings, LLC; Glendale Sqaure Rx, Inc.; Good Wave, LLC; Goodman

Pharmacy, LLC; Hawkins Pharmacy Holdings, LLC; Hawkins Pharmacy, LLC; Hawthorne

Pharmacy, LLC; Hawthorne Rx Holdings, LLC; Hazelwood Pharmacy, LLC; Health Rx

Holdings, LLC; Health Saver Holdings, LLC; Health Saver Rx, LLC; Improve Rx Holdings,

LLC; Improve Rx, LLC; Ingram Diabetic, LLC; Ingram Medical Administration, Inc.;

Innovative Rx, LLC; Insight Rx Holdings, LLC; JTK Medical, LLC; Kendall Pharmacy, Inc.;

Living Again Holding Co, LLC; Lockeford Rx Holdings, LLC; Lockeford Rx, Inc.; Lone Peak

Rx, LLC; Med Mart Holdings, LLC; Medina Pharmacy, LLC; Medsource Rx Pharmacy, LLC;

Namaste Capital Holdings, LLC; New Jersey Rx Holdings, LLC; New Jersey Rx, LLC; New Life Pharmacy, LLC; Newton Rx Holdings, LLC; Newton Rx, LLC; Norwood Pharmacy, LLC; Oak Creek Pharmacy Holdings, LLC; Oak Creek Rx, LLC; Ohana Pharmacy Holdings, LLC; Ohana Rx, LLC; Ollin Pharmaceutical, LLC; On Track Rx Holdings, LLC; On Track Rx, LLC; Osceola Clinic Pharmacy, LLC; Osceola Rx Holdings, LLC; Peach Medical Holdings, LLC; Peterson Rx, LLC; Pharmacare Holdings, LLC; Philadelphia Pharmacy Holdings, LLC; Pineview Rx Holdings, LLC; Pinnacle Pharmacy Solutions, LLC; Pro Rx Holdings, LLC; Raven Pharmacy Holdings, LLC; Raven Pharmacy, LLC; Richardson Pharmacy, LLC; Riverbend Prescription Services, LLC; Riverfront Pharmacy, LLC; Riverfront Rx, LLC; Rock City Pharmacy, LLC; Rx Pro Holding Co, LLC; Rx Pro Holding Co., LLC; Rx Solutions Holdings, LLC; Skyline Health Services, LLC; Smart Rx Holdings, LLC; Staley Pharmacy, LLC; Steel Medical, LLC; Stonybrook Pharmacy, LLC; Twin Lakes Pharmacy, LLC; Uinta Rx Holdings, LLC; Uinta Rx, LLC; Uplift Rx Holdings, LLC; Uplift Rx, LLC; Vitality Holdings, LLC; Warner Diabetic, LLC; Waverly Pharmacy, LLC; Western Diabetic Supply Corp.; White Capital Management, LLC; Woodward Drugs, LLC; and Woodward Rx Holdings, LLC.

80. Defendants used various methods to obtain DME Strips, which were then sold or distributed to Alliance-affiliated pharmacies with the intent that those pharmacies would dispense them to Pharmacy Plan beneficiaries and then fraudulently claim reimbursement from Pharmacy Plans for non-existent sales of Retail Strips. During the period at issue in this Second Amended Complaint, Defendants caused Alliance-affiliated pharmacies to submit *over one million* fraudulent insurance reimbursement claims to multiple Pharmacy Plans. The proceeds generated thereby were, by various means, passed up to Alliance.

81. This fraud generated tens of millions in illicit profits for Alliance. Each fraudulent insurance claim generated a payment that was intended to reimburse the pharmacy for

the cost of a box of Retail Strips with a wholesale price of $46 to $62.  Dispensing DME Strips

with a wholesale price of $24 or less allowed Alliance to make a multiple of the profit it would

have received on a legitimate, non-fraudulent transaction.

82.     In sworn deposition testimony given on July 19, 2017, two Alliance

employees readily admitted this massive fraud, with one describing it as "the foundational

practice" of Alliance.  A third employee testified in deposition that "delivering one product but

billing for another . . . was an integral part of [Alliance's] business model."

**Alliance Builds a Patient Base**

83.     Alliance's roots begin in 2007, when Defendant Jeffrey Smith purchased

Medsource-Direct, a diabetes test strips wholesaler.  By September 2011, Medsource-Direct

discontinued its wholesale business and began operating as the mere "purchasing arm" of

Medsource Rx Pharmacy, an entity created by Jeffrey Smith for the purpose selling test strips

directly to patients.

84.     Medsource Rx Pharmacy began branding itself as "Ingram Medical" in

February 2012.  To expand its test strip business, Ingram purchased customer leads from vendors

that identified diabetes patients.

85.     In January 2014, Ingram acquired its largest lead vendor, Alliance Health

Networks ("AHN"), which was founded by Defendant Geoffrey Swindle.  After its acquisition of

AHN, Ingram adopted the "Alliance" brand name.

86.     Alliance maintained several websites and online social networks that

provided information to diabetes patients.  Alliance's primary social network for diabetes

patients was called "Diabetic Connect."  By asking Diabetic Connect users to sign up for various

services and discounts, these websites obtained valuable personal information from users,

including names, addresses, and medical issues.  Alliance had hundreds of employees in call

centers who earned commissions by phoning these "leads" and convincing them to purchase their test strips from Alliance. On average, Alliance telephoned a lead less than 30 seconds after receiving it.

87.     From among the leads it obtained, Alliance selected its customers based on their location, insurance carrier, brand of test strips, and profitability, in order to create a "low risk" customer base. "Low risk," words used by Alliance in its internal communications, referred to the risk of detection of Alliance's operations by those defrauded or harmed.

88.     If a lead was too risky or insufficiently profitable, Alliance would attempt to sell the lead to another company rather than attempt to sell test strips to the patient. As Alliance came under increasing scrutiny from certain insurance companies, it would "fire" current customers who didn't meet profitability/risk metrics.

**Alliance Acquires LifeScan DME Strips on the Gray Market**

89.     Alliance's scheme depended on its ability to source large quantities of DME Strips to fill patients' orders. This was not a simple task. Alliance could not legitimately purchase DME Strips from LifeScan or from LifeScan's authorized distributors, since it was not selling them to DME Beneficiaries. Accordingly, Alliance purchased DME Strips from "diverters," parties willing to breach their contracts with LifeScan (or who purchase from such parties) and sell DME Strips on the gray market to entities like Alliance that to use them to commit insurance fraud.

90.     Jose Vargas, Alliance's Director of Procurement, testified that Defendant Jeffrey Smith instructed him to buy as many LifeScan DME Strips as possible from unauthorized distributors. In an email to a business partner, Mr. Vargas stated that Alliance "only buy[s] MO or NRS strips." "MO" and "NRS" strips are DME Strips.

91.     Alliance's decision to use the gray market to supply its inventory of DME

Strips was both a necessity for committing its fraud—because that is the only place it could obtain large quantities of DME Strips—and evidence of its intent to commit fraud and, more specifically, to supply DME Strips to its Pharmacy Patients—because one cannot source large quantities of Retail Strips on the gray market.  The higher wholesale price LifeScan charges for its Retail Strips leave too little opportunity for diverters to make a profit.

92.     In an effort to disguise its fraud, Alliance did not purchase LifeScan test strips under Alliance's own name, but instead purchased them through its affiliated purchasing entities.  The first such entity was Medsource-Direct, Inc., which changed its name to SP Diabetic in September 2011.  At some point, health insurers refused to reimburse Alliance for sales of LifeScan test strips purchased by SP Diabetic, so Alliance began purchasing through other subsidiaries named Alta Distributors and Ollin Pharmaceuticals, disguising the fact the underlying purchaser had not changed.

93.     After Alliance purchased DME Strips on the gray market, it falsely identified them in its inventory system using the NDC number for Retail Strips.  In fact, despite the fact that Alliance purchased almost exclusively DME Strips, Alliance's inventory system did not recognize the NDC number for DME Strips.  The purchase orders, invoices, and other internal reports generated by Alliance's inventory tracking systems, therefore, always falsely displayed the Retail Strip NDCs for the corresponding brand of strips, even though Alliance was purchasing DME Strips.

94.     Alliance's use of the Retail Strip NDC on all of its documents was important to hiding its fraud.  When auditors and regulators demanded proof from Alliance-affiliated pharmacies that they had purchased sufficient Retail Strips to support their thousands of claims, the pharmacies would produce invoices from their Alliance-affiliated wholesalers purporting to show that the strips purchased by the pharmacies were Retail Strips.  The auditors

were not told that these wholesalers were simply another arm of Alliance's fraudulent enterprise, and that the records kept by the wholesalers falsely displayed the retail NDC number despite the fact that the strips being dispensed were DME Strips.

**Alliance Builds a Network of Pharmacies to Execute and Mask Its Fraud**

95.     Pharmacy Plans typically contract with pharmacy benefit managers ("PBMs") to manage insurance claims and reimbursements.  The PBMs, in turn, have contracts with retail pharmacies.  Typically, those contracts prohibit pharmacies from receiving reimbursements for the sales of DME Strips and from operating by mail order.  In addition, they give the PBMs the right to audit pharmacies' compliance with their contracts and to seek repayment of (or "chargeback") any reimbursements sought in breach of the contracts.

96.     It was essential for Alliance's fraud that Alliance hide the fact that it was dispensing DME Strips by mail and deceive PBMs into believing it was dispensing Retail Strips at brick-and-mortar retail pharmacies.  Alliance initially attempted to do this by shipping DME Strips to patients through a group of pharmacies it owned in states throughout the country. However, as Alliance scaled its fraud, and PBMs began to catch on to the Alliance-owned pharmacies' mail order business model, Alliance created a network of pharmacies that were ostensibly independent, but effectively owned and controlled by Alliance, as a means to erect a facade of legitimacy and avoid detection.  Planning for this effort began in or about 2013 and execution began the following year.

97.     The combination of PBM chargebacks and the availability of "independent" pharmacies lead Alliance to close its internally-owned "retail" pharmacies:

- Prime, a PBM, claimed a $1,860,423 chargeback against Medsource Rx Pharmacy, LLC, and the PBM Catamaran claimed a $3,200,000 chargeback against Medsource.  Medsource closed on May 1, 2014;

- Prime claimed a $519,170 chargeback against Aspire Rx, LLC, and Catamaran claimed an $83,883 chargeback against Aspire.  Aspire closed by May 30, 2014;

- Prime claimed a $653,207 chargeback against Everest Pharmacy, LLC, and Express Scripts Inc., another PBM, asserted Everest breached its contract. A third PBM, OptumRX, claimed a $1,466,725 chargeback against Everest. A fourth, Caremark, claimed a $583,974 chargeback against Everest. Everest closed by June 30, 2014;

- OptumRX suspended payments and claimed a $1,422,379 chargeback against Brighton Pharmacy, LLC. Prime claimed a $560,717 chargeback against Brighton. Express Scripts claimed a $3,337,693 chargeback. Brighton closed by August 2015.

When an Alliance-owned pharmacy closed, Alliance simply redirected that pharmacy's patients to an "independent" pharmacy.

        98.    Alliance's "independent" pharmacies each had a straw owner, usually a friend or business associate of Jeffrey Smith. Acting through its subsidiaries, Alliance provided its "independent" pharmacies with test strip orders from patients and sold them DME Strips. The pharmacies shipped the DME Strips to the patients and, using software provided by Alliance, submitted false insurance claims for Retail Strips to PBMs in the pharmacies' names. The pharmacies then remitted the insurance reimbursements to Alliance. But Alliance's name was divorced from the entire transaction with the PBM, which had no way to know of Alliance's involvement.

        99.    It was well understood by Defendants, that Alliance used "independent" pharmacies for the sole purpose of deceiving PBMs. As May 15, 2016 memo sent by Jeffrey Smith to Alliance's Board of Directors—including Defendants Travis Hughes, Alison Wistner, and Adam Koopersmith—put it succinctly:



100.    Alliance solidified its relationships to its "independent" pharmacies with three contracts between the pharmacies and Alliance affiliates.  First, a pharmacy entered into a Vendor Agreement whereby it agreed to purchase DME Strips from Alta Distributors.

101.    Second, the pharmacy entered into a Security Agreement with Alta Distributors, which gave Alta Distributors a security interest in the pharmacy's receivables for amounts owed under the Vendor Agreement.

102.    Third, the pharmacy entered into a Services Agreement with Skyline for the provision of "marketing services."  Skyline would provide the pharmacy with test strip orders, which the pharmacy would fill and submit claims for.  If the pharmacy earned $2,000 or more in a month from the orders provided by Skyline, Skyline earned a $2,000 fee.  The Services Agreement was comprehensive and ensured that the straw owners of the independent pharmacies need not have any pharmacy experience.  Dow Jones, the nominal owner of one such pharmacy has testified that Alliance completely ran the pharmacy's day-to-day operations while Jones merely took care of "the business part of things, the bookkeeping, payroll."

103.    Alliance required its affiliated pharmacies to use an internally-developed platform called Pharmacy Patient Management System ("PPMS") to manage prescriptions, shipment, and billing of test strips.  The system was installed on a computer terminal placed at each pharmacy that pharmacists used solely for test strips sold through Alliance.  The PPMS software tracked patient and sales information, and then fed that data to Alliance's wholesaling entities which would automatically replenish each pharmacy's supply of test strips from the unauthorized, gray market sources described above.

104.    Alliance's PPMS software also handled adjudication of insurance claims.  Alliance trained its pharmacists to adjudicate insurance claims for test strips by inputting "short codes" or "quick codes" for each brand of test strips.  The pharmacist's input of a "quick code"

triggered the system to insert an NDC code for the product being dispensed into the insurance claim, but the NDC code inserted by the software was not the NDC code for the test strips that had been dispensed.

105.    Pharmacists were instructed to submit the quick code "OTU50" when adjudicating a 50-count box of LifeScan's OneTouch Ultra test strips.  Entry of that code resulted in the NDC code for LifeScan's Retail Strips automatically being submitted to the insurance company, even though DME Strips had been dispensed.   In sworn testimony, Alliance's former Director of Pharmacy Operations, Amy McMurtry, stated that "[a]ny adjudication that went through was for the retail NDC regardless of the box received in or dispensed out" and that she could not "think of any exception to that."  Former Alliance pharmacist Masum Amin likewise agreed at her deposition that when she "delivered DME test strips to a patient, their insurance would be billed for retail test strips."  Alliance's use of "short codes" also had the benefit of hiding Alliance's fraudulent adjudication from all but the most observant pharmacists.

106.    Independent pharmacies partnered with Alliance at significant risk.  Had a PBM discovered the scheme, it could have clawed back its prior reimbursements (which had already been funneled up to Alliance) and/or cancelled its contract with the pharmacy.  The risk to Alliance was comparably lower, because if a PBM cancelled a contract with one pharmacy, Alliance could simply shift that pharmacy's patients to other Alliance pharmacies.  Amy McMurtry, Alliance's former Director of Pharmacy Operations, testified in deposition that, when PBMs would cut off an Alliance pharmacy, Alliance "would move those patients to another Alliance-affiliated pharmacy so that it could continue submitting reimbursement claims for test strips for those patients."

107.    Recognizing this disproportionate risk, the Service Agreement gave each

independent pharmacy a "PBM Put Right" that permitted the straw owner of the pharmacy to sell itself to Skyline if a PBM demanded $10,000 or more in chargebacks or cancelled a contract covering 10% or more of the pharmacy's customer base.

108.     While a PBM, Pharmacy Plan, or test strip manufacturer might uncover contract breaches or fraud at individual pharmacies, they had no reason to know the pharmacies were part of a larger conspiracy or of Alliance's organizing role in the conspiracy.  Even if they did, Alliance did not publicly list the pharmacies it was affiliated with, making it impossible to know which pharmacies were part of the conspiracy.  In fact, Alliance explicitly instructed the pharmacists at its affiliated pharmacies to deny association with other Alliance pharmacies.  For example, in a July 31, 2014 e-mail from former Director of Pharmacy Operations Amy McMurtry to Defendant Sahily Paoline and the PICs of the Alliance-affiliated Oak Creek, David, River Front, Cure, Hawkins, Peterson, Norwood, Stonybrook, and New Life Pharmacies, McMurtry wrote:

> Team,
>
> I know that many of the Independent locations have sheets containing information about the other Independent sites (Name, Address, NPI, etc).  In an effort to reduce confusion, I am asking that you take down all site information sheets.  Please either file them away for future reference or place them in a HIPAA container.  The information on these sheets was probably not useful to most of you anyways, as it was mostly just information.  We are making the change for a couple of reasons:
>
> 1)  Each site is an Independent site with a separate owner.  There is no correlation or tie between the two sites.
>
> 2)  When a site is asked questions like: "are you a chain or an independent?"; "Are you linked to any other pharmacies?" I think it gets confusing if you do have the other sites information, and gives an inaccurate sense of connection to each other.
>
> . . .

109.     Amy McMurtry testified in deposition that pharmacists at Alliance's

"independent" pharmacies "were instructed to not tell anyone that they were affiliated with Alliance or affiliated with other pharmacies," and she testified that one reason they were instructed to do so was because a "PBM could cut contracts at more than one pharmacy."

110.    When Alliance created its network of "independent" pharmacies, it hoped that they would have a lifespan of approximately three years before the PBMs caught on.  That proved to be too optimistic.  As recounted in a May 15, 2016 memorandum to Alliance's Board of Directors:

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████

The May 15 memorandum further explained that ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████.

111.    ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████

112.    In order to implement the 10% PIC model, Alliance entities entered into agreements to acquire the following pharmacies between May 31 and July 1, 2016:  Alameda Pharmacy, LLC; Baytree Pharmacy, LLC; Cordele Pharmacy, LLC; CureRX Pharmacy, LLC; David Pharmacy, LLC; El Dorado Pharmacy, LLC; Genesee Pharmacy, LLC; Hawkins Pharmacy, LLC; Jefferson Pharmacy, LLC; Oak Creek Pharmacy, LLC; PetersonRX, LLC; Rock City Pharmacy, LLC; Staley Pharmacy, LLC; and Twin Lakes Pharmacy, LLC.

**Alliance Conceals the Fraud From Auditors and Inspectors**

113.    In addition to using a network of ostensibly independent pharmacies to disguise their fraud, the Defendants also affirmatively mislead PBM auditors and state inspectors who might have discovered it.

**Falsified Invoices**

114.    Alliance had a regular practice of responding to audits with falsified or misleading invoices in order to avoid detection of its adjudication fraud.  As illustrated below, the practice of using falsified and/or misleading invoices was known to and approved by Defendants.

115.    One aspect of the audits the Alliance-affiliated pharmacies faced is an examination of invoices and purchase orders to ascertain whether the pharmacy purchased sufficient quantities of a product to support the claims it submitted for dispensing the product, and whether the pharmacy had purchased from an authorized distributor, as is generally required under PBM contracts.

116.    Anticipating such examinations, Alliance maintained a practice of requesting the gray market suppliers that sold DME Strips to Alliance to issue false invoices reflecting that Alliance had purchased Retail Strips.

117.    For example, in a June 19, 2013 e-mail to Alliance's vendors, Jose Vargas wrote:

> Could you please have your invoices match our item numbers and descriptions as they are on the list below?  We expect the NRS [not for retail sale] and MO [mail order] packaging, however this will help with receiving in our warehouse since these are our internal codes and descriptions.

Vargas thereafter listed five items with corresponding codes and descriptions.  One of the items was a 50-count box of One Touch Ultra diabetic test strips, and the "item #" listed for that product was "53885024450"—the NDC for a box of LifeScan Retail Strips.  *See* ¶ 76, *supra*.  Vargas' email thus requested the vendors to invoice Alliance for Retail Strips when delivering DME Strips.

118.    Similarly, in an August 14, 2013 e-mail to another vendor, Jose Vargas wrote:

> Please see attached [purchase order].  One quick question, could you please edit your invoice so that the Item Code and Description match the one on my PO?  This just helps us with the receiving side of things, we use the Retail NDC's as our internal codes to receive in goods.

119.    Where vendors could not be induced to place incorrect NDC numbers on invoices, Alliance sometimes persuaded them to simply omit NDCs from their invoices so they would not show sales of DME Strips.  During an August 23, 2018 deposition, Amy McMurtry confirmed that Alliance's wholesaling entities "removed from [their] invoices to the pharmacies the NDC codes of the actual products that were being delivered to the pharmacy," so as "not to disclose to the [PBMs] that [Alliance] was dispensing not for retail products but billing them as though they were retail products."

120.    In January 2016, the PBM Prime Therapeutics issued audit letters to a number of Alliance-affiliated pharmacies, including David Pharmacy. On January 28, 2016, Alliance's outside counsel e-mailed Defendants David Grant, Sahily Paoline, and Blaine Smith about responding to the audits: "Prime has asked for proof of Alta[ Distributor]'s purchases from its suppliers/vendors. We can provide invoices showing David Pharmacy's purchases from Alta, but Prime would like one more step in the purchasing chain." Grant responded: "As you know, . . . [t]he pharmacies do not have pedigree information for [diabetes testing strips]." Alliance's outside counsel replied:

> David,
>
> I think we have a misunderstanding. They are not looking for the pedigree information from the pharmacy. They are looking for pedigreeish information from Alta. In other words, they are looking for the invoices, or proof of purchase, between Alta and their source. Because Alta does not have a license, they need something to show that Alta is actually purchasing product.

121.    Defendant Justin Leavitt forwarded this e-mail to Jose Vargas, who responded later on January 28, 2016:

> This could be tricky since we don't have all invoices showing the Retail NDC. Some vendors like Strategic, AZ, Wholesale Med Supply and IMS put the retail NDC but it would be interesting to see how much "proof of purchases" they want to see.

Vargas was referring to the fact that, while many of Alliance's gray market vendors of DME Strips were willing to show Retail Strip NDC on their invoices for DME Strips, not all vendors did so. In saying that "it would be interesting to see how much 'proof of purchases' they want to see," Vargas was expressing concern about whether he could gather a sufficient number of false invoices to cover the amount of test strips Prime was seeking to verify.

122.    In circumstances where Alliance did not have a sufficient number of fraudulent or misleading vendor invoices on hand to satisfy an audit, Alliance Defendants sometimes caused misleading invoices to be created for that purpose.

123.     During a March 2015 audit of the Hawkins pharmacy by the PBM Optum Rx, the auditor requested invoices from Hawkins' test strip supplier, Alta Distributors.  Attempts to stall apparently did not work, as the PIC of the Hawkins Pharmacy e-mailed Alliance employee Kassie Thomas on March 23, 2015 that Optum's auditor "ha[d] called again saying that he still has not received the Alta invoices that were requested."  Thomas forwarded that e-mail to Defendant David Grant, writing:  "Should we send the invoices?  He still has not sent a written request for these invoices, just many calls to the pharmacy."

124.     On March 23, 2015, Grant forwarded that e-mail to Defendants Justin Leavitt and Sahily Paoline, writing:

> Justin and Si,
>
> We have sent the summary sheet that does not contain pricing.  Do we want to decline sending invoices, send invoices that are redacted not showing pricing, or send unredacted invoices showing pricing for December?  I recommend sending redacted invoices.  I do not think we should get in the habit of sending unredacted invoices, even though the December invoices are not going to reveal the secondary source issue.  The invoices this year will have only the 3% mark-up, and will clearly reveal the secondary market source.

Grant was concerned about disclosing pricing information on Alta invoices because the low prices would reveal that Alliance was purchasing DME Strips, which were the test strips available on the secondary market.

125.     On March 25, 2015, Kassie Thomas e-mailed Paoline:

> I just met with David [Grant] and Justin [Leavitt] (by phone) I am going to white out the dollar amounts on the invoices but they want me to have the item number that is listed on the invoice, verified by Toni or someone that that is the NDC number that we are billing them for the product.

As discussed above, the "item number" on Alta's invoices was the NDC of the retail version of the relevant product, even though Alliance was stocking its pharmacies with DME Strips.

126.     In some instances, Alliance would intentionally respond to PBM audits with invoices lacking any NDCs at all.  For example, in late 2016, the PBM Express Scripts

-31-

("ESI") demanded documentation from Alliance's wholesaling entity proving that it had purchased enough retail strips to cover what it was allegedly sending to Alliance-affiliated pharmacies. On November 29, 2016, David Grant wrote to Jeff Smith:

> Jose [Vargas]'s team pulled a group of invoices from secondary wholesalers that do not identify the product based on NDC number. Kassie's team is doing a final review of these invoices this morning to assure that we have sufficient invoices for the ESI chargebacks for Baytree and Alameda. If we can get a quick settlement from ESI on this basis, we will continue the process for the pharmacies with the largest chargebacks until we run out of invoices that do not identify the NDC. At that point, we will analyze the amount of money we have been able to collect, the remaining money we could recover, and determine next steps to pursue claims that will only be supported by invoices that show non-retail NDC purchases.

Jeffrey Smith responded, "That is a good plan."

**Token Amounts of Retail Strips**

127.    In other instances, Alliance Defendants arranged to mislead inspectors and auditors in other ways, including by placing token amounts of Retail Strips at Alliance-affiliated pharmacies to create a false impression that the pharmacies were dispensing that product instead of DME Strips.

128.    On March 21, 2016, Mary Glenn, the PIC of the Alliance-affiliated Hawkins Pharmacy in Mississippi, e-mailed Alliance employees Amanda Haynie and Lyndsey Oltmans to inform them that the Hawkins Pharmacy had received a surprise inspection by two representatives of the Mississippi Board of Pharmacy ("BOP"). Ms. Oltmans forwarded the e-mail to Amy McMurtry, who notified Sahily Paoline and David Grant in an e-mail later that same day:

> Si and David,
>
> This morning Hawkins had two BOP inspectors show up for an on-site inspection. Mary [Glenn] will be sending a recap once they leave, but the inspection has mainly focused around product/NDC concerns. They reviewed wholesaler invoices thoroughly and compared them to the NDC's in FSI [Alliance's claim adjudication software] and what is on the shelf, and realized that these NDC's in

all three areas do not align. They asked specific questions about what "not for retail sale" means and referenced the fact that DME product should not be stocked near retail product as to not accidentally dispense this DME product to retail insurance customers. Mary has not asked for an explanation yet, but I am confident either her or the auditors will be requesting more information on this. David has previously provided in depth detail around the NDC issue and the FDA's stance on the intentions behind an[] NDC. **If Mary or the BOP inquires more about this, are we ok to use this information in our conversations surrounding our process for entering one NDC regardless of the product that arrives on site**? Any insight you can provide would be appreciated.

(emphasis added).

        129.    On March 21, 2016, David Grant responded to Amy McMurtry's request

for guidance on how to proceed with providing information on Alliance's billing practices:

Amy,

I would recommend that we be judicious about what we provide. I would only respond to specific questions and requests from either the auditors or Mary. We can discuss further if specific questions or requests are raised, and the appropriate response.

Thanks

After sending this reply e-mail to McMurtry, Grant forwarded it to Defendant Blaine Smith.

        130.    On March 22, 2016, Amy McMurtry sent an e-mail to, among others,

Sahily Paoline and David Grant with the subject line "Hawkins BOP Inspection." That e-mail

read:

All,

Thanks for meeting today to discuss the situation at Hawkins and provide guidance on the best way to proceed. Below is an outline of the next steps and action items we will be taking. Please let me know if you have any questions.

Recap:

-    On Monday 3/21 Hawkins had two inspectors from the MS BOP on site and they expressed concern over the NDC's being dispensed not aligning with the NDC's adjudicated in the computer system. The inspectors left strict instructions with the PIC [Pharmacist in Charge] that moving forward all NDC's dispensed must be verified that they align with the product dispensed and they would return in 30 days to confirm

In order to comply with these requirements, and be least disruptive both financially and operationally, we are moving forward with the following action items:

- Transfer out all patients receiving strips that we currently do not purchase in retail packaging . . .

. . .

- Order a small amount of retail strips in all brands to keep a small supply on hand . . .

. . . .

131.    Alliance's deceptive tactics proved successful.  On April 18, 2016, Amy McMurtry e-mailed Sahily Paoline:

Si,

Below is a summary of the recent follow up inspection at Hawkins by the MS BOP.  The BOP inspectors pulled each employee into a room and questioned them one by one, I have included each of their recaps below.  Unfortunately Mary [Glenn] was off that day, so most of the information is coming from a per-diem Pharmacist that was working.  I am assuming the questioning did not go over that well, as the per diem has informed us that she no longer is will to pick up shifts at Hawkins.

. . .

Per Rhonda (Per-diem Pharmacist): 2 members of the board came in yesterday before lunch.  They first asked to see invoices for the past 2 years.  They then took pictures of some of those as well as some boxes of strips.

. . .

132.    Sahily Paoline forwarded McMurtry's e-mail to David Grant on April 20, 2016.  Later that day, Grant responded:  "Interesting.  Had we stocked with correct NDCs as we discussed?"  Paoline replied:  "Yes."  Grant wrote back:  "Perfect.  The quick action by you and your team likely saved the day.  Well done."  These emails document Alliance's general counsel congratulating Alliance's Vice President of Pharmacy Operations on successfully hiding Alliance's fraud from Mississippi State officials by using a token number of boxes of Retail Strips to mislead them into believing that Hawkins Pharmacy was not engaged in adjudication

fraud.

133.    More generally, Defendants' response to the Hawkins Pharmacy's BOP inspection was typical of their response to any audit of Alliance's billing practices:  they would provide as little information as possible to inspectors and their own pharmacists, and they would simply shift affected patients to another Alliance-affiliated pharmacy in order to maintain the profits gained from false adjudication.  This tactic was described by Amy McMurtry in sworn testimony that "the way Alliance dealt with" BOP inspections was to "move the patients to pharmacies that had not been visited by the Board of Pharmacy inspectors."

134.    Alliance Defendants also employed similar tactics against ESI in 2016.

135.    As described below, ESI audited a number of Alliance-affiliated pharmacies during 2016 to ascertain, among other things, whether the pharmacies had purchased a quantity of Retail Strips equal to the quantity they claimed to have dispensed.

136.    On or about August 23, 2016, ESI notified numerous Alliance-affiliated pharmacies that it had identified massive discrepancies between the amount of Retail Strips they had purchased and the amount they claimed to have dispensed.

137.    On receiving these notices, Alliance immediately went into damage control mode and began devising strategies to preserve its relationship with ESI, including by committing to actually dispense Retail Strips going forward.  To evidence that commitment Alliance Defendants, including David Grant and Sahily Paoline, planned to send ESI photos of Retail Strips stocked on the shelves of the Alliance Pharmacies.

138.    The photos, however, were intended to document a sham.  Emails among Alliance employees confirm that the pharmacies were each to receive only five boxes of Retail Strips and that those boxes were intended to be used as props, never to be dispensed to patients. Indeed, an August 29, 2016 email sent to Amy McMurtry went so far as to ask, "[C]an we put

some kind of caution tape or something like that on these boxes so that the pharmacies have a reminder not to use them? . . . And then we should brainstorm how to write off so that we don't keep counting this as usable inventory."

**Alliance Seeks to Squelch Potential Whistleblowers**

139.    Defendants' efforts to perpetuate their fraud also included squelching would-be whistleblowers within the Alliance organization.

### Chad Gubler

140.    Chad Gubler was a pharmacy technician who worked at an Alliance-owned pharmacy in Utah.  As described more fully below, Mr. Gubler raised concerns with Defendants Sahily Paoline and Stephen Hadlock concerning the illegality of the fraudulent adjudications.  They responded to Mr. Gubler with a carefully-worded response, vetted by Defendant David Grant, and intended to misdirect Mr. Gubler into thinking that the false adjudications were in some way acceptable.  Mr. Gubler, unconvinced, raised his concerns with the Utah Department of Professional Licensing, received confirmation that such actions were indeed illegal, and promptly resigned.

141.    On February 10, 2014, Mr. Gubler sent an e-mail to Defendant Sahily Paoline with the subject line "NDC."  The email detailed Mr. Gubler's concern that he was not "following the laws" when he shipped DME Strips but adjudicated them as Retail Strips:

> I hope this NDC issue does not cause a lot [of] issues, but I thought that it should be brought to light.  I've been aware of the issue for nearly a year now and other technicians have been as well.  Corre[c]t me if I am wrong, but do we ship these [DME] products for financial gain?  Would it be too expensive for the company to ship the correct NDC if purchased from McKesson or another manufacturer?  If the NDC issue is a mistake of not updating the correct NDC in FSI [Alliance's adjudication software], then **why do we ship products that are labeled "DME beneficiary only," "Not for retail sale," "HMO use only," and "Mail order only?"**
>
> The main reason I bring this up is because as a tech, I want to be treated fairly as an employee and at times, feel that the techs get overlooked and our opinions are

not as valuable as sales.  I want my superiors to be honest with me and not pretend that I am unaware of what is going on.  I enjoy working here and the people I work with and excellent [*sic*].  **I just want to be honest in my work and know that I am following the laws as a technician.**

Please respond when you have time.

Thanks,

Chad

(emphasis added)

142.   The same day Chad Gubler sent this e-mail to Defendant Paoline, Paoline forwarded Gubler's e-mail to a coworker named Alison Humphrey, writing:  "WTH?!?!" Humphrey responded later that day:  "What are we going to do about this???  I know he probably talks about this to others.  I was hoping that we were able to distract him enough in the meeting. This is not good…"

143.   Two days later, on February 12, 2014, Defendant Paoline e-mailed Defendant David Grant with a draft response to Chad Gubler's e-mail.  Paoline wrote:

David,

Please review and let me know your thoughts.  As you can see, I've kept it short and sweet figuring we can go further if the need arises.  Let's hope for the best.

Paoline's draft response stated:

Chad, thanks for reaching out to me regarding your concern.  As you know, purchasing the amount of test strips and diabetic supplies needed to service our growing patient base is a challenge.  Although we do purchase supplies from McKesson, Anda and other primary wholesalers, we also purchase from the secondary wholesale market.  Wholesalers on the secondary market buy up available excess product, and deliver at a discount.  It is confirmed that it is identical product.  Ingram is working to establish a direct buying relationship with the major manufacturers, such as Bayer and Abbott.  Once those direct buying relationships are in place, IM can purchase product direct from the manufacturer and avoid working with wholesalers altogether.  We are expecting to receive the first such direct buying contract from Bayer next month.

144.   Paoline's response followed a pattern of responding to concerned

employees by purposefully confusing two distinct problems with Alliance's practices.  The first—which Paoline addressed in her email—was Alliance's use of test strips purchased on the gray market.  Although that practice is problematic for several reasons—for example, pharmacies cannot be sure that test strips sourced from secondary wholesalers were stored in proper conditions—it is separate from the practice of fraudulently adjudicating DME Strips using the NDC for Retail Strips to obtain improper and excessive reimbursements.  As Alliance's Vice President of Operations, John Renola, explained in an October 4, 2016 e-mail to a coworker, "secondary, primary is what the suppliers are.  Retail, institutional, etc. are what the NDCs are."

145.    Paoline's response to Gubler also employed another diversionary tactic: portraying Alliance's use of gray market DME Strips as a temporary solution to product sourcing problems to be used only until Alliance established buying relationships with manufacturers or authorized distributors.

146.    The suggestion that Alliance was dispensing diverted DME Strips only because it could not obtain Retail Strips from legitimate sources was false.  Alliance purchased diverted DME Strips because they were far less expensive than Retail Strips and thus gave Alliance a far greater profit when Alliance dispensed them and claimed reimbursement from insurers for dispensing Retail Strips.  And even in a fantasy world in which Alliance had no choice but to purchase diverted DME Strips, it would still be the case that dispensing those strips would have necessarily required Alliance to intentionally commit adjudication fraud, because the PBMs to which Alliance submitted claims for reimbursement did not include DME Strips on their formularies and would only accept claims for Retail Strips.

147.    Defendant David Grant, the General Counsel of Alliance, reviewed Paoline's draft response to Mr. Gubler, and despite the fact that it was intentionally misleading in the above-described manner, he opined that the response was "Perfect."  Paoline sought

additional input on her draft response to Mr. Gubler from Defendant Hadlock, who responded:

"Nicely done."

148.     Hadlock also made his own efforts to move Mr. Gubler off his concerns in

a meeting in which he employed the same diversionary tactics Paoline had used, adding the

further false notion that dispensing DME Strips rather than Retail Strips did not increase

Alliance's profits, and he sought to intimidate Mr. Gubler from expressing his concerns to other

employees.  Hadlock recounted the meeting in a February 13, 2014 email to Paoline (using her

nickname, "Si"):

> Si,
>
> I had a good interview with Chad and was able to explain the situation regarding
> NDC variations with the strips.
>
> 1.     The product is OTC [over the counter]
> 2.     The item contained in each box is the same
> 3.     We use only one NDC for convenience since all have the same product
> 4.     AWP [average wholesale price] is the same on all for the purpose of
>        billing
> 5.     Pharmacists are the final say and they are approving the process
>
> He was accepting of the explanation.
>
> I also said he is not to further this conversation with others unless it is with either
> me or you.
>
> Any further issues are to be brought to us if he has any questions.
>
> Thanks,

Paoline responded later that day:  "Thank you so much Steve.  Apparently, he has already

brought this to other team member[s].  I'll be by to discuss further."

149.     Gubler ignored Hadlock's demand that he keep his concerns about

Alliance's fraudulent practices to himself.  On March 4, 2014, Gubler e-mailed a hotline for the

Utah Department of Professional Licensing ("DOPL"), asking:

> Is it legal to dispense a different NDC than the NDC billed to the insurance

company?  What if the product being dispensed is an OTC, does that mean you can dispense a different NDC than what you bill the insurance?  Is it legal for a retail pharmacy to dispense HMO, DME, or Mail Order only products?

On March 12, 2014, a Utah DOPL employee responded:

> Dear Chad,
>
> I'm sorry for the delay in responding to your email.  I suggest you consult with a competent attorney about this, but **I think it is illegal to dispense a different NDC than the NDC billed to the insurance company**. . . .

(emphasis added).

150.   Gubler resigned from Alliance in March or April 2014.

**<u>Masum Amin</u>**

151.   Masum Amin was the PIC of the Alliance-affiliated Peterson Pharmacy in New Jersey.  As described more fully below, Ms. Amin, like Mr. Gubler, raised concerns with Defendants Paoline and Hadlock, as well as Defendant Grant, about Alliance's practice of dispensing DME Strips but adjudicating them as Retail Strips.  Ms. Amin, like Mr. Gubler, saw through the Defendants attempts at misdirection, and reported the activity to the Department of Health and Human Services for what it was: fraud, waste, and abuse.

152.   On March 31, 2014, after hearing of Masum Amin's concerns and suspicion that test strips  were being falsely adjudicated, Defendant Paoline e-mailed Defendant Hadlock:

> Steve,
>
> Wanted your thoughts on reaching out to Masum regarding the NDC issue.  Amy [McMurtry] said the explanation you provided to her set her at ease.  Amy did try but Masum kept pushing and was concerned that she was the only site receiving the DME strips. . . .
>
> Thanks for your help. . . .

As described above, "the NDC issue" was Alliance's shorthand for its practice of billing PBMs using the NDC for Retail Strips despite dispensing DME Strips with a different

NDC.

> 153.    Replying to Paoline's March 31, 2014 e-mail, Hadlock described how he

had addressed similar questions from other employees:

> The explanation that I gave to Amy and Robert was that we are struggling to have enough of our regular inventory to supply all of our patient's needs.  The DME packaging is a short fix until we can get more product.  We are working to get a better supply chain set up to provide for our needs.
>
> If they are OK with that, I don't go further.  If they do push for more information, I tell them that we are in negotiations for direct buying right now with our legal dept. but that may take some time to set up, but this will solve our challenge with product.
>
> I only give them information that they ask for and only give them more if required.
>
> Steve

In other words, Hadlock recommended that Paoline use the same false and diversionary tactics

that she used with Chad Gubler.

> 154.    On April 8, 2014, Masum Amin e-mailed Defendant Paoline (copying

Defendant Steven Hadlock), writing:

> I wanted to reach out and express my concern on the [LifeScan] One touch Ultra DME products.  I sent out an email last Wednesday after a small order was received with DME products and have heard no respon[se].  According [to] the direction sent to us we are to use the product on the shelves, in the time for a resolution however after Monday[']s order I have a little over 2200 boxes of One Touch Ultra DME strips and 2100 of DME contour strips.
>
> I have received the correct Bayer strips which I intend to use and have asked Andrew to return of the DME, since the correct ones are available.
>
> I have told my shippers that I do not want any DME products on my picking [station], as I will not send them out.  I am concerned and need much more detailed information on the use of DME products.

> 155.    Defendant Sahily Paoline responded to Ms. Amin's e-mail later that day,

writing:

> Hi Masum,

> I am really sorry about the confusion but as we expressed last week, we are currently unable to source any other One Touch product. I wish there was another option, but none exists currently. As we discussed, our team is working hard on direct manufacturer contracts but again, there is no definitive timeline as we are in lengthy negotiations with several manufacturers including Life Scan. . . .

As with Paoline's response to Chad Gubler, her e-mail to Ms. Amin intentionally misrepresented

Alliance's fraudulent practices as mere matters of temporary problems with product sourcing.

Further, her representation that Alliance was engaged in negotiations with LifeScan was untrue.

156.    Like Mr. Gubler, Ms. Amin was not fooled. She responded to Defendant

Paoline's misleading e-mail that same day: "Where do pharmacists stand on a liability

standpoint? Every box that goes out has my name on it. How do other dispensing pharmacist[s]

feel about this?"

157.    The next day, Defendant Paoline forwarded Ms. Amin's e-mail to Amy

McMurtry and wrote, "How in the heck do I answer this?? Ughhh" McMurtry suggested: "Most

of the liability falls on the insurance billing and purchasing side, so maybe we try to find a way

to emphasize that the patient is getting the right product, the package is just a package."

McMurtry was correct that "liability falls on the insurance billing . . . side" because Alliance was

committing insurance fraud.

158.    On April 9, 2014, Defendant Paoline responded to Ms. Amin's question

about pharmacists' liability. Once again, she side-stepped Ms. Amin's question and made the

irrelevant and non-responsive point that DME Strips were functionally the same as Retail Strips:

> Hi Masum,
>
> I understand and appreciate your concern, I had the same question when I was a pharmacist at Everest [an Alliance-owned pharmacy]. The patient is provided exactly the same product made by the same manufacturer, we are not providing the patient an inferior product. Manufacturers currently try to control supply of product and earmark these products for specific delivery channels. We are working hard on contracts with manufacturers.
>
> Steve and I have had similar conversations with other pharmacists and after

reviewing the background and explaining the company plan to remedy the situation, they have been on board. I hope this helps you feel more comfortable with the situation. If you still feel uneasy perhaps you, Amy and I can set up a meeting to discuss further and discuss next steps. Just so we understand the landscape, are shipments being held from getting to our patients?

159. On April 10, 2014—the day after receiving Paoline's diversionary e-mail—Ms. Amin responded that she wanted to set up a conference call. Later that day, Paoline wrote to McMurtry that she was "thinking ahead on a possible change in PIC" at the Peterson Pharmacy – *i.e.*, thinking about replacing the problematic Ms. Amin. In response, McMurtry wrote:

> I had a very honest and open discussion with Masum today, very similar to the discussion Steve [Hadlock] had with me when it came to this point. It ended with her spending today/tonight thinking over some things I said and if she makes a decision that she is not on board, that we would work with her to find a new position elsewhere. I think it went well, and didn't really know what else to say anymore, besides to be very honest and if she's not ok with it, I understand but it is what it is, and until we get the MFG [manufacturer] contracts in place it won't change. She would like to still set up a call with us tomorrow. **The main concerns she had was that DME product is only for Medicare/Medicaid billing and she thinks we are committing insurance billing fraud**. . . .

(emphasis added).

160. Ms. Amin was still in place two years later, when ESI conducted its investigation of multiple Alliance pharmacies, including the Peterson Pharmacy. Prompted by inquiries from ESI, Ms. Amin reviewed the invoices Peterson Pharmacy had received from Alta Distributors and noticed that the invoices reflected the NDC for Retail Strips even though Alta Distributors had provided Peterson Pharmacy with DME Strips. In a June 13, 2016 e-mail to Alliance employees Amanda Haynie and Lyndsey Oltmans, with the subject line "Express investigation," Amin wrote:

> After getting a little overview of this . . . investigation I wanted to be more thorough in our PO and inventory process and I have come across a few concerns.
>
> As you can see the NDC numbers we are receiv[ing] and what is on the Invoice do not match. The product received does not match the ACCU50 and ULT50

billing NDC #s.  How are we to proceed to correct this? . . .

161.    Lyndsey Oltmans immediately forwarded Amin's e-mail to Amy McMurtry, writing:

> Amy, it appears Masum is back [from maternity leave] and has lots of questions. Mostly regarding NDC and product as you can see below.  Do you suggest Amanda has the NDC and different channels discussion?  Or do you think we should set up a call with legal?  I'm not sure how well the NDC discussion will go over with Masum.

McMurtry, in turn, forwarded Amin's e-mail to Defendant Paoline, writing:

> Masum is back from maternity leave and after reading the letter from ESI regarding NDC she has some questions/concerns over the NDC's on shipments and invoices not aligning.  . . .  Knowing Masum, I feel like she may respond better to legal having this discussion with her, but before I scheduled a call I was hoping to get your opinion.  Thoughts?

Paoline responded: "Totally agree, we should enlist Legal from the get go."

162.    As is evident from the ensuing communications, McMurtry and Paoline decided to "enlist Legal" not because was a legitimate answer to Ms. Amin's concerns but because they hoped that Alliance's counsel, Defendant Grant, would be more effective at fending off Ms. Amin's questions with obfuscations than Paoline had been when Amin first raised them in 2014.

163.    On June 14, 2016, McMurtry e-mailed Defendant Grant to request his help with addressing "Peterson PIC NDC concerns."  Grant agreed to conduct a conference call with Ms. Amin, and she memorialized the substance of the call in a June 16, 2016 email to Grant and others with the subject line "Call Follow up Regarding Product selection and dispensing":

> I wanted to recap what we discussed in hopes to make sure I understand everything correctly.
>
> -FDA intention of the use of NDC # is to identify product- that's all
>
> -Manufacturers have taken the slightly altered NDC # as a means to channel product in different distributions, resulting in increased rebates and profits etc

-a secondary market is used to purchase discounted DTS [diabetic test strips] so business plan can be sustainable

-Alta distributors do not recognize different manufacture NDC#s, so they send product all under one retail item #/NDC#

-As a company, Alliance Health, does not differentiate between the retail packaging and manufacturers alternative packaging.  Ex: "mail order only" or "Institutional use only"

-Since the company does not differentiate in the manufacture, the billing concerns are contractual concerns and not a regulatory matter

-according to FWA and medicare-d billing, based on the FDA intention of the use of an NDC, billing of medicare with the retail NDC, and dispensing any of the manufactures packaging is acceptable

. . .

**As dispensing pharmacists we are billing PBMs, including medicare-d, for retail NDC# which is linked to a specific reimbursement rate, while we may be sending out a differently packaged product.**  Regardless of the integrity of the product and the use of FDA's definition of an NDC#, the reimbursement rates are established by PMBs [*sic*] and they are linking that rate to the different NDC # numbers on the manufacturers packaging.

**David to be clear, as per company belief of no product differentiation, the pharmacist is to knowing[ly] bill retail NDC# and send out alternatively packaged product?**

Thank you for the detailed information on the call and the legal clarifications provided.  As the dispensing pharmacist[], I want to be certain that I am understanding of the situation in a legal manner and keeping Peterson Pharmacy compliant.

I appreciate your counsel.

(emphasis added).

164.    Ms. Amin's June 16, 2016 is remarkable in that it memorializes Defendant Grant—Alliance's *general counsel*—(i) acknowledging to an employee of an Alliance pharmacy that Alliance was systematically committing insurance fraud and (ii) trying to persuade the employee that the fraud was reasonable and legal.  As Ms. Amin indicated at the end of her email, she did not buy Grant's song-and-dance and asked Grant to clearly confirm that his

direction was that "the pharmacist is to knowing[ly] bill retail NDC# and send out alternatively packaged product?"

166. A few hours after Ms. Amin sent her e-mail, Amy McMurtry forwarded it to Defendant Sahily Paoline, writing:  "Well she nailed it below……I'm assuming this is her attempt to receive David[ Grant's] buyoff . . . ."  Paoline responded:  "She sure did! . . ." and later in the same email chain Paoline—having obviously discussed Ms. Amin's email with Grant—told McMurtry that Grant was "very apprehensive to respond.  *He said this would be Exhibit A* **[in a lawsuit].**" (emphasis added)  In response, McMurtry wrote, "LOL.  I have no doubt it would be.  I would be unwilling to respond too!"

166. Later on June 16, 2016, Defendant Grant sent the following reply to Ms. Amin's email:

Masum,

Here are the links that I mentioned:

http://www.fda.gov.Drugs/DrugSfety/ucm17449.htm
http://www.fda.gov.Drugs/DevelopmentApprovalProcess/UCM070829

On the first link, see the third paragraph discussing the benefits of the secondary market, *i.e.* sales from one wholesaler to another.

Notably, Grant did not dispute Ms. Amin's account of their phone call, nor did he respond to her request for confirmation that Alliance's pharmacists should claim reimbursement from PBMs for Retail Strips while dispensing DME Strips.

167. Noticing that Grant had avoided her question, Ms. Amin posed it again in an email later that same day, writing "To the original question, as per company belief of no product differentiation, the pharmacist is to knowingly bill retail NDC# and send out alternatively packaged product?"

168. Several days later, after Ms. Amin made clear that she would refuse to

dispense test strips to Peterson Pharmacy's thousands of patients until her concerns were addressed, Defendant Grant sent her an email offering to provide her a written memorandum providing "guidance," but only if she first signed a two-page confidentiality agreement that threatened damages and injunctive relief in the event of a breach.

169.    On information and belief, after consulting counsel, Ms. Amin declined to sign the confidentiality agreement Grant had demanded.

**Defendants Try to Stymie Plaintiff's Investigation of the Fraud**

170.    By June 2015, Plaintiff had begun to explore the possibility of some form of misconduct by Alliance.  Plaintiff thus dispatched personnel to Utah to seek to interview former Alliance employees about the company's business practices.  In June 2015, at least two of these former Alliance employees notified Defendant Jeffrey Smith that they had been visited by such personnel; at least one notified Defendant Geoffrey Swindle of the same.

171.    On June 23, 2015, Jeffrey Smith e-mailed Alliance's outside counsel and Defendant David Grant, writing:

See text from Greg Heaps – previous VP of Marketing [for Alliance]:

Hey Jeff.  I just had an unusual visit at my home from a couple attorneys from NY regarding one touch product.  They had a lot of questions about AH [Alliance Health] procurement and reimbursement practices.  I told them that wasn't my area of business and I wasn't sure of the details.  I also told them I was under a confidentiality agreement and couldn't say much.  Thought you should know.

172.    David Grant responded to Jeffrey Smith later that day:

I just spoke with Greg and got more detail. . . .  They began by asking about procurement and reimbursement practices.  They then pulled out a sheet that was divided into three columns, and talked about different costs and reimbursements associated with the three columns (I would guess DME, mail order and retail), and suggested to the effect that some are billing for a different type of product. . . .

It is apparent that they are probing the NDC issue and they are ignoring the fact that they are causing former employees to violate their contractual obligations.

Grant's immediate understanding that the Plaintiff was probing "the NDC issue," and his noting that to Jeffrey Smith, makes clear that both men were well familiar with Alliance's ongoing adjudication fraud.

173.   The day after learning of Plaintiff's efforts, Defendants sought to block them by filing suit against Plaintiff and its outside counsel in Utah state court, seeking an injunction to prevent Plaintiff's personnel from questioning former Alliance employees on Defendants' fraudulent enterprise.  The suit was later withdrawn.

174.   The following day, June 25, 2015, after receiving an email from Plaintiff's counsel, Alliance's outside counsel wrote to Defendants Jeffrey Smith, Justin Leavitt, and David Grant:  "Well—see below.  Looks like we've fleshed out the issue.  It's the billing issue you've discussed with us. . . ."  Responding to that e-mail, Justin Leavitt wrote to David Grant on June 25, 2015:  "What are your thoughts?"  Grant replied:

> I had a long call with [outside counsel].  He seemed to agree with my assessment that the risk is a civil risk.  The real issue is the means of determining damages of [LifeScan], and the ability to pierce the veil.  The email does nothing more than confirm what we already suspected, and validates our filing of the lawsuit.

175.   Grant's e-mail shows that the Alliance Defendants believed that "the real issue" was their personal liability for Plaintiff's damages—not whether they had in fact engaged in fraudulent adjudication, which was a given.

**Defendants' Fraudulent Scheme Is Collapsed by Express Scripts and the FBI**

176.   As it turned out, the shift to the 10% PIC model in 2016 was too little too late.  In May 2016, ESI retroactively rejected insurance claims for approximately 30,000 of Alliance's patients and hundreds of thousands of LifeScan Retail Strips.  In letters sent to certain of the Alliance pharmacies, ESI stated that it had conducted an investigation "to validate that Provider had purchased sufficient [LifeScan Retail Strips] to support the claims it had billed to Express Scripts during the investigative date range."  The letters further stated that, in response

to the investigation, the Alliance-affiliated pharmacies had been unable to supply evidence to demonstrate that they had purchased the Retail Strips for which they had claimed reimbursement from ESI.  Noting that the Alliance-affiliated pharmacies' failure in this regard raised serious questions concerning whether they had been "purposely dispensing a 'not for retail sale' product and billing payors using more expensive retail NDCs," as well as questions concerning the "authenticity" of the invoices the Alliance pharmacies had proffered, ESI advised that it would chargeback millions in reimbursement payments previously made to the Alliance pharmacies. This action by ESI caused Alliance to suffer a loss of almost $5.5 million in the third quarter of 2016.

177.    As a result of its deteriorating financial condition, Alliance defaulted on its loan from Zions Bank in or around December 2016.

178.    On or about February 23, 2017, the Federal Bureau of Investigation and U.S. Postal Inspection Service executed search warrants at Alliance's headquarters and warehouses as part of an investigation into potential criminal wrongdoing by Alliance.  The FBI also seized bank accounts at Zions Bank of Alliance and its affiliates and issued damming warrants to seize incoming receivables.

179.    On April 9, 2017, unable to access cash held in its own bank accounts due to an asset freeze, under increasing governmental and commercial scrutiny for its fraud, Alliance and a number of its affiliates and subsidiaries, including many of the Alliance-affiliated pharmacies, filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas.

180.    Within weeks after the commencement of the bankruptcy case, Defendant Jeffrey Smith was fired by the Board and replaced by an interim CEO.  Just a few weeks after that, the Bankruptcy Court entered an order replacing Alliance's management altogether and

appointing a Chapter 11 Trustee to manage all aspects of the business.

181.    The full extent of this fraud remains unknown.  At a minimum, the
Alliance Pharmacies submitted *more than one million* fraudulent insurance claims and caused
LifeScan to suffer tens of millions of dollars in losses.  On information and belief, the
Department of Justice's criminal investigation is ongoing.

**The Officer Defendants' Knowledge of, Participation in, and Authorization of the Fraud**

182.    During her August 23, 2018 deposition, Amy McMurtry, a former
Director of Pharmacy Operations for Alliance, agreed that "the fact that Alliance billed for one
type of product but delivered another version of the product was well-known within Alliance,"
that it "was something that all of the senior managers . . . [a]nd a lot of the employees" knew
about.  McMurtry added that the practice of false adjudication "was openly discussed" within
Alliance.  When asked at her deposition, "Is there any senior people at Alliance, to your
knowledge, who didn't know about the practice?" McMurtry answered, "not that I'm aware of,
no."

183.    Consistent with McMurtry's recollection, each of the Officer Defendants
actively participated in and/or conspired to perpetrate Alliance's adjudication fraud.

**Jeffrey Smith**

184.    As the former CEO of Alliance Health—and its predecessor corporations,
Medsource Rx Pharmacy, and Ingram Medical—Defendant Jeffrey Smith was driving force
behind Alliance's fraudulent practices from the beginning.

185.    When Smith purchased Alliance's predecessor corporation in 2007, that
company was a pharmaceutical wholesaler.  But in 2011, Jeffrey Smith oversaw the transition of
his wholesale business into the "purchasing arm" of Medsource Rx Pharmacy, LLC—a sister
company created by Smith for the purpose of selling diabetic test strips directly to patients.  In a

February 28, 2017 e-mail to David Grant prompted by service of the Complaint in this action, Justin Leavitt recalled that Jeffrey Smith "work[ed] closely" with pharmacists Ric Sykes and Paul Dunn during the creation of the Medsource Rx Pharmacy "to develop the pharmacy's practices"—namely, the practice of false adjudication.

      186.    In addition to developing his companies' fraudulent billing practices, Jeffrey Smith was directly involved in sourcing the DME Strips that his pharmacies would falsely adjudicate under the retail pharmacy benefit.  In a December 2011 memorandum, an investor in Medsource Rx Pharmacy wrote ███████████████████████████ ██████████████████████████████████████████████. Jose Vargas, Alliance's Director of Procurement, likewise testified that it was Jeffrey Smith who directed him to purchase DME Strips, not Retail Strips, to be sold and reimbursed as Retail Strips.

      187.    Jeffrey Smith also designed Alliance's network of affiliated pharmacies for the purpose of executing Alliance's fraud, and he knew and approved of Alliance's use of misleading invoices to prevent PBM auditors and others from uncovering the fraud.

      188.    Jeffrey Smith was acutely aware of the source of his company's profits and the risks associated with its practices.  In an April 22, 2014 e-mail, Smith wrote:

> I think we basically have two diversification problems from where we derive our profits and revenue for the company.
>
> 1. Product Risk (most of our profit and revenue from diabetic testing supplies which have NDC and supply issues)
>
> 2. Payor Risk (most of our business is from two payers and we have PBM risks with Mail order risks)

As noted throughout this Complaint, Jeffrey Smith and other Alliance employees used "the NDC issue" as a euphemism for the adjudication of non-Retail Strips using the NDC for Retail Strips.

      189.    As alleged above, Jeffrey Smith's reaction to learning of Plaintiff's June 2015 inquiries, and his communications with David Grant about the same, also evidences his

awareness and participation in Alliance's fraud.

190.    Jeffrey Smith's reaction to Plaintiff's inquiries was further memorialized by Geoffrey Swindle ██████████████████:



191.    On October 26, 2015, David Goldsmith, Alliance's Vice President of Corporate Strategy and Business Development, e-mailed his resignation to Jeffrey Smith, Blaine Smith, and David Grant.  Addressing his e-resignation directly to Jeffrey Smith, Goldsmith wrote:

Dear Jeff,

I appreciated the chance to sit down with you and David Grant on Friday to lay out my concerns regarding our business practices as it relates to the pharmacy fulfillment strategy I have been tasked to execute.  As I shared with you two weeks ago after returning from the NCPA conference, I have had growing concerns about the propriety and sustainability of these practices, especially with respect to NDC coding of secondary product for reimbursement purposes and our copay collections.  As I explained to you on Friday, I have been wrestling with how to reconcile my current understanding of these practices with the need to protect my professional reputation.

After speaking with you and David about these concerns, I spent the better part of this weekend doing additional due diligence. I consulted with my employment attorney and conferred with two people I know professionally – one with deep expertise in health law and the other in civil litigation. These conversations only heightened my concerns and made it clear that it is untenable for me to continue my employment with Alliance Health. Doing so places my career, my professional reputation, and my livelihood in clear jeopardy. **That risk would be only greater given my responsibility for executing a pharmacy fulfillment strategy specifically designed to perpetuate business practices that are without question unethical, and quite possibly illegal. You also expressed your concerns on Friday when you said you are not comfortable with the "morality" of our practices but view them as necessary, at least for the foreseeable future.**

When I rejoined Alliance Health in January, I did so with a great deal of enthusiasm. I was excited about the future of the company and optimistic I could play a significant role in its success. In hindsight, had I known last December what I know today about the company's business practices, I can say unequivocally that I would not have accepted my offer of employment. Beyond the risk to my professional reputation, I simply cannot work in an environment so ripe for regulatory and legal scrutiny one in which the risk of civil, and potentially more serious penalties, appears quite significant.

You told me on Friday that if I'm not comfortable in this environment I should move on. After considerable thought and due diligence, I feel compelled to do so, effective immediately. I believe these circumstances amount to a constructive discharge, and as such, expect Alliance Health to honor the severance terms outlined in my offer of employment. If for any reason you don't agree, please let me know and I will have my attorney . . . follow up directly with David Grant.

Respectfully,

David

(emphasis added).

192.    Goldsmith later testified that Jeffrey Smith "was concerned about what he described as the morality of the practice" of false adjudication, but that "[h]e said . . . his job was to increase the revenue of the company and that this business model ensured that that would happen." Goldsmith similarly testified: "what Jeff Smith said to me was, in essence, it was his job to continue to increase revenue for the company and that he would do what it took to do that," and that Smith "said that on the heels of saying he felt these practices were a concern from

a moral standpoint." Goldsmith recalled telling Jeffrey Smith that Alliance's practice of false adjudication "was tantamount to fraud, and I had two attorneys who I had spoken to informally reinforce that for me."

193.    In sworn testimony given in open court on November 7, 2017 in connection with Alliance's bankruptcy proceeding, Alliance's Chief Financial Officer Scott Klossner testified that Jeffrey Smith made the decision to continue committing insurance fraud even after other executives and board members raised objections.

**Steven Hadlock**

194.    As Alliance's Director of Pharmacy Operations, Defendant Steven Hadlock knew of and implemented the complex scheme to build a network of pharmacies to execute Alliance's fraudulent scheme and conceal it from PBMs, Pharmacy Plans, and test strip manufacturers such as LifeScan. In his pharmacy operations role, Hadlock was aware that the insurance billing systems developed by Alliance and provided to Alliance-affiliated pharmacies only permitted pharmacies to submit insurance claims for Retail Strips, not DME Strips, despite the fact that the pharmacies distributed DME Strips to patients.

195.    When Alliance pharmacy technician Chad Gubler discovered Alliance's fraudulent adjudication practices and raised his concerns internally, Hadlock moved swiftly to contain the fallout. In a February 13, 2014 e-mail to Sahily Paoline, Hadlock wrote that he spoke with Gubler to "explain the situation regarding NDC variations with the strips," and "also said he is not to further this conversation with others unless it is with either me or you."

196.    Hadlock was serious about enforcing a code of silence at Alliance. On March 5, 2014, Hadlock e-mailed Gubler:

> Chad,
>
> It has come to my attention that there may or may not have been a cancellation of an insurance at a site.

It has also been mentioned that you are talking about this with other technicians.

When we spoke several days ago, I asked you not to talk about items like this. I requested that you come and speak to me or [Sahily Paoline] if anything like this would occur and not speak to members of any team.

I need to hear from you as to what the issue is and why you would speak to others when you had agreed not to.

197.    On March 13, 2014—only a few days after his stern e-mail to Chad Gubler—Hadlock circulated a calendar invite to Sahily Paoline, David Grant, and others to have a "[c]onversation on the challenge of multiple NDCs for like products and pharmacist's liability." The "challenge" Hadlock referenced was how to continue Alliance's adjudication fraud in light of pharmacists' concerns about incurring liability for it. Hadlock's desire to hold this meeting proved prescient: within the next few weeks, pharmacists Shonela Jalaluddin and Masum Amin both expressed concern about their liability for dispensing DME Strips and filing insurance claims for Retail Strips.

198.    Shonela Jalaluddin was the Pharmacist in Charge at the Alliance-affiliated Cure Pharmacy in Pennsylvania. On March 19, 2014, Hadlock e-mailed Sahily Paoline:

Si,

Andrew Jenkins came to me and said they needed to ship an order to Cure. They are [in] need of stock and he wanted to know if he could ship the One Touch that we have to be used in fulfillment. He can't ship if we don't have her approval.

This forced me to talk with Shonela about the issue of NDCs. I explained to her the problem of not having enough "retail One Touch" to supply our needs at the moment.

I told her of our moving forward with direct buying, but I couldn't give her a date as to this resolution.

I suggested that she use what she has but that I couldn't force her to do so. So will not ship the DME strips out in place of the retail strips. She had a 'friend' who came in some time ago, saw the product we were using and told her it was a felony to substitute the products. She will not put her license in jeopardy.

. . .

As discussed above, Hadlock was aware that Alliance's adjudication fraud had nothing to do "not having enough 'retail One Touch' to supply our needs."

199.    Hadlock recommended to Paoline that she make the same misrepresentation to other concerned Pharmacists.  On March 31, 2014, Sahily Paoline e-mailed Hadlock seeking his advice on how to address the concerns of Masum Amin, the Pharmacist in Charge of the Alliance-affiliated Peterson Pharmacy in New Jersey.  Hadlock responded that Paoline should intentionally confuse "the NDC issue" with product sourcing problems and tell Amin that "[t]he DME packaging is a short fix until we can get more product."  Hadlock added: "I only give [pharmacists] information that they ask for and only give them more if required."  Hadlock added that he had given this same explanation to other concerned Alliance pharmacists.

**Sahily Paoline**

200.    Defendant Sahily Paoline, as Alliance's Chief Pharmacy Officer, knew of and implemented the complex scheme to build a network of pharmacies to execute Alliance's fraudulent scheme and conceal it from PBMs, Pharmacy Plans, and test strip manufacturers such as LifeScan.  In her pharmacy operations role, Paoline was aware that the insurance billing systems developed by Alliance and provided to Alliance Pharmacies only permitted pharmacies to submit insurance claims for Retail Strips, not DME Strips, despite the fact that the pharmacies distributed DME Strips to patients.

201.    David Goldsmith testified that Paoline was one of the persons to whom he expressed concern about Alliance's practice of "delivering one product but billing for another" before he resigned.

202.    Paoline also participated in discussions around submitting doctored or misleading invoices to PBMs in response to audits.  Similarly, Paoline was involved in discussions concerning Alliance's response to the surprise inspection of the Hawkins Pharmacy

by Mississippi Board of Pharmacy inspectors—namely, shifting patients out of Hawkins and ordering a small number of retail strips for the pharmacy to disingenuously display when inspectors returned.

203.   Paoline's efforts to further Defendants' fraudulent practices are also demonstrated by the lead role she played in dealing with pharmacists and technicians who refused to participate.  For example, when Alliance pharmacy technician Chad Gubler e-mailed Paoline directly with his concerns about Alliance's fraudulent billing practices, Paoline intentionally attempted to divert attention from Gubler's real concerns.  Paoline also lead the effort to rein in Masum Amin, the PIC of the Alliance-affiliated Peterson Pharmacy in New Jersey.

204.   Both Masum Amin and Peterson Pharmacy owner Dow Jones testified at their depositions that Sahily Paoline personally signed off on DME Strips being adjudicated as retail product from the Peterson Pharmacy in New Jersey.  When asked during his April 25, 2018 deposition whether Paoline "encouraged Masum Amin to continue" dispensing DME packaged products while billing for retail strips, Dow Jones answered, "That's correct."

205.   On information and belief, Paoline attended an Alliance management meeting in August 2014 at which Alliance's practice of engaging in fraudulent adjudication was discussed.

**David Grant**

206.   As Alliance's General Counsel, it was David Grant's responsibility to ensure that Alliance was operating within the bounds of the law.  Grant abandoned that responsibility almost immediately after joining Alliance and, instead of working to keep Alliance compliant, worked to implement and maintain Alliance's fraudulent scheme.

207.   Grant participated in efforts to deceive PBMs about the fact that Alliance

was dispensing DME Strips purchased on the secondary market instead of Retail Strips purchased from authorized distributors by, for example, submitting doctored or misleading invoices in response to PBM audits and/or sending retail product to pharmacies to deceive on-site inspectors.

208.    Grant also acted within Alliance to facilitate the continuation of its fraud. Only two months after he joined Alliance, Grant participated in a March 13, 2014 meeting with Hadlock and Paoline to discuss "the challenge of multiple NDCs for like products and pharmacist's liability."  As is evident from the allegations above, the aim of that meeting was not to help pharmacists avoid liability by acting within the law; the goal was to find methods to persuade pharmacists to continue to engage in fraud.

209.    Grant acted as Alliance's final line of defense when pharmacists or Alliance employees raised concerns about Alliance's business practices.  For example, when Masum Amin noticed discrepancies in the NDCs on invoices her pharmacy had received from Alliance's subsidiary wholesaler, Grant conducted a conference call with Amin during which he explained Alliance's adjudication fraud and attempted to convince Amin to participate.  When Amin sought Grant's written confirmation that she was expected to commit fraud, Grant refused because he was concerned that written confirmation would become "Exhibit A."

210.    When asked at her deposition whether Grant "encouraged [her] to send out DME Strips and bill for Retail Strips," Amin responded:

> I took it as encouragement.  He was very adamant on just telling me that it's not a pharmacy issue, that I'm not giving somebody the wrong product, it's a contractual [*sic*] issue.  It was – that was, like, the only thing that he had on repeat, despite my concerns not being that I'm giving somebody the wrong product.

211.    As detailed above, Grant's response to learning that Plaintiff was probing Alliance in June 2015 confirms he had previously known of the fraud and failed to stop it.  In

fact, his response to Plaintiff's inquiries was not to try to stop the fraud but, rather, to try to stop the inquiries.

212.    Grant also authored a November 4, 2015 memorandum to Alliance's Board of Directors about the "NDC Issue."  In that memorandum, attached hereto as Exhibit A (with apologies to Grant for not abiding by his prediction), Grant described the company's practice of falsely adjudicating DME Strips purchased on the gray market as Retail Strips.  He noted as a "fact" that "the Company has purchased diabetic testing supplies packaged by [LifeScan] for various distribution channels and regardless of the packaging (with the NDC code affixed), the pharmacies have dispensed the supplies and billed them as if they were packaged for retail distribution."  He also wrote that Alliance "takes the same approach with diabetic test strips manufactured by the other major manufacturers."

213.    In that same memorandum, Grant also acknowledged that Alliance's profitability was the result of its adjudication fraud.  "[E]liminating reliance on the secondary market," he wrote,

> will be extremely difficult if not impossible for so long as the Company-owned and managed pharmacies dispense those supplies.  The pricing for diabetic testing supplies for the major manufacturers from their primary distribution channels are such that diabetic testing supplies would be a loss leader.  The only means of eliminating reliance on the secondary market for diabetic testing supplies while providing the level of service currently provided by the Company would require direct purchasing contracts with the major manufacturers without significant exclusions (which the Company has been unable to obtain), or to accept losses on each fill of a prescription for diabetic testing supplies from the major manufacturers, or to discontinue dispensing diabetic testing supplies from the major manufacturers, thus eliminating the ability to service a major portion of the market.  None of these options is feasibly available in the short term.  In the medium term, the business decision will be based on the perceived risk of further contract loss and/or chargebacks from the PBMs or threat of litigation from the manufacturers versus the lost revenues resulting from the chosen course of action.

214.    The diabetic testing strips available for purchase on the gray market were overwhelmingly strips packaged for sale to DME Plans, because the lower wholesale price

manufacturers charged for such strips, relative to strips packaged for retail sale, enabled diverters to make a profit when reselling them (in violation of their contractual obligations).  With this context, Grant's memo can be clearly read to say that Alliance's profitability depended upon its ability to continue selling DME Strips to its retail customers, which is necessarily adjudication fraud.  Going forward, Grant advised the Board, Alliance was faced with the choice of continuing to accept the risks of adjudication fraud—PBM cancellations and lawsuits by test strip manufacturers—or foregoing profitability.

**Justin Leavitt**

215.     Defendant Justin Leavitt, as former Chief Financial Officer of Alliance, also knew of and provided substantial assistance for the fraud.

216.     Leavitt participated in decisions to respond to PBM audits with doctored or misleading invoices and to supply Alliance pharmacies with small amounts of retail product to display in the event of an on-site audit.

217.     As discussed below, Alliance obtained investments and credit refinancing from Zions Bank, Mercato Partners, and Pritzker Group by disclosing its fraud and then signing agreements explicitly acknowledging the fraud.  Leavitt was intimately involved in drafting those disclosures and negotiating those agreements.

218.     On information and belief, Leavitt attended an Alliance management meeting in August 2014 at which Alliance's practice of engaging in fraudulent adjudication was discussed.

219.     As with Defendants' Smith and Grant, Leavitt's response to learning that Plaintiff was probing Alliance in June 2015 confirmed he was previously aware of it.  In emails written by Leavitt at that time, he offers several rationalizations for the massive billing fraud—including that other pharmacies purportedly did the same thing and that patients were not put at

risk.  At no point, however, did he deny that the practice was occurring or that he was aware of it.  Ironically, when Leavitt resigned from Alliance in 2016, he told the consultant hired to find his replacement that he did not "feel prepared to navigate the legal challenges that he sees coming forward."

**Blaine Smith**

220.    Blaine Smith, Alliance's Chief Revenue Officer, was well aware that fraudulent adjudication was Alliance's "foundational practice."  For example, in a February 1, 2015 e-mail to Sahily Paoline, Smith noted that Alliance was not disputing PBM chargebacks based on Alliance's failure to collect co-pays because it "didn't want to expose the potential of revealing the NDC issue."  As with the rest of Alliance's executives, Blaine Smith used "the NDC issue" as shorthand for fraudulent adjudication of DME Strips as Retail Strips.

221.    Blaine Smith also oversaw the expansion of Alliance's pharmacy network, which David Goldsmith correctly observed was "specifically designed to perpetuate" Alliance's practice of fraudulent adjudication.  Further, because Smith was responsible for Alliance's "pharmacy fulfillment strategy," he was continually apprised of the mounting accusations that Alliance's reimbursement practices constituted fraud.  And when inspectors from Mississippi's Board of Pharmacy later conducted a surprise inspection of the Alliance-affiliated Hawkins pharmacy seeking information on adjudication fraud, David Grant forwarded Blaine Smith his recommended strategy:  provide as little information as possible to both inspectors and Alliance's own pharmacists.

222.    On information and belief, Blaine Smith attended an Alliance management meeting in August 2014 at which Alliance's practice of engaging in fraudulent adjudication was discussed.

223.    Blaine Smith was also copied on emails sent by Defendants Grant and

Leavitt concerning Alliance's response to Plaintiff's 2015 inquiries into Alliance, which acknowledged Alliance's practice of billing DME Strips as Retail Strips.

224.    Blaine Smith was also on Alliance's Board of Directors and, therefore, received David Grant's above-described memorandum detailing Alliance's adjudication fraud and its crucial role in Alliance's profitability.

**Geoffrey Swindle**

225.    Defendant Geoffrey Swindle was the founder and President of Alliance Health Networks ("AHN"), a digital marketing and patient lead vendor.  In January 2014, AHN was acquired by Ingram Medical—the company whose "foundational practice" was fraudulent adjudication of diabetic test strips.  After acquiring AHN, Ingram adopted the "Alliance" brand name and Swindle became Alliance's Chief Strategy Officer.

226.    Even before Swindle's company was acquired by and absorbed into Defendants' fraudulent enterprise, Swindle was integral to keeping that enterprise afloat. Specifically, Swindle's company sold leads for diabetic patients to Ingram Medical—leads specifically tailored to reduce the risks associated with Alliance's business model.  In an October 15, 2012 e-mail to Jeffrey Smith (and later forwarded to Geoffrey Swindle), AHN proposed a lead vending/purchasing agreement between AHN and Ingram Medical.  AHN wrote:  "Below is a time line idea and potential pricing model.  Nothing is set in stone here and much of the pricing is due to eliminating the Big 3 without increased demand for the big 3 elsewhere . . . ."

227.    The "Big 3" were the three largest PBMs:  Express Scripts, CVS/Caremark, and Medco.  Ingram wanted to avoid leads for patients whose insurance was processed through the "Big 3" because diversifying its payor base would reduce the risks of audits, chargebacks, and contract cancellations resulting from Alliance's deceptive business practices.

228.    Swindle was well aware that Ingram's business practices involved significant risks and that leads management was a way of mitigating those risks.  In fact, when Ingram began negotiations to acquire AHN in late 2013, Ingram's primary reason for doing so were the "synergies" to be gained from AHN's leads business.  For example, On October 7, 2013, Jeffrey Smith e-mailed Geoffrey Swindle (and copied, among others, Alison Wistner):

> Geoff:
>
> Alison and I talked.  We are interested in pursuing the perspective [*sic*] opportunity; however, we will need some financial information ASAP.  We are going to focus on the synergies of the Leads business.  You and I discussed the synergies after the meeting. . . .

229.    Swindle's pitch for why Ingram should acquire AHN had a slightly different focus.  In a slide deck sent to Jeffrey Smith and Alison Wistner on October 8, 2013, Swindle wrote ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████

230.    Swindle's pitch thus reveals his knowledge of the numerous problematic aspects of Ingram's business model.  ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

231.     As discussed below, the Contribution and Asset Purchase Agreement effecting Ingram's acquisition of AHN contained a set of Purchaser Disclosure Schedules explicitly describing Ingram's practice of fraudulent adjudication.  Geoffrey Swindle negotiated and signed that Asset Purchase Agreement on behalf of AHN.

232.     After Ingram acquired AHN and Swindle became the Chief Strategy Officer of the new "Alliance," he attended a management meeting at which false adjudication was discussed.  On August 21, 2014, Alliance employee Chris Kennedy circulated a "Management Meeting Deck" to Alliance's executive team, which included Geoffrey Swindle. Slide 12 of that deck was titled "Key Discussion Items," and stated in part:

**Productive Paranoia Items**

- Audit Concerns/Challenges
    - NDC
    - Transfers
- Partnership Opportunities to Mitigate Risk
    - Bayer/Walgreens
- Protecting Our Core Business

Slide 24 of that deck was titled "Productive Paranoia – Key Opportunities," and stated in part:

**Need to Protect Our Core**

**Bayer – Partially Addresses NDC Issue**

. . .

**Walgreens – Addresses NDC and Audit Issues**

Additional slides in that deck discussed recent audits and contract terminations at Alliance Pharmacies, as well as chart listing the nine new pharmacies that Alliance was adding to its

"independent" pharmacy network.

233.    As noted throughout this Complaint, the "NDC Issue" was shorthand for the fact that Alliance Pharmacies were dispensing DME Strips while adjudicating claims for Retail Strips.  Swindle thus was aware of "the NDC issue," and that securing a source of Retail Strips through Bayer was intended to "Partially Address[] the NDC Issue," as early as August 2014.

234.    Swindle's reaction to learning that Plaintiff was inquiring into Alliance's misconduct also evidences his awareness of it.



235.

236.    David Goldsmith likewise recalled that before his resignation in October 2015, Swindle was one of the persons to whom he expressed concerns with Alliance's practice of

"putting in an NDC code different than the NDC on the box that was being given to the patient."

237.    Geoff Swindle resigned from Alliance on October 19, 2015.  Upon his departure, Swindle signed a release agreement forbidding him from discussing Alliance's fraudulent practices.  In exchange for his silence, Swindle received a severance package of six months' worth of his $200,000 salary.  Swindle's release agreement also acknowledged his vested stock options; Swindle later exercised his Unit Option Agreement and sold his stock back to Alliance for $1,121,793.75.  Swindle walked away from Alliance with over one million dollars knowing that the vast majority of that money came from fraud, and that he'd received that money in exchange for his promise to keep quiet.

**The Investor Defendants' and Director Defendants' Participation in and Authorization of the Fraud**

238.    The Hughes Entities, Mercato Partners, and Pritzker Group each invested millions of dollars in Alliance.  As a consequence, each had a representative on Alliance's Board of Directors, and acting both directly and through those representatives, each participated in, provided substantial assistance to, and/or conspired to further Alliance's fraud.

### The Hughes Entities

239.    The Hughes Entities acted primarily through Travis Hughes, who was on Alliance's Board of Directors as their agent and representative from in and after 2012.  Mr. Hughes is the Managing Director of Hughes & Company, which describes itself as a "growth-oriented private equity firm focused exclusively on the healthcare industry."  Hughes & Company's public-facing website, www.hughes-co.com, still advertises Alliance as part of its investment portfolio, and Travis Hughes' conducted business as a member of Alliance's Board of Directors through an e-mail address with the @hughes-co.com domain.

240.    On information and belief, Hughes and Company has at all relevant times held its investment in Alliance and its predecessors through HS MedSource Holdco, ██████



██████. The manager of HS MedSource Holdco is Kesman Hughes & Company which and the manager of Kesman Hughes & Company is Mr. Hughes.

241.   ████████████████████████████

████████████████████████████████

████████████████████████████████ Hughes & Company Investment Partners, LLC lists its address as 161 North Clark Street, Suite 1310, Chicago, Illinois 60601 with the Illinois Secretary of State.  That address is also listed as the address for Hughes & Company on its website.

**Mercato Partners**

242.   Mercato Partners, which describes itself as a "growth-oriented private equity firm focused exclusively on the healthcare industry," primarily acted first through Greg Warnock, who was made a member of Alliance's Board of Directors upon the closing of Mercato Partners' investment in or about May 2013.  Warnock is a co-founder and managing director of Mercato partners.  Alison Wistner replaced Warnock on the Alliance Board in or around October 2013.  Wistner was a managing director of Mercato Partners until she left the firm in or around September 2017.  Ms. Wistner conducted business as a member of Alliance's Board of Directors through an e-mail address with the @mercatopartners.com domain. Warnock and Wistner each acted as Mercato Partners' agent and representative on Alliance's Board of Directors.

243.   On information and belief, Mercato Partners has at all relevant times held its investment in Alliance and its predecessors through two special purpose vehicles, Mercato Partners Ingram, LLC, and Mercato Partners Ingram Co-Invest, LLC.  An entity named Mercato

Partners Growth II GP, LLC is the general partner of both those SPVs, and Greg Warnock is the

Managing Director of Mercato Partners Growth II GP, LLC.  Together, Mercato Partners

Ingram, LLC, and Mercato Partners Ingram Co-Invest, LLC invested $14 million in Alliance.

244.    On information and belief, all of the above-named Mercato Partners

entities, as well as Mercato Management, LLC, Mercato Partners Growth II GP, LLC, Mercato

Partners Growth Affiliates II, L.P. and Mercato Partners AI II, L.P share principal place of

business at 2750 East Cottonwood Parkway, Suite 500, Cottonwood Heights, Utah 84121.

**Pritzker Group**

245.    Pritzker Group, which advertises itself as "an investor in leading middle-

market businesses" with "a deeply rooted understanding and appreciation for building

businesses," acted through Adam Koopersmith, a Pritzker Group partner, who leads the firm's

healthcare practice and acted as Pritzker group's agent and representative on Alliance's Board

from not later than January 2014.  Koopersmith conducted business as a member of Alliance's

Board of Directors through an e-mail address with the @pritzkergroup.com domain.

246.    On information and belief, Pritzker Group has at all relevant times held its

investment in Alliance and its predecessors through two special purpose vehicles, NWV-Alliance

LLC and NWV Alliance 2 LLC, which are managed directly or indirectly by Jabodon PT

Company.

247.    On information and belief, all of the Pritzker Group entities share a

principal place of business at principal place of business at 111 South Wacker Drive, Suite 4000,

Chicago, Illinois 60606.

**The Investor Defendants Invested With Knowledge of and Because of the Fraud**

248.    Shipping diabetic testing supplies directly to patients was not a novel idea

when the Alliance entered that market in 2011.  What made Alliance unique were the ways it

increased profits by deceiving insurance companies and test strip manufacturers.  Indeed, it was Alliance's fundamentally deceptive business model that made it a "disruptor" in the industry and an enticing opportunity for investors like the Investor Defendants (and, as detailed below, Zions Bank).

249.    Each of the Investor Defendants knew when it invested that Alliance's business model and profits depended on misleading PBMs into believing that pharmacies surreptitiously owned and/or run by Alliance were brick-and-mortar "retail" businesses selling test strips to walk-in customers, when Alliance was in fact operating a mail order business through those pharmacies that shipped DME Strips to patients and then claimed reimbursement from the PBMs for sales of Retail Strips.  The profits generated by this fraud were the incentive for the Investor Defendants to invest in Alliance.

250.    That Alliance engaged in adjudication fraud and that its business would suffer if it were caught was explicitly disclosed to each of the Investor Defendants:

- 

- Incorporated into the May 15, 2013 Series B Preferred Unit Purchase Agreement

effecting Mercato Partners' investment in Ingram Medical was a schedule of disclosures made by Ingram to Mercato.  Schedule 2.25 was titled "Material Contracts," and Disclosure 2.25.397 stated:

> Certain Subsidiaries are licensed as retail pharmacies.  Such Subsidiaries applied for such license classification because each of the pharmacy benefit managers, with whom such Subsidiaries have contracted, owns its own mail order companies and will not contract with such Subsidiaries are licensed as a mail order pharmacy; however, all of such Subsidiaries' business is through mail order.  **Such Subsidiaries bill the patient's insurance under the retail pharmacy benefit but ship mail order diabetic testing supplies nationwide.**  Due to such practices of the Subsidiaries, it is possible that a pharmacy benefit manager may terminate its relationship with such Subsidiary and seek contractual remedies, which could have a material adverse effect on the Company and its Subsidiaries. (emphasis added).

• Incorporated into the January 17, 2014 Asset Purchase Agreement effecting Ingram Medical's acquisition of AHN—in which Pritzker Group had invested and was represented on its Board of Directors by Koopersmith—was a list of Purchaser Disclosure Schedules; Ingram was the "Purchaser."  Schedule 4.13 was titled "Claims and Proceedings," and the first disclosure in that Schedule stated:

> Certain subsidiaries of Purchaser are licensed as retail pharmacies.  Such subsidiaries applied for such license classification because each of the pharmacy benefit managers, with whom such subsidiaries have contracted, owns its own mail order companies and will not contract with such subsidiaries if such subsidiaries are licensed as a mail order pharmacy; however, all of such subsidiaries' business is through mail order.  **Such subsidiaries bill the patient's insurance under the retail pharmacy benefit but ship mail order diabetic testing supplies nationwide.**  Due to such practices of such subsidiaries, it is possible that a pharmacy benefit manager may terminate its relationship with such subsidiary and seek contractual remedies, which could have a Purchaser Material Adverse Effect.  (emphasis added).

251.    Notably, when Alliance was confronted with Plaintiff's June 2015 inquiries, Defendants Leavitt and Grant agreed that the language in these disclosures was clear enough on its own to bring Alliance's outside counsel "up to speed" on the relevant issues.  On

June 23, 2015, after David Grant concluded that Plaintiff was probing "the NDC issue," Leavitt

e-mailed Grant:

> David,
>
> I just spoke with Jeff.  Not sure if he said he's talked to you about this yet or not, but wanted you [and Alliance's outside counsel] to have a call tomorrow and start thinking about developing a loose plan of defense and try to identify, to the extent possible, what kind of liability we could have from this[]?
>
> Also, to help bring [outside counsel] up to speed, I wonder if we ought to provide him the paragraph on this issue that is in the schedules in Mercato's purchase agreement?

Later on June 23, 2015, Grant replied:

> Justin,
>
> I think providing the schedule to [outside counsel] is a great idea.  I am not sure where to lay my hands on it.

On June 24, 2015, Justin Leavitt forwarded Grant the language from the disclosures made to the

Corporate Defendants:

> Certain subsidiaries of Purchaser are licensed as retail pharmacies.  Such subsidiaries applied for such license classification because each of the pharmacy benefit managers, with whom such subsidiaries have contracted, owns its own mail order companies and will not contract with such subsidiaries if such subsidiaries are licensed as a mail order pharmacy; however, all of such subsidiaries' business is through mail order.  Such subsidiaries bill the patient's insurance under the retail pharmacy benefit but ship mail order diabetic testing supplies nationwide.  Due to such practices of such subsidiaries, it is possible that a pharmacy benefit manager may terminate its relationship with such subsidiary and seek contractual remedies . . . .

252.     Even before receiving that disclosure, Mercato and Pritzker had conducted

due diligence on Alliance's business that alerted them to the risk that Alliance was engaged in

adjudication fraud, and they proceeded with their investments anyway.

253.     Negotiations around Mercato Partners' investment began in March 2013,

when Mercato signed a term sheet with Alliance's predecessor corporation, Warner Diabetic,

LLC d/b/a Ingram Medical.  Thereafter, Alison Wistner began the process of conducting due

diligence on Ingram.

254.    On March 29, 2013, Wistner e-mailed Jeffrey Smith to ask if he would permit Mercato to use Craig Hartman as a consultant during its diligence assessment.  Hartman previously had worked at Caremark, a large PBM, and Simplex, a diabetes test strip seller, was eminently qualified to assist.  On March 30, 2013, Jeffrey Smith wrote to Wistner:  "We would be delighted to work with Craig Hartman."  Wistner hired Hartman to serve as Mercato's health care industry domain expert.

255.    Wistner sent Ingram a first round of due diligence questions on March 26, 2013.  On April 15, 2013, Wistner sent Ingram a list of follow-up questions.  On April 18, 2013, Craig Hartman reviewed Wistner's proposed follow-up questions and wrote to Wistner:



Wistner sent these questions to Ingram on April 18, 2013 ████████████████.

256.    The same day Wistner sent Hartman's follow-up questions to Ingram, Jeffrey Smith e-mailed Wistner directly:  "I wanted to make sure you were not sharing the names and information on any of our product suppliers with Craig (previously Simplex)."  Wistner replied that she would not and then, indicating her understanding of Hartman's concern, she

wrote, "His questions on inventory are around verifying that the supplies are for pharmaceutical reimbursement I think?"

257. Ingram responded to Hartman's diligence questions by providing information that Ingram had submitted to CVS/Caremark during a recent audit. On April 22, 2013, Hartman e-mailed Wistner (in pertinent part):

[redacted]

As discussed above, "[redacted]" is exactly what the Alliance Defendants were doing.

258. Wistner requested the additional data from Ingram, which again replied with non-responsive information that it had submitted during a recent audit—this time, an audit by Medco. On April 23, 2013, Hartman wrote to Wistner:

[redacted]

[redacted]

[redacted]

[redacted]

Later that day, Wistner e-mailed Ingram [redacted] Wistner forwarded her questions to Hartman, who

responded:  "Let me know how the conversation goes…I assume they want to move us off the NDC issue."

259.    On April 25, 2013, Ingram again replied to this inquiry with non-responsive materials it had submitted during a recent audit.  On April 26, 2013, Wistner e-mailed Hartman:  "█████████████████████████████████████████████████"

260.    On May 5, 2013, Wistner e-mailed Hartman requesting ████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████.

261.    ███████████████████████████████████████████████████ ████████████████████████████



262.    On May 8, 2013, Ingram e-mailed Wistner a document titled ███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████

263.    In an October 2018 deposition, Craig Hartman testified that he never received information that answered his questions on whether Ingram was dispensing a different product than what it was adjudicating to PBMs.  Ingram's persistent refusal—or, more

accurately, its inability—to answer Hartman's questions about possible adjudication fraud, though an obvious red flag, did not dissuade Mercato from going forward with its multi-million dollar investment.

264.    Mercato was also not put off by the part of Ingram's deceptive business model that Hartman had been able to pin down.  The final due diligence report Hartman provided to Mercato noted, *inter alia*, that



Mercato incorporated this advice into its internal investment memorandum, which described the "Market Risk" associated with Alliance:

> . . . Risk that PBMs might cancel contracts with Ingram's pharmacies if they discover the extent of mail order vs. retail pharmacy business under the contract. Ingram has lost 2 contracts to date, which resulted in 2,300 net patients lost.
>
> Ingram has been deliberate in diversify payor mix (<50% exposure to top 3 PBMs) and pharmacy location (<12,000 patients per pharmacy) to avoid scrutiny and has successfully managed frequent PBM audits. . . .

Mercato also received a report prepared for another investor that stated, *inter alia*, "roughly 98%" of Ingram's revenue came from diabetic test strips.  Thus, Mercato knew that Ingram was making almost all of its money from deceptive practices.

265.    While Mercato was happy to take all of the upside of Alliance's fraud, when it came time to ink the investment contract, Mercato sought to limit its exposure to the downside.  Among other things, Ingram warranted in the contract that its business was being operated lawfully, that it was not in breach of any material contracts, and that it had no undisclosed material liabilities.  However, the disclosure in Schedule 2.25 that Ingram was committing fraud by surreptitiously operating a mail order business that claimed reimbursement from PBMs for non-existent sales of retail product alerted Mercato to the fact that those

warranties were not true.  Hoping to preserve its ability to sue Ingram if the fraud exploded,

Mercato proposed to insert language in the contract stating that Ingram's disclosures would not

limit or qualify Ingram's representations and warranties or Mercato's ability to claim

indemnification for any breaches of those representations and warranties.

266.    Ingram would not agree.  On May 9, 2013, Mercato's counsel e-mailed

Alison Wistner, writing:



267.    The final agreement does not contain Mercato's proposed language

limiting the effects of Ingram's disclosures, indicating that Mercato ultimately agreed that it

would "shoulder the risks" of Alliance's fraud in exchange for sharing in the profits of the fraud.

268.    Pritzker Group also conducted diligence prior to investing in Alliance.

Pritzker Group originally invested in Alliance Health Networks ("AHN"), Geoffrey Swindle's

lead generation company.

269.    As a member of AHN's Board of Directors, Defendant Koopersmith was

involved in the negotiations for AHN's acquisition by Ingram Medical and conducted his own

due diligence on Ingram.  In an October 22, 2013 e-mail to members of AHN's Board of

Directors and, among others, Geoffrey Swindle, Koopersmith wrote:





(emphasis added).  As noted above, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████.

270.   In addition to indicating that ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

271.   On November 15, 2013—when Ingram and AHN were still negotiating

the acquisition—Alison Wistner e-mailed Koopersmith ████████████████████████

████████████████████████████████████

272.   When Ingram Medical acquired AHN in January 2014, Pritzker Group

retained approximately $10 million of equity in the newly formed "Alliance," and Koopersmith

became Pritzker Group's appointee to the merged entity's Board of Directors.

273.   Pritzker Group thus moved its investment from AHN to Alliance fully

understanding the fraud on which Alliance's business was based and approved of measures taken

by Alliance—such as the development of the "independent" pharmacy network—to prevent
discovery of its fraud.

### The Investor and Director Defendants Were Regularly Updated On The Fraud

274.    As discussed above, when Koopersmith joined Alliance's Board as
Pritzker Group's appointee, the company was poised to begin creating the web of "independent"
pharmacies that was specifically designed to perpetuate the false adjudication of diabetic test
strips.  On January 24, 2014, Koopersmith emailed his colleagues at Pritzker Group to update
them on that effort:



275.    The purpose of Alliance's independent pharmacy network—specifically,
to deceive PBMs—was discussed in numerous board meeting presentations and compliance
memoranda.  For example, in connection with the March 5, 2014 meeting of Alliance's Board of
Directors attended by, *inter alia*, Jeffrey Smith, Justin Leavitt, Blaine Smith, David Grant, Travis
Hughes (representing the Hughes Entities), Alison Wistner (representing Mercato Partners), and
Adam Koopersmith (representing the Pritzker Group), attendees were provided a slide deck.
Slide twelve in that deck was titled ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████████████

███████████

276.   Alliance's Board was also regularly apprised of Alliance's progress in growing its network of independent pharmacies:

- A March 5, 2014 memo to the Board stated that "As part of the continuing plan to diversify and avoid concentration of patients with any one pharmacy, we have established relationships with four currently operating independent pharmacies. . . .   An additional six independent pharmacies are at various stages of development.

- A November 18, 2014 memo to the Board of Directors boasted that "Alliance is currently working with ten independent pharmacies in the network, and there are six additional independent pharmacies in the pipeline."

- A February 24, 2015 memo to the Board of Directors stated: ███████
███████████████████████████████████████

- A May 13, 2015 memo to the Board of Directors stated: "Alliance is currently working with fifteen independent pharmacies in the network, and there [is] one additional independent pharmacy in the pipeline."

- An August 19, 2015 memo to the Board of Directors stated: "Alliance is currently working with sixteen independent pharmacies in the network."

277.   These same memoranda provided the Board with regular updates on mounting PBM audits, charge-backs, and contract cancellations at Alliance's affiliated pharmacies.  For example:

- The August 19, 2015 memo to the Board contained a table titled "PBM Contracts Lost Since 1/1/15."  That table listed 18 contract cancellations at 8 different corporate-owned and independent pharmacies.

- The August 24, 2016 memo to the Board contained a table titled "PBM Contracts Lost Since 1/1/2016" and listing 29 contract cancellations at 16 different corporate-owned and independent pharmacies.

- The November 16, 2016 memo to the Board's table of "PBM Contracts Lost Since 1/1/16" listed 41 contract cancellations at 18 different corporate-owned and independent pharmacies.

278.   In May 2016, the Board was also apprised of Alliance's plan to move from the "independent" pharmacy structure to the 10% PIC model in a further effort to perpetuate the

fraud.  The Board approved of that plan at its May 25, 2016 meeting, during which the Board

was told in a memorandum that the plan entailed misleading PBMs and regulators about the true

ownership of the pharmacies:  "All pharmacies will be structured with a 10% ownership in the

Pharmacist-in-Charge or the current owner and that individual will be the only person disclosed

in PBM contract applications or licensure applications."

279.    Board members, including Koopersmith, Wistner, and Hughes were also

apprised when Alliance's management learned of Plaintiff's June 2015 inquiries into the

company.  Contemporaneous notes made by Defendant Swindle memorialize conversations in

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████

280.    Alerted to the possibility that the fraud would be exposed, Koopersmith,

Wistner, and Hughes began a calculated effort to create a record of attempting to fulfill their

corporate governance responsibilities.

281.    On July 27, 2015, Adam Koopersmith e-mailed Wistner and Travis

Hughes:

> I've had a couple other AH conversations and it seems some of the difference of
> opinion also has to do with ongoing battles with the PBMs.  Some folks
> (confidentially) seem to believe that there are ways to change our business
> operations that may sacrifice margin but would (a) dramatically reduce the PBM
> risk we fight today and (b) make us a more attractive partner for pharma(cies) and
> specialty pharma(cies) going forward.  The two main areas seem to be around:
>
> -   Purchasing direct from manufacturer vs. the secondary markets.  It seems that
>     we now have direct relationships but are still going to the secondary market
>     because prices are slightly lower.  (Thus pissing off the manufacturers for a
>     little bit of margin, and not having the chain of custody HC folks like to see)
>
> -   Billing insurance companies under the retail reimbursement rate, even though
>     we're fulfilling via mail order.  This issue can be exacerbated if we're buying
>     one mail order product on the secondary market than billing back for a retail
>     product that receives higher reimbursement.  Again, the concern is that we're

prioritizing the short term margin over business practices that will drive better partner relationships over time.

You guys may be aware of these issues and have had these conversations, and now may or may not be the best time to raise them with Jeff (given we're scrambling for revenue /margin these days), but I wonder if it makes sense to have [Alliance Board of Directors Executive Chair] Matt Simas do a quick evaluation so we can develop our own impression from a board perspective.

What do you guys think?

Adam

282.    Later on July 27, 2015, Wistner replied to Koopersmith:

283.    Travis Hughes then responded,

284.    While ostensibly a discussion about developing a "board perspective" on the issues implicated in LifeScan's investigation, the July 27-28, 2015 email thread among Koopersmith, Wistner and Hughes makes clear

285.    Confirming that Koopersmith's July 27, 2015 email about developing a "board perspective" on Alliance's adjudication fraud was mere lip service, Koopersmith,

Wistner, Hughes, and Alliance's Board of Directors as a whole took no action on the issues

raised in the July 27, 2015 email.  The Board did not investigate, much less stop, the fraud, and

Alliance's deception-based business continued as usual.

286.    Several months later, in October 2015, the Board was forced to react again

in response to David Goldsmith's noisy resignation.

287.    As alleged above, on October 26, 2015, after becoming aware of

Alliance's adjudication fraud, Mr. Goldsmith sent Defendants Grant, Jeffrey Smith, and Blaine

Smith a resignation email in which he wrote that he would not be responsible "for executing a

pharmacy fulfillments strategy specifically designed to perpetuate business practices that are

without question unethical, and quite possibly illegal."  Several days before sending that email,

Mr. Goldsmith discussed his concerns with Koopersmith, prompting Koopersmith to send the

following email to Wistner and Hughes (with a cc: to Matthew Simas):

> Alison / Travis-
>
> Just checking in.  Per the note below from 4 months ago [Koopersmith's July 27, 2015 email], I just got off the phone with a very concerned Alliance employee about our pharmacy practices.  They reiterated that we are still relying on product from the secondary market, still refuse to collect co-pay and are illegally billing PBMs for products as if it was retail even though it is mail order.  They think it's immoral, illegal and are pissed that the practices are still going on and will likely expand as we bring on more "independent" pharmacies (they plan to resign in the coming weeks)
>
> I don't remember exactly, who is on the risk committee, but it would be great to get an update on where we are on these topics.

288.    On October 26, 2015, Hughes responded to Koopersmith's 22 e-mail,

adding Jeffrey Smith and David Grant to the conversation:

> Adam,
>
> The Board will need to address your concerns.
>
> **The issues outlined in your July 27 email are not new**, and we've been advised by the company, general counsel and outside counsel that the company's practices

meet legal and regulatory guidelines.

The employee's concerns from last week appear to be more specific.  Hopefully the employee you reference (assuming it is David Goldsmith?) shared his concerns with internal compliance and senior management including Jeff Smith and David Grant.  There are internal processes to address such concerns.

Given the escalation to the Board, the Board will need to seek counsel as how best to address the concerns, ensuring that the Company's practices meet compliance guidelines.

Travis

(Emphasis added.)

289.    Hughes' email admitted that the issue of Alliance's adjudication fraud was not new to the Board of Directors.  But Hughes suggestion that the Board had investigated the issues and been advised that they did not pose any legal or regulator problem was not true. There had been no investigation, and neither the company, nor its general counsel, nor its outside counsel had advised Alliance's Board that the company's adjudication fraud was legal.  And, of course, it was not legal.

290.    David Grant responded to Hughes' email the following day with an email to Koopersmith, Wistner, and Hughes (with Simas and Jeffrey Smith cc'd) stating that he was "preparing a memorandum addressing the concerns raised in Adam's October 22 email" that he would send to the Board after it was reviewed by outside counsel.  Grant then warned the Board members to be circumspect in their email communications and "to imagine any written correspondence as an exhibit in court."  He advised that "the best means to discuss issues that may involve potential liability is by telephone" and that "it is prudent to have a regular and documented practice of deleting emails after they have been maintained for a period of time and no longer serve a business purpose."

291.    Grant also correspondended separately about Koopersmith with Jeffrey Smith (with Blain Smith and Justin Leavitt copied), advising him in an October 26, 2015 email

that Koopersmith—whose loyalty had apparently come into question—could not be forced off the Alliance Board of Directors and would remain a Board member unless removed by the Pritzker Group entity that appointed him or he resigned.

292.    David Grant did, in fact, prepare a memorandum in response to Koopersmith's e-mail that discussed Alliance's fraud in detail.  Before circulating the final draft of that memorandum to the full Board of Directors, and before receiving input from outside counsel, Grant sent a preliminary draft of the memorandum to Wistner and Hughes for their comments.  As noted above, the memorandum unambiguously stated that Alliance was engaged in systematic adjudication fraud and was dependent on that fraud for its profitability.

293.    Hughes did not respond to David Grant's request for feedback in writing. Indeed, Hughes made no comment on the fact that Grant's memorandum admitted that Alliance engaged in adjudication fraud as alleged herein by Plaintiff, or that Alliance had no intention of stopping that practice because doing so was not economically feasible.

294.    Wistner, who seemingly saw no urgency to address to an issue of systemic fraud at Alliance, waited two days to provided her comments on the draft memo in an email to Grant dated November 1, 2015:

> Hi David,
>
> I reviewed the memo this afternoon and had a few thoughts that I'm happy to chat about tomorrow.
>
> Basic comments:
>
> - Should we quantify the liability potentially introduced by the chargebacks?  Is there a materiality issue?
>
> - Should we mention that our Medicare customers are not a significant number?
>
> - In the co-pay section, I don't know if we should include comments about occasional behavior by call center reps and/or form collection letters having been drafted.  I think some of the company's responses could come

in the form of a plan presented to the risk committee as a next step.  We could also mention the new tech infrastructure and e-commerce platform more capable of consistent credit card transactions, but again that might be better in a risk committee plan.

- Outside counsel mentioned PBM behavior as anticompetitive in some regards.  Is that relevant?

Interested to hear outside counsel comments here.

Thanks,

Alison

295.    Wistner remarkably had no comment on the fact that Grant's memorandum admitted that Alliance engaged in adjudication fraud as alleged herein by Plaintiff, or that Alliance had no intention of stopping that practice because doing so was not economically feasible.

296.    Neither Hughes nor Wistner commented on the obvious conflict of interest inherent in their being asked to comment on a memorandum that ostensibly was intended to provide the entire Board of Directors with an independent legal opinion on fraudulent practices within Alliance.

297.    Grant circulated the final draft of his memorandum to Alliance's Board of Directors on November 4, 2015.  It prompted no action.  Faced with a choice between continuing business as usual or stopping the fraud and gutting Alliance's profitability (and acquirability), the Investor Defendants and the Director Defendants, chose the former.

298.    Indeed, less than two months later, Koopersmith was helping Alliance find new independent pharmacies—pharmacies that Koopersmith knew would be used to commit thousands of acts of fraud.  On December 4, 2015, Alliance employee Morgan Mower e-mailed Koopersmith:



299.   Koopersmith replied later that day: ████████████████████ ███████████████████████ On December 7, 2015, Koopersmith forwarded ███████ ██████████████████████ to two people, writing: ████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████

300.   The Investor Defendants and the Director Defendants never acted to stop Alliance's fraud.  They facilitated its continuance until ESI and the FBI brought it to an end.

**Zions Bank Knowingly & Substantially Assisted Alliance's Fraud**

301.   Zions Bank extended tens of millions in credit to Alliance knowing that the funds would be used to operate a business engaged in fraud.  Zions Bank thereby knowingly and intentionally facilitated that fraud in order to generate profits in the form of interest and fees.

302.   On June 24, 2014, Alliance and Zions Bank executed a Credit Agreement refinancing Alliance's existing $36 million credit facility.  That agreement explicitly acknowledged that Alliance was engaged in a number of illegal activities.  The agreement also

explicitly acknowledged that Alliance's business was fundamentally fraudulent.

303.     The Credit Agreement expressly disclosed that the Alliance Pharmacies illegally distributed diabetes test strips in states where they are not licensed to do so:

> From time to time, certain Subsidiaries of Borrower have shipped diabetic testing supplies to customers located in various states where such Subsidiary has not been (and may still not be) licensed . . . .

304.     The Credit Agreement also acknowledged that Alliance most likely operates in violation of State Anti-Kickback Statutes:

> Approximately thirteen states have statutes patterned after the federal Anti-kickback Statute which prohibits payment of any remuneration for referrals of Medicare beneficiaries, though such state statutes are applicable to private insurance beneficiaries.  Those states could construe payments for qualified leads on a per lead basis as a violation of those statutes.

305.     The Credit Agreement also acknowledged that Alliance operated in violation of HIPAA.

306.     Most importantly, however, the Credit Agreement expressly acknowledged the fraudulent "foundational practice" on which Alliance's business was based: selling DME Strips but submitting them for insurance reimbursement as Retail Strips.

307.     In particular, paragraph 17 of the Credit Agreement explicitly acknowledged that Alliance Pharmacies shipped mail-order DME Strips to patients but billed PBMs for Retail Strips.  It stated that:  "Certain Subsidiaries of Borrower are licensed as retail pharmacies. . . . *Such Subsidiaries bill the patient's insurance under the retail pharmacy benefit but ship mail order diabetic testing supplies nationwide.*"

308.     Zions Bank was fully aware that this fraudulent practice rendered Alliance culpable and subjected Alliance to the risk of being caught.  Indeed, the very next sentence of the agreement noted that PBMs may seek to terminate their relationships with Alliance subsidiaries as a result of their practices:  "Due to such practices of such Subsidiaries, it is possible that a

pharmacy benefit manager may terminate its relationship with such subsidiary and seek contractual remedies."

309.   Having acknowledged that Alliance's business was premised on fraud, Zions Bank proceeded to structure the Credit Agreement for the express purpose of assisting and enabling this fraud.  Indeed, helping Alliance to conceal its widespread fraud was the essential rationale for the Credit Agreement.

310.   Prior to entering into the Credit Agreement, Don Rands, a Zions Bank Senior Vice President, presented a proposal to Zions Bank's Senior Loan Committee that showed he was fully aware of Alliance's fraudulent business model and abet the fraud.

311.   Mr. Rands's loan proposal explained that "[Alliance] has chosen to run its claims through 12 regional pharmacies to diversify its claims so that the volume of any one pharmacy does not appear significant or potentially damaging to the PBMs."

312.   The proposal further explained that because PBMs "could choose to cancel a reimbursement contract in place with a retailer," Alliance "has chosen to diversify through its network of 12 regional pharmacies—where Alliance will ship product to the pharmacies and have the local pharmacies process and ship the supplies and then submit a reimbursement claim to the [PBM] for adjudication (review, processing, and payment of a medical service claim)."  By routing claims through "independent pharmacies," Alliance created "a shield . . . from reimbursement pressure from the PBMs while diversifying concentrations."

313.   Zions Bank structured the Credit Agreement to help Alliance deceive PBMs into believing that its subsidiaries were independent pharmacies.  Under the Credit Agreement, a complex web of nominally separate bank accounts belonging to Alliance's subsidiaries was formed.  Although the accounts appeared to outsiders to be independent accounts belonging to independent companies, that was not the case.  Instead, the accounts

would "sweep" into a centralized account controlled by Alliance.  This structure, implemented by Zions Bank, permitted Alliance to disguise the fact that supposedly "independent" pharmacies were in fact operating together to effect a fraudulent scheme.

314.    During the course of its business relationship with Alliance, Zions Bank became aware of LifeScan's claims against Alliance for the fraud described herein.  In December 2015, Alliance informed Zions Bank that LifeScan "believes it may have claims against one or more Subsidiaries of [Alliance], and that its potential claims arise from product sourcing issues in connection with the sale of diabetic testing strips."

315.    On August 5, 2016, Alliance and Zions Bank executed the Second Amendment to the Credit Agreement.  As in the Credit Agreement itself, Zions Bank acknowledged that Alliance's business was predicated upon the Alliance pharmacies shipping DME Strips to patients but billing PBMs for Retail Strips.

316.    In the Second Amendment to the Credit Agreement, Zions Bank acknowledged that PBMs had sought to recover nearly $7 million in reimbursements wrongfully provided to Alliance Pharmacies that were in breach of their contracts with PBMs due to this fraud:

> During various audits of Borrower or its Subsidiaries, pharmacy benefit managers have discovered discrepancies and, in connection therewith, have demanded that Borrower or its Subsidiaries pay a recovery amount determined by the pharmacy benefit manager . . . .

317.    The Second Amendment to the Credit Agreement also acknowledged Alliance Pharmacies had lost their contracts with PBMs after the PBMs discovered those pharmacies' fraud.

318.    As alleged above, the collapse of Alliance's fraud scheme in the latter half of 2016 left Alliance unable to service its debt to Zions Bank, which issued a notice default on December 2, 2016.

319.     Sensing that the end was near, Zions Bank made an internal decision to disengage from its relationship with Alliance.  By mid-December 2016, it had begun making plans to implement that decision and communicated the decision to Alliance.

320.     The situation grew urgent, from Zions Bank's perspective, in late February 2017.  On February 22, 2017, with the outstanding balance on Alliance's credit facility approximately $30 million, Zions Bank was tipped off that the United States Department of Justice had obtained two warrants to seize money held in certain Alliance Bank accounts.  That same day, Zions Bank demanded that Alliance execute a joinder agreement to add **86** new parties as guarantors of Alliance's debt so that the assets of those entities—primarily companies owning Alliance Pharmacies—would serve as collateral for the debt.  Alliance, in league with Zions Bank, agreed to sign the joinder agreement.

**LifeScan Suffered Tens of Millions of Dollars in Damages as an Intended and/or Foreseeable Victim of Defendants' Fraud**

321.     As alleged above, Defendants committed and conspired to commit a years-long fraud wherein they caused the Alliance Pharmacies to submit false insurance claims stating that they had dispensed LifeScan's Retail Strips when they had, in fact, dispensed LifeScan's lower-priced DME Strips.  LifeScan was an intended and/or foreseeable victim of this fraud.

322.     Each time an Alliance-affiliated pharmacy falsely claimed to have dispensed a box of LifeScan Retail Strips, it obtained a reimbursement from a PBM that was intended to provide Alliance a reasonable profit on a box of Retail Strips purchased for somewhere between $46 and $62.  Alliance, however, caused its pharmacies to dispense DME Strips acquired for far less than that amount on the gray market and thereby fraudulently inflated its profits.

323.     Alliance's fraudulently inflated profits came largely at LifeScan's

expense, because LifeScan pays substantial rebates to PBMs on the reimbursements they pay to

pharmacies on sales of Retail Strips.  Thus, each time Alliance caused one of its pharmacies to

fraudulently obtain a reimbursement from a PBM for a non-existent sale of LifeScan Retail

Strips, it also caused LifeScan to pay a substantial rebate to the PBM on that non-existent sale.

The net result, illustrated below, is that instead of making a profit on a sale of Retail Strips,

LifeScan suffered a loss on a sale of DME Strips:[2]



324.    In the aggregate, LifeScan suffered a loss in the tens of millions of dollars,

as detailed below.

325.    That LifeScan would be victimized in this fashion was known and/or

foreseeable to Defendants.  As experienced and sophisticated participants in the blood glucose

---

[2]   The numbers shown in the diagram below are for illustrative purposes as the actual numbers varied
within a range over time.

test strip industry and/or having conducted extensive due diligence on that industry, Defendants knew that the false reimbursement claims submitted by the Alliance pharmacies would be transmitted to LifeScan via rebate claims and would be relied on by Plaintiff to its detriment.

326.    It is widely known throughout the blood glucose test strip industry—and therefore was known to Defendants as Alliance's officers, directors, and sophisticated investors that conducted due diligence—that manufacturers like LifeScan, Abbott, and Roche pay rebates to Pharmacy Plans.  David Goldsmith, Alliance's former Vice President of Corporate Strategy and Business Development testified in deposition that knowledge of manufacturer rebates was "basic to being in the test strip industry."

327.    Defendants, as persons knowledgeable about the blood glucose test strip industry, understood that the rebates paid to PBMs by test strip manufacturers explain why Pharmacy Plans are willing to pay higher reimbursement rates than DME Plans.

328.    Defendants, as persons knowledgeable about the blood glucose test strip industry, likewise understood that a primary reason why test strip manufacturers like LifeScan package product sold through DME Plans differently than product sold through Pharmacy Plans, and implement other measures to prevent product packaged for DME Plans from being sold through Pharmacy Plans, is because manufacturers pay rebates on product sold through Pharmacy Plans and, therefore, need to prevent lower-priced DME Strips from being sold through that channel to avoid losing money.

329.    In addition, numerous documents and communications between the Defendants reveal their knowledge of manufacturer rebates.  For example, on December 4, 2012, Jeffrey Smith sent an e-mail with the subject line "PBM INFO SLIDES" to Sahily Paoline, Blaine Smith, Justin Leavitt, and the co-founder of Alliance's predecessor corporation, Kevin Plumb.  Attached to Jeffrey Smith's e-mail was a slide deck titled "The PBM Model."  The first

slide of that deck contained a diagram of PBM revenue streams, one of which was "Manufacturers." The slide explained: "large pharma companies pay rebates for having their drugs on formulary and rebates are frequently shared with large employers."

330. On April 25, 2013, Kevin Plumb e-mailed Jeffrey Smith in connection with an investor's decision to divest from Alliance. The subject line of Plumb's e-mail was "Plexus Info – TPA and MFG Direct Points." Plumb discussed one of Alliance's initiatives for mitigating the risk of PBM contract cancellations: establishing "Diabetic Manufacturer Direct Relationship[s]." Plumb wrote to Smith that manufacturers "desire to bring their customers directly to Ingram Medical for fulfillment rather than paying 'preferred status' rebates to PBMs."

331. On October 9, 2013, a consultant from Pharmacy Healthcare Solutions, Inc. ("PHSI"), which had been hired by Alliance to evaluate the possibility of Alliance launching its own PBM, e-mailed Blaine Smith, Jeffrey Smith, and Justin Leavitt a slide presentation focused on ██████████████ A diagram on the third slide ██████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████

332. On March 10, 2014, Jeffrey Smith e-mailed the PSHI slide deck to Alliance's Board of Directors, including Alison Wistner, Adam Koopersmith, and Travis Hughes, announcing that Alliance was "contemplating launching [its] own PHARMACY BENEFIT MANAGEMENT COMPANY." On March 10, 2014, Jeffrey Smith forwarded that e-mail and the slide deck to Sahily Paoline.

333. On October 20, 2014, Justin Leavitt e-mailed a draft slide deck titled "Management presentation: October 2014" to Blaine Smith, Geoff Swindle, and Jeffrey Smith. A diagram on the seventh slide in that deck depicted an arrow pointing from a box labeled

"Pharma manufacturer" to a box labeled "PBM"; next to the arrow was written "Negotiated rebates."

334.    In a July 10, 2015 e-mail to Alliance's executive team, Geoffrey Swindle wrote that at a meeting with representatives of Walmart, those representatives disclosed that PBMs were not interested in covering Walmart-branded strips "because the PBMs don't receive rebates" for those strips.

335.    On July 13, 2015, after Alliance became aware of Plaintiff's inquiries into Alliance, Alliance's outside counsel e-mailed David Grant, Jeffrey Smith, Justin Leavitt, Blaine Smith, and Sahily Paoline:

> All—
>
> I communicated with a client that received a demand letter from Lifescan last year. . . . I don't know how much I can read into our situation based on theirs, but that client shared with me some Lifescan correspondence that outlines its case for damages, as follows below. . . .
>
> Lifescan says:
>
> . . .
>
> In submitting insurance claims to pharmacy benefit payors using the incorrect NDC number, your company has caused Lifescan to pay rebates to Medi-Cal and managed care organizations for discounted product which was intended for DME beneficiaries only.
>
> . . .

336.    On September 23, 2015, Sahily Paoline e-mailed Amy McMurtry to ask that she review and add items to a list of questions to ask pharmacies that Alliance was considering adding to its network.  Attached to that e-mail was a document titled "Operational Questions for Indies."  That document contained ten categories of questions, with the ninth category titled "Secondary Product."  Under this category, Paoline wrote:  "Explain different distribution channels, manufacturer rebates to PBM . . . ."

**Damages**

337.    Between 2009 and 2015, the currently-known Alliance-affiliated pharmacies submitted reimbursement claims for at least 57,395,765 Retail Strips—the equivalent of 1,147,915 50-count boxes.  During this same period, the currently-known Alliance-affiliated pharmacies and their affiliates purchased a mere 392,475 Retail Strips—the equivalent of 7,850 50-count boxes.

338.    With the exception of the reimbursement claims for 7,850 boxes of Retail Strips the Alliance Pharmacies actually purchased from authorized wholesalers, the Alliance Pharmacies' reimbursement claims for Retail Strips were fraudulent.  1,140,065 of the 1,147,915 boxes for which the Alliance Pharmacies submitted retail reimbursement claims were in fact boxes of DME Strips.

339.    The Pharmacy Beneficiaries who purchased these 1,147,915 boxes of LifeScan DME Strips would have purchased Retail Strips but for Defendants' fraud.  That is what those individuals intended to purchase; that is what their insurance plans covered; that is what fit the LifeScan meters they used.  Accordingly, but for Defendants' fraud, LifeScan would have sold 1,147,915 additional boxes of Retail Strips.

340.    LifeScan, having already paid rebates on the non-existent sales of 1,147,915 boxes of Retail Strips, is entitled as damages to, *inter alia,* the additional revenue it would have received had Alliance actually sold those boxes of Retail Strips (for which LifeScan receives between $46 and $62 per box) instead of selling DME Strips (for which LifeScan receives $24 or less per box).  In total, this amounts to not less than $50 million, and that figure is conservative because there are likely to be additional Alliance pharmacies LifeScan is not yet aware of and because it does not account for the fraud that continued throughout 2016.

**FIRST CLAIM FOR RELIEF**
**RACKETEERING (18 U.S.C. § 1962(c))**
**(Against All Defendants Except ZB, N.A.)**

341.   LifeScan incorporates by reference all the foregoing allegations as if fully

set forth herein.

342.   LifeScan is, and at all relevant times has been, a "person" within the

meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

343.   Each of the Defendants is, and at all relevant times has been, a person

within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) and (d).

344.   Alliance (including its predecessors, Alliance Health Networks, Inc.,

Warner Diabetic, LLC, and Medsource Rx Pharmacy, LLC, et al.) was at all relevant times an

enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

345.   Alliance and together with its "independent" pharmacies (including

Alameda Pharmacy, Baytree Pharmacy, Cordele Pharmacy, Cure Pharmacy, David Pharmacy, El

Dorado Pharmacy, Genesee Pharmacy, Hawkins Pharmacy, Jefferson Pharmacy, Oak Creek

Pharmacy, Peterson Pharmacy, Riverfront Pharmacy, Rock City Pharmacy, Staley Pharmacy,

Twin Lakes Pharmacy), its corporate-owned pharmacies (including Aspire Pharmacy, Brighton

Pharmacy, Everest Pharmacy, Medsource Pharmacy, New Life Pharmacy, and Stonybrook

Pharmacy), and its wholesaling entities (including SP Diabetic, LLC; Alta Distributors, LLC;

and Ollin Pharmaceuticals, LLC) were at all relevant times an association-in-fact enterprise (the

"Alliance Association-in-Fact Enterprise") within the meaning of 18 U.S.C. §§ 1961(3) and

1962(c).

346.   The purpose of the Alliance Association-in-Fact Enterprise was to

generate profits through committing adjudication fraud in relation to blood glucose test strips.

347.   There was an ongoing structure and relationships among the entities

comprising the Alliance Association-in-Fact Enterprise.  Alliance owned and/or controlled the

wholesaling entities, which provided test strips to the "independent" and corporate owned

pharmacies, which were owned and/or controlled by Alliance and used as instrumentalities to

commit adjudication fraud and thereby generate profits that were funneled up to Alliance.

348.    The Alliance Association-in-Fact Enterprise existed from at least 2011

into 2017.

349.     Alliance and the Alliance Association-in-Fact Enterprise each at all

relevant times engaged in, or conducted activities which affected, interstate or foreign

commerce.

350.    Defendants were each associated with Alliance and with the Alliance

Association-in-Fact Enterprise, within the meaning of 18 U.S.C. § 1962(c), as a senior officer,

director, or major investor in Alliance and its predecessors.

351.    Defendants each conducted or participated, directly or indirectly, in the

conduct of the affairs of Alliance and the affairs of the Alliance Association-in-Fact Enterprise

through a pattern of racketeering activity, within the meaning of 18 U.S.C. §§ 1961(5) and

1962(c), consisting of thousands of instances of mail fraud, in violation of 18 U.S.C. § 1341, and

wire fraud, in violation of 18 U.S.C. § 1343.

352.    The aforementioned racketeering activity was intended to and did further a

scheme Defendants devised to defraud and obtain money by means of false and fraudulent

pretenses wherein employees of Alliance and/or employees of members of the Alliance

Association-in-Fact Enterprise would purchase LifeScan DME Strips, sell those DME Strips to

Pharmacy Plan beneficiaries, and claim reimbursement from PBMs for non-existent sales of

LifeScan's higher-priced Retail Strips.

353.    Defendants, on thousands of occasions during the period extending from

at least 2011 into 2017, for the purpose of executing or attempting to execute the aforementioned scheme to defraud and obtain money by means of false and fraudulent pretenses, caused shipments of LifeScan DME Strips to be sent across state lines by commercial interstate carrier. Each such shipment constituted a violation of the federal mail fraud statute, 18 U.S.C. § 1341.

354.    Defendants, on thousands of occasions during the period extending from at least 2011 into 2017, for the purpose of executing or attempting to execute the aforementioned scheme to defraud and obtain money by means of false and fraudulent pretenses, caused the transmission of false insurance reimbursement claims—*i.e.*, claims misrepresenting sales of LifeScan DME Strips as sales of LifeScan Retail Strips—by means of wire communication in interstate or foreign commerce.  Each such transmission constituted a violation of the federal mail fraud statute, 18 U.S.C. § 1343.

355.    The conduct of Defendants' scheme was continuous, escalating, and of substantial duration and would have continued had it not been discovered and interrupted. Further, Defendants' scheme had no finite end and, on information and belief, targeted multiple victims.  *See Roche Diagnostics Corp. and Roche Diabetes Care, Inc. v. Jeffrey C. Smith, et al.*, Case No. 2:19-cv-08761-CCC-CLW (D.N.J.).  Each Defendant's last racketeering activity occurred after the effective date of 18 U.S.C. § 1961, et seq., and each Defendant's last racketeering act occurred within 10 years after the commission of a prior act of racketeering activity.

356.    LifeScan suffered direct and substantial injury to its business and property as a direct and proximate result of Defendants' above-described violation of 18 U.S.C. § 1962(c), including but not limited to the loss of tens of millions of dollars of revenue LifeScan would have received on sales of LifeScan Retail Strips that would have occurred but for the Defendants' racketeering activity and fraud, the loss of tens of millions of dollars that LifeScan

rebated to PBMs as a direct result of the false insurance reimbursement claims Defendants caused to be submitted to the PBMs, and LifeScan's costs incurred in detecting and investigating Defendants' racketeering activity and fraud.

357.     Pursuant to 18 U.S.C. § 1964(c), LifeScan is entitled to recover treble its compensatory damages, plus interest, costs and attorneys fees.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**RACKETEERING CONSPIRACY (18 U.S.C. § 1962(d))**
**(Against All Defendants)**

</div>

358.     LifeScan incorporates by reference all the foregoing allegations as if fully set forth herein.

359.     During the period from in or about 2011 until in or about 2017, Defendants violated the provisions of 18 U.S.C. § 1962(d) by conspiring to violate the provisions 18 U.S.C. § 1962(c);  to wit, Defendants each knowingly agreed that they and/or others would conduct and/or facilitate conducting the affairs of Alliance and the affairs of the Alliance Association-in-Fact Enterprise through the above-described pattern of racketeering activity consisting of thousands of instances of mail fraud, in violation of 18 U.S.C. § 1343, and wire fraud, in violation of 18 U.S.C. § 1341.

360.     LifeScan suffered direct and substantial injury to its business and property as a direct and proximate result of Defendants' above-described violation of 18 U.S.C. § 1962(d), including but not limited to the loss of tens of millions of dollars of revenue LifeScan would have received on sales of LifeScan Retail Strips that would have occurred but for the Defendants' racketeering activity and fraud, the loss of tens of millions of dollars that LifeScan rebated to PBMs as a direct result of the false insurance reimbursement claims Defendants agreed would be and caused to be submitted, and LifeScan's costs incurred in detecting and investigating Defendants' racketeering activity and fraud.

361.   Pursuant to 18 U.S.C. § 1964(c), LifeScan is entitled to recover treble its compensatory damages, plus interest, costs and attorneys fees.

**THIRD CLAIM FOR RELIEF**
**RACKETEERING (N.J. Stat § 2C:41-2(c))**
**(Against All Defendants Except ZB, N.A.)**

362.   LifeScan incorporates by reference all the foregoing allegations as if fully set forth herein.

363.   LifeScan is, and at all relevant times has been, a "person" within the meaning of N.J. Stat. §§ 2C:41-1(b) and 2C:41-4(c).

364.   Each of the Defendants is, and at all relevant times has been, a person within the meaning of N.J. Stat. §§ 2C:41-1(b) and 2C:41-2(c).

365.   Alliance (including its predecessors, Alliance Health Networks, Inc., Warner Diabetic, LLC, and Medsource Rx Pharmacy, LLC, et al.) was at all relevant times an enterprise within the meaning of N.J. Stat. § 2C:41-1(c).

366.   Alliance and together with its "independent" pharmacies (including Alameda Pharmacy, Baytree Pharmacy, Cordele Pharmacy, Cure Pharmacy, David Pharmacy, El Dorado Pharmacy, Genesee Pharmacy, Hawkins Pharmacy, Jefferson Pharmacy, Oak Creek Pharmacy, Peterson Pharmacy, Riverfront Pharmacy, Rock City Pharmacy, Staley Pharmacy, Twin Lakes Pharmacy), its corporate-owned pharmacies (including Aspire Pharmacy, Brighton Pharmacy, Everest Pharmacy, Medsource Pharmacy, New Life Pharmacy, and Stonybrook Pharmacy), and its wholesaling entities (including SP Diabetic, LLC; Alta Distributors, LLC; and Ollin Pharmaceuticals, LLC) were at all relevant times an association-in-fact enterprise (the "Alliance Association-in-Fact Enterprise") within the meaning of N.J. Stat § 2C:41-1(c).

367.   The purpose of the Alliance Association-in-Fact Enterprise was to generate profits through committing adjudication fraud in relation to blood glucose test strips.

368.     There as an ongoing structure and relationships among the entities comprising the Alliance Association-in-Fact Enterprise.  Alliance owned and/or controlled the wholesaling entities, which provided test strips to the "independent" and corporate owned pharmacies, which were owned and/or controlled by Alliance and used as instrumentalities to commit adjudication fraud and thereby generate profits that were funneled up to Alliance.

369.     The Alliance Association-in-Fact Enterprise existed from at least 2011 into 2017.

370.     Alliance and the Alliance Association-in-Fact Enterprise each at all relevant times engaged in, or conducted activities which affected, interstate or foreign commerce.

371.     Defendants were each associated with Alliance and with the Alliance Association-in-Fact Enterprise as a senior officer, director, or major investor in Alliance and its predecessors.

372.     Defendants each conducted or participated, directly or indirectly, in the conduct of the affairs of Alliance and the affairs of the Alliance Association-in-Fact Enterprise through a pattern of racketeering activity, within the meaning of N.J. Stat. § 2C:41-1(a) and (d), consisting of thousands of instances of mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.  These federal fraud violations constituted racketeering activity under N.J. Stat. § 2C:41-1(a)(2).

373.     The aforementioned racketeering activity was intended to and did further a scheme Defendants devised to defraud and obtain money by means of false and fraudulent pretenses wherein employees of Alliance and/or employees of members of the Alliance Association-in-Fact Enterprise would purchase LifeScan DME Strips, sell those DME Strips to Pharmacy Plan beneficiaries, and claim reimbursement from PBMs for non-existent sales of

LifeScan's higher-priced Retail Strips.

374.    Defendants, on thousands of occasions during the period extending from at least 2011 into 2017, for the purpose of executing or attempting to execute the aforementioned scheme to defraud and obtain money by means of false and fraudulent pretenses, caused shipments of LifeScan DME Strips to be sent across state lines by commercial interstate carrier. Each such shipment constituted a violation of the federal mail fraud statute, 18 U.S.C. § 1341.

375.    Defendants, on thousands of occasions during the period extending from at least 2011 into 2017, for the purpose of executing or attempting to execute the aforementioned scheme to defraud and obtain money by means of false and fraudulent pretenses, caused the transmission of false insurance reimbursement claims—*i.e.*, claims misrepresenting sales of LifeScan DME Strips as sales of LifeScan Retail Strips—by means of wire communication in interstate or foreign commerce.  Each such transmission constituted a violation of the federal mail fraud statute, 18 U.S.C. § 1343.

376.    LifeScan suffered direct and substantial injury to its business and property as a direct and proximate result of Defendants' above-described violation of N.J. Stat § 2C:41-2(c), including but not limited to the loss of tens of millions of dollars of revenue LifeScan would have received on sales of LifeScan Retail Strips that would have occurred but for the Defendants' racketeering activity and fraud, the loss of tens of millions of dollars that LifeScan rebated to PBMs as a direct result of the false insurance reimbursement claims Defendants caused to be submitted to the PBMs, and LifeScan's costs incurred in detecting and investigating Defendants' racketeering activity and fraud.

377.    Pursuant to N.J. Stat. § 2C:41-4(c), LifeScan is entitled to recover treble its compensatory damages, plus interest, costs and attorneys fees.

**FOURTH CLAIM FOR RELIEF**
**RACKETEERING CONSPIRACY (N.J. Stat. § 2C:41-2(d))**
**(Against All Defendants)**

378.   LifeScan incorporates by reference all the foregoing allegations as if fully set forth herein.

379.   During the period from in or about 2011 until in or about 2017, Defendants violated the provisions of N.J. Stat. § 2C:41-2(d) by conspiring to violate the provisions N.J. Stat. § 2C:41-2(c);  to wit, Defendants each knowingly agreed that they and/or others would conduct and/or facilitate conducting the affairs of Alliance and the affairs of the Alliance Association-in-Fact Enterprise through the above-described pattern of racketeering activity consisting of thousands of instances of mail fraud, in violation of 18 U.S.C. § 1343, and wire fraud, in violation of 18 U.S.C. § 1341.

380.   LifeScan suffered direct and substantial injury to its business and property as a direct and proximate result of Defendants' above-described violation of N.J. Stat. § 2C:41-2(c), including but not limited to the loss of tens of millions of dollars of revenue LifeScan would have received on sales of LifeScan Retail Strips that would have occurred but for the Defendants' racketeering activity and fraud, the loss of tens of millions of dollars that LifeScan rebated to PBMs as a direct result of the false insurance reimbursement claims Defendants agreed would be and caused to be submitted, and LifeScan's costs incurred in detecting and investigating Defendants' racketeering activity and fraud.

381.   Pursuant to N.J. Stat. § 2C:41-4(c), LifeScan is entitled to recover treble its compensatory damages, plus interest, costs and attorneys fees.

**FIFTH CLAIM FOR RELIEF**
**Fraud (Including Aiding & Abetting Fraud and Conspiracy to Commit Fraud)**
**(Against all Defendants)**

382.   LifeScan incorporates by reference all the foregoing allegations as if fully

set forth herein.

383.    Defendants knowingly and intentionally made and caused to be made thousands of false insurance reimbursement claims to numerous Pharmacy Plans and their agents.  These insurance reimbursement claims falsely represented that the Alliance pharmacies had dispensed LifeScan's Retail Strips to patients, when in fact they had sold DME Strips.

384.    Defendants knew and intended that the Pharmacy Plans and their agents would pay reimbursements to the Alliance pharmacies in reliance on the misrepresentations in the thousands of false insurance reimbursement claims Defendants made or caused to be made.

385.    Defendants also knew and intended that the false representations they made or caused to be made to the Pharmacy Plans and their agents—that Alliance pharmacies had dispensed LifeScan's Retail Strips—would be passed on to LifeScan when the Pharmacy Plans and their agents sought rebates from LifeScan on reimbursements and that LifeScan would rely on the false representations in paying such rebates to the insurance companies and their agents.

386.    Defendants could not have perpetrated their fraud without the substantial and material assistance of each other Defendant.  Each Defendant benefited from the success of the fraud.

387.    Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to defraud LifeScan.  All Defendants adopted the goal of furthering and facilitating this conspiracy.

388.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the submission of false insurance claims, shipments of LifeScan Retail Strips to Pharmacy Plan beneficiaries, and other acts set forth above.

389.    LifeScan, the Pharmacy Plans and their agents justifiably relied on Defendants' misrepresentations and were unaware of Defendants' fraud.

390.    As a result of Defendants' conduct, Plaintiff has been injured in an amount not less than $50 million.

### SIXTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(Against all Defendants)**

391.    LifeScan incorporates by reference all the foregoing allegations as if fully set forth herein.

392.    Defendants caused the Alliance pharmacies to misrepresent to Pharmacy Plans and their agents that the product they were selling was Retail Strips when they in fact sold DME Strips.  These misrepresentations were passed along by the insurance companies to Plaintiff, directly causing LifeScan to pay the insurers millions of dollars in rebates.

393.    As a result of these false representations, Defendants wrongfully obtained a monetary benefit to which they were not legally entitled.

394.    Each Defendant benefitted as a result of the additional profits Defendants made as a result of their false representations.  Defendants have no right to retain these unjust gains.

395.    If Defendants are permitted to keep this monetary benefit, it would be manifestly unjust.

### SEVENTH CLAIM FOR RELIEF
**Negligent Misrepresentation**
**(Against all Defendants)**

396.    LifeScan incorporates by reference all the foregoing allegations as if fully set forth herein.

397.    Defendants caused the Alliance pharmacies to misrepresent to Pharmacy

Plans and their agents that they were selling Retail Strips when in fact they were selling DME

Strips.  These statements of fact and material omissions were false and misleading.  Additionally,

these statements and omissions were negligent because Defendants did not exercise reasonable

care in verifying the accuracy of these statements or in ensuring that they did not fail to make

material disclosures.

398.    Defendants did not take any affirmative steps to correct their materially

false statements or material omissions.

399.    Defendants had a duty to provide the Pharmacy Plans with accurate

information because they knew and intended the Pharmacy Plans would rely on their false

representations and material omissions in providing reimbursements to Defendants.  Defendants

further knew and intended LifeScan would rely on Defendants' false representations and material

omissions in providing rebates to Pharmacy Plans.

400.    The Pharmacy Plans and LifeScan reasonably relied upon Defendants'

misrepresentations and material omissions and were unaware that they were false.

401.    As a result of Defendants' conduct, Plaintiff was injured in an amount not

less than $50 million.

**EIGHTH CLAIM FOR RELIEF**
**Tortious Interference With Prospective Business Relation**
**(Against all Defendants)**

402.    Plaintiff hereby repeats and re-alleges the allegations in paragraphs 1 to

115 above as if set forth fully herein.

403.    Defendants caused the Alliance pharmacies to misrepresent to insurance

companies and their agents that the product they were selling was Retail Strips when they in fact

sold DME Strips.

404.    These misrepresentations deprived Plaintiff of the sale of millions of

dollars' worth of Retail Strips and wrongfully caused Plaintiff to pay millions of dollars in rebates to insurance companies.

405.    Defendants' malicious interference with Plaintiff's reasonable expectations of economic advantage caused losses to Plaintiff.

406.    As a result of Defendants' conduct, Plaintiff was injured in an amount not less than $50 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against all Defendants as follows:

(a)  an order entering judgment in favor of Plaintiff against Defendants, jointly and severally;

(b)  compensatory damages in an amount to be determined, but in no event less than $50 million;

(c)  treble damages on Plaintiff's first, second, third, and fourth causes of action;

(d)  punitive damages on Plaintiff's remaining causes of action;

(e)  pre-judgment and post-judgment interest;

(f)  an order awarding Plaintiff's reasonable attorneys' fees and other costs;

(g)  a permanent injunction against Defendants, as well as all of those in active concert or participation with them, with notice thereof, enjoining and restraining all of them from engaging in the unlawful conduct alleged herein; and

(h)  for such additional relief as the Court finds just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims asserted in its complaint.

## **CERTIFICATION OF NON-ARBITRABILITY AND NON-MEDIATION**

In accordance with Local Rule 201.1(d)(1), I certify that the within matter is not subject to compulsory arbitration or to mediation because this action does not consist only of money damages not in excess of $150,000, exclusive of interest and costs and any claim for punitive damages.

Dated:  July 5, 2019

*/s/ Thomas R. Curtin*
Thomas R. Curtin
George C. Jones
McELROY, DEUTSCH, MULVANEY
 & CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075
Tel:  (973) 993-8100
Fax:  (973) 425-0161
E-mail:  tcurtin@mdmc-law.com
 gjones@mdmc-law.com

Kevin S. Reed, Esq. (*pro hac vice*)
Kimberly E. Carson, Esq. (*pro hac vice* to be submitted)
Joanna E. Menillo, Esq.
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
51 Madison Avenue
New York, New York  10010
Tel: (212) 849-7000
Fax: (212) 849-7100
E-mail:  kevinreed@quinnemanuel.com
 kimberlycarson@quinnemanuel.com
 joannamenillo@quinnemanuel.com

*Attorneys for Plaintiff LifeScan, Inc.*